## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**MEGAN MORYC**,

                Plaintiff,

v.

**MICHIGAN STATE POLICE**, a
department of the State of Michigan;
**JAMES F. GRADY II**; **AIMEE
BRIMACOMBE**; **LISA GEE-CRAM**;
**DALE HINZ**; **CAMERON HENKE**;
**JASON NEMECEK**; **MICHAEL
DILLON**; **ERIK DARLING**;
**KANDYCE HERR**; **THOMAS
DEASY**; **MATTHEW WILLIAMS**;
**NICOLE BOCK**; **KEVIN SWEENEY**;
**ANDREW FIAS**; **RYAN MAKI**;
**MICHAEL STEPHENS**; **BRIAN
BUEGE**; **ROBERT DAVIS**; and
**SCOTT ZIESMAN**; officially and
in their personal capacities,

                Defendants.

Case No. 1:25-cv-1127

Hon.

JURY DEMAND

---

Elizabeth K. Abdnour (P78203)
ABDNOUR WEIKER LLP
325 E. Grand River Ave., Ste. 250
East Lansing, MI 48823
(517) 994-1776
liz@awlawohio.com

*Attorneys for Plaintiff*

---

## **COMPLAINT AND JURY DEMAND**

NOW COMES Plaintiff MEGAN MORYC, by and through her attorneys, ABDNOUR

WEIKER LLP, and hereby files the following Complaint against Defendants as captioned above.

1

## INTRODUCTION

1.      Megan Moryc is a dedicated, hardworking Michigan State Police (MSP) Trooper and lifelong Michigan resident.  She joined Michigan State Police in 2016 because she wanted to help keep our State safer and give back to the community.  She successfully made it through the challenging MSP Trooper School, which MSP itself compares to "military boot camp."

2.      From the beginning, Michigan State Police set Tpr. Moryc up for failure.  After Trooper School, Tpr. Moryc was assigned to the MSP Lakeview Post in Montcalm County, Michigan.  While the majority of Tpr. Moryc's male counterparts were assigned to a post within their top three choices, Tpr. Moryc was assigned to her fourteenth choice.  Despite MSP's promise to try to keep married couples and families close to home, Tpr. Moryc was forced to arrange separate housing away from her husband, as the Lakeview Post was almost two hours away from Marshall, Michigan, where they lived.  This caused significant strain on Tpr. Moryc's marriage.

3.      Unbeknownst to her, the second supervisor she was assigned in November 2016, Tpr. Trevin Antcliff, was a known sexual harasser who had a reputation for engaging in inappropriate communications and conduct with women.  MSP reportedly assigned Tpr. Moryc to Tpr. Antcliff's supervision because she was married, and by some flawed logic believed her marital status would protect her from harassment.  It did not.

4.      Tpr. Antcliff began sexually harassing Tpr. Moryc almost immediately.   He repeatedly propositioned her for dates and sex, knowing she lived almost two hours away from her husband.  Eventually, she felt powerless to continue resisting the advances of her supervisor, who was also vital in determining whether she was permitted to make it past probationary status as an employee, and she agreed to begin a sexual relationship with him.  This decision broke up her marriage.  Their relationship continued, and Tpr. Antcliff became increasingly abusive.  Tpr.

2

Moryc feared reporting the abuse to MSP, as she was afraid both parties would be terminated.  Tpr. Antcliff's abuse escalated until Tpr. Moryc feared for her life.

5.      Tpr. Moryc also experienced rampant sexual harassment and discrimination from other MSP employees in the workplace.  She was repeatedly forced to endure sexual comments and jokes, condoms being placed in her backpack, male troopers watching pornography in the workplace, and lewd comments about her female coworkers.  Eventually, Tpr. Moryc could not take the abuse anymore, and in February 2020, she filed the first of a series of reports of sexual assault, harassment, and discrimination against other MSP employees.  Due to Tpr. Antcliff's abuse and threats, Tpr. Moryc was not safely able to report his sexual assault, discrimination, and harassment to MSP until April 2023, after she ended their relationship.

6.      Almost immediately after making her first report in February 2020, Tpr. Moryc became the victim of a sustained, unrelenting retaliation by MSP employees from within the Lakeview Post all the way up to the very top of MSP.  The retaliation continues to this day, as MSP has not allowed Tpr. Moryc to work since 2021, unlawfully withheld health insurance payments from her paycheck for periods during which she was not covered by MSP insurance, attempted to interfere with her law enforcement certification recertification process, repeatedly violated her rights under her collective bargaining agreement, and misrepresented information in Michigan courts of law, among a long series of retaliatory acts.

7.      Despite it all, Tpr. Moryc wants nothing more than to return to work and get back to the job of keeping Michiganders safe from abuse from bad actors and holding wrongdoers accountable.  After all she has been through, it is difficult to imagine anyone more qualified for the job than Tpr. Moryc.

## JURISDICTION AND VENUE

8.     This Court has original jurisdiction over Plaintiff's federal and Constitutional claims under 28 U.S.C. §§ 1331 and 1361.

9.     This Court has the authority to grant declaratory and injunctive relief and to compel or set aside agency action to address duties arising under the Constitution, laws, or treaties of the United States. 42 U.S.C. § 1983, 28 U.S.C. § 2201 and 5 U.S.C. §§ 702, 704, and 706.

10.     Pursuant to 28 U.S.C. § 1391(b), venue lies in the Western District of Michigan as the events giving rise to this action occurred in and around the Counties of Montcalm, Ionia, and Gratiot, State of Michigan.

## PARTIES

11.     Plaintiff Megan Moryc is a current resident of Ionia County, Michigan.  From 2016 to 2018, Plaintiff was a resident of Montcalm County, and from 2018 to present, Plaintiff has been a resident of Ionia County.  At all relevant times, Plaintiff has been a resident of the State of Michigan and an employee of Michigan State Police, working within the Lakeview Post which covers Montcalm, Ionia, and Gratiot Counties.

12.     Defendant Michigan State Police (MSP) was at all relevant times and continues to be a Department of the State of Michigan, headquartered in Eaton County, State of Michigan, organized and existing under the laws of the State of Michigan.

13.     At all relevant times, Defendant Colonel James F. Grady II, in his official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  From September 2023 to present, Col. Grady has served as the Director of MSP.

14.     At all relevant times, Defendant Lieutenant Colonel Aimee Brimacombe, in her

4

official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of her employment.  From December 2023 to present, Lt. Col. Brimacombe has served as the Chief Deputy Director of MSP.

15.    At all relevant times, Defendant Lisa Gee-Cram, in her official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of her employment.  At all relevant times, Gee-Cram has served as Inspector of MSP's Human Resources Division.

16.    At all relevant times, Defendant Lieutenant Colonel Dale Hinz, in his official capacity, worked within Kent and Eaton Counties, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  At all relevant times until around August 2021, Lt. Col. Hinz served as the Captain (first in command) of MSP's Sixth District.  Since around August 2021 to March 2024, Lt. Col. Hinz served as Deputy Director of MSP's Field Services Bureau.

17.    At all relevant times, Defendant Captain Cameron Henke, in his official capacity, worked within Kent and Eaton Counties, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  At all relevant times until around August 2021, Capt. Henke served as the Inspector (second in command) of MSP's Sixth District.  At all relevant times since around August 2021 to present, Capt. Henke has served as Commander of MSP's Special Investigation Division within the Field Operations Bureau.

18.    At all relevant times, Defendant Captain Jason Nemecek, in his official capacity, worked within Kent County, State of Michigan, and was an agent and/or employee of MSP, acting

or failing to act within the scope, course, and authority of his employment.  At all relevant times until around August 2021, Capt. Henke served as the Inspector (second in command) of MSP's Sixth District.  At all relevant times since around August 2021 to present, Capt. Nemecek has served as Commander of MSP's Sixth District.

19.     At all relevant times, Defendant Detective First Lieutenant Michael Dillon, in his official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  At all relevant times, Det. F/Lt. Dillon has served as the Commander of MSP's First District Special Investigation Section.

20.     At all relevant times, Defendant Detective Lieutenant Erik Darling, in his official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  At all relevant times, Det. Lt. Darling has served as the Assistant Section Commander of MSP's First District Special Investigation Section.

21.     At all relevant times, Defendant Detective Sergeant Kandyce Herr, in her official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of her employment.  At all relevant times, Det. Sgt. Herr has served as a Detective Sergeant within MSP's First District Special Investigation Section.

22.     At all relevant times, Defendant Captain Thomas Deasy, in his official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  At all relevant times until approximately January 2025, Capt. Deasy served as the Commander of MSP's Transparency

and Accountability Division.

23.     At all relevant times, Defendant Captain Matthew Williams, in his official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  At all relevant times since approximately January 2025, Capt. Williams has served as the Commander of MSP's Transparency and Accountability Division.

24.     At all relevant times, Defendant First Lieutenant Nicole Bock, in her official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of her employment.  At all relevant times since around March 2023, F/Lt. Bock has served as a First Lieutenant within MSP's Professional Standards Division.

25.     At all relevant times, Defendant First Lieutenant Kevin Sweeney, in his official capacity, worked within Montcalm County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.   From approximately July 2016 to approximately February 2020, F/Lt. Stephens served as the Commander of the Lakeview Post.

26.     At all relevant times until around September 2022, Defendant First Lieutenant Andrew Fias, in his official capacity, worked within Montcalm County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.   From approximately June 2020 to approximately September 2022, F/Lt. Fias served as the Commander of the Lakeview Post.

27.     At all relevant times, Defendant First Lieutenant Ryan Maki, in his official capacity, worked within Montcalm County, State of Michigan, and was an agent and/or employee

7

of MSP, acting or failing to act within the scope, course, and authority of his employment.   From approximately September 2022 to approximately August 2024, F/Lt. Maki served as the Commander of the Lakeview Post.

28.    At all relevant times, Defendant First Lieutenant Michael Stephens, in his official capacity, worked within Montcalm County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.   At all relevant times since approximately January 2024, F/Lt. Stephens has served as the Commander of the Lakeview Post.

29.    At all relevant times, First Lieutenant Brian Buege, in his official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.   At all relevant times, F/Lt. Buege has served as the Commander of MSP's Recruiting and Selection Section.

30.    At all relevant times, Lieutenant Robert Davis, in his official capacity, worked within Montcalm and Kent Counties, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.   At all relevant times until around 2020, Lt. Davis served as the Assistant Post Commander of the Lakeview Post.   At all relevant times since around 2020, Lt. Davis has served as Detective Lieutenant in the Sixth District.

31.    At all relevant times, Sergeant Scott Ziesman, in his official capacity, worked within Ingham and Eaton Counties, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment. At all relevant times, Sgt. Ziesman served as Squad Sergeant of the Lakeview Post.

## APPLICABLE LAW AND POLICIES

32.    Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 *et seq.*,

states that it shall be an unlawful employment practice for an employer:

> (1) to fail or refuse to hire or to discharge any individual, or
> otherwise to discriminate against any individual with respect to his
> compensation, terms, conditions, or privileges of employment,
> because of such individual's race, color, religion, sex, or national
> origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for
> employment in any way which would deprive or tend to deprive any
> individual of employment opportunities or otherwise adversely
> affect his status as an employee, because of such individual's race,
> color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

33.    Under Title VII, 42 U.S.C. § 2000e-2, the term "employer" means a person engaged

in an industry affecting commerce who has fifteen or more employees for each working day in

each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of

such a person.

34.    Under Title VII, 42 U.S.C. § 2000e, the term "employee" means an individual

employed by an employer.

35.    The First Amendment to the United States Constitution provides that Congress

shall make no law "abridging the freedom of speech." U.S. Const. amend. I.

36.    First Amendment retaliation claims apply to public officials speaking as private

citizens on matters of public concern. *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017); *Garcetti

v. Ceballos*, 547 U.S. 410 (2006).

37.    For a public employee in the Sixth Circuit to "prove a First Amendment retaliation

claim, [she] must show: (1) [s]he engaged in protected speech; (2) the defendant took an adverse

action against h[er]; and (3) there is a causal connection between the protected speech and the adverse action." *Josephson v. Ganzel*, 115 F.4th 771, 783 (6th Cir. 2024).

38.    While a public employee's  speech may conflict with an "employer's interests in running an efficient workplace . . . the First Amendment protects a public employee's speech if: (1) the speech was on a matter of public concern; (2) the speech was not made pursuant to the employee's official duties; and, assuming the employee can satisfy the first two elements, (3) the employee's interest in speaking on a matter of public concern outweighs the employer's interest in promoting the efficiency of the public services it performs through its employees." *Id.* at 783-84 (internal citations omitted).

39.    In *Kentucky v. Graham*, the Supreme Court held that personal-capacity suits seek to impose personal liability upon a government official for actions they take under color of state law. Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which [a government official] is an agent." 473 U.S. 159, 165 (1985) (quoting *Monell v. Dep't of Soc. Svcs. of the City of New York*, 436 U.S. 658, 690 n.55 (1978).

40.    To establish municipal liability under section 1983, a plaintiff must establish that (1) they have suffered a deprivation of a constitutionally protected interest and (2) that the deprivation was caused by an official policy, custom, or usage of the municipality. *Monell*, 436 U.S. at 694.

41.    The Fifth Amendment to the U.S. Constitution provides that "No person shall be… deprived of life, liberty, or property, without due process of law…." U.S. Const. amend. V.

42.    The Fourteenth Amendment to the U.S. Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

## FACTUAL ALLEGATIONS

**Background Information**

43.    Plaintiff Megan Moryc has been employed as a Trooper by MSP since March 2016.

44.    In around November 2016, MSP assigned Tpr. Moryc to the second and shadow phase of her field training under the supervision of Field Training Officer (FTO) Trooper Trevin Antcliff at the MSP Lakeview Post in Lakeview, Michigan.

45.    The Lakeview Post is overseen by MSP's Sixth District Headquarters Grand Rapids Post.

46.    The Sixth District is overseen by MSP's Field Operations Division.

47.    The Field Operations Division is overseen by the Director and Deputy Director of MSP.

48.    At the time Tpr. Moryc began in 2016, Tpr. Antcliff had a reputation within MSP for being dangerous to women.

49.    Upon information and belief, MSP assigned Tpr. Moryc to Tpr. Antcliff because she was married at the time and MSP staff believed that would protect her from any unwanted advances by Tpr. Antcliff.

50.    Tpr. Moryc's marital status did not protect her.

51.    Tpr. Antcliff began a campaign of pressure and coercion until Tpr. Moryc ultimately surrendered to a sexual and romantic relationship with him, ultimately moving into Tpr. Moryc's home in September 2018 after her relationship with her ex-husband had deteriorated.

52.    Starting in mid 2016 through October 2020, Tpr. Moryc was repeatedly forced to endure sexual comments and jokes, condoms being placed in her backpack, male troopers watching pornography in the workplace, and lewd comments about her female coworkers from

11

male troopers within the Lakeview Post.

53.     Eventually, Tpr. Moryc could not take the abuse anymore, and in February 2020, she filed the first of a series of reports of sexual assault, harassment, and discrimination against other MSP employees.

54.     Tpr. Moryc's male colleagues filed both internal and criminal complaints against her in October 2020 for engaging in horseplay of the exact same type in which they frequently engaged.

55.     MSP immediately suspended Tpr. Moryc when those complaints were filed against her.

56.     The criminal charges led to a criminal conviction against Tpr. Moryc and a 30-day jail sentence.

57.     As will be described later in this Complaint, Tpr. Moryc only learned that the complaint against her was made in retaliation for filing complaints of sex discrimination against the male troopers when she received responses to a FOIA request her former attorney made in November 2024.

58.     Although Tpr. Moryc has technically been employed by MSP since 2016, she has been on administrative leave since October 19, 2020, on which date her badge was taken away, and has not been returned to her.

59.     MSP terminated Tpr. Moryc on August 9, 2021, without going through the progressive discipline process identified in the Michigan State Police Troopers Association (MSPTA)-MSP collective bargaining agreement.

60.     As a result, MSPTA filed a grievance on behalf of Tpr. Moryc, and MSPTA and MSP had entered voluntary labor arbitration to resolve the grievance.

61.    On February 3, 2022, the arbitrator, Kathleen Opperwall, had found for Tpr. Moryc and MSPTA, reducing Tpr. Moryc's termination to a two-month unpaid suspension and awarding Tpr. Moryc reinstatement to her position and back pay.  Ex. 1.

62.    MSP has been fighting compliance with the 2022 arbitration award since the day it was issued.

63.    To date, MSP has not allowed Tpr. Moryc to return to duty and has engaged in a years-long pattern of discrimination and retaliation for reporting and speaking out against sex discrimination and harassment within MSP.

**MSP's Retaliation Against Tpr. Moryc through the MSPTA-MSP Grievance Process, Arbitration, and Litigation Related to her Wrongful Terminations**

64.    In February 2022, Arbitrator Opperwall found that former Capt. Hinz's decision to terminate Tpr. Moryc was too severe, citing Tpr. Moryc's clean disciplinary record and finding MSP's disparate use of progressive discipline as cause to overturn the termination decision and reinstate Tpr. Moryc with back pay.

65.    At that point, for the first time in forty years, MSP chose to break the negotiated rules of the MSPTA-MSP CBA and sought to overturn Arbitrator Opperwall's arbitration award in the Ingham County Circuit Court.

66.    On September 19, 2022, Ingham County Circuit Court Judge James Jamo reversed Arbitrator Opperwall's arbitration decision. *Mich. St. Police v. Mich. St. Police Troopers Ass'n.*, No. 22-136-CZ (Ingham Co. Cir. Ct. Sep. 19, 2022).

67.    MSPTA appealed Judge Jamo's decision to the Michigan Court of Appeals.

68.    On December 28, 2023, the Michigan Court of Appeals issued a unanimous decision reversing and remanding Judge Jamo's decision. *Mich. St. Police v. Mich. St. Police Troopers Ass'n.*, No. 363241 (Mich. App. Dec. 28, 2023).

13

69.     On February 8, 2024, in MSP's unprecedented third, but not final, attempt to vacate Tpr. Moryc's arbitration award, for the first time ever, MSP sought leave to appeal the Michigan Court of Appeals' decision to the Michigan Supreme Court.

70.     On September 18, 2024, the Michigan Supreme Court denied MSP's request for leave to appeal.  *Mich. St. Police v. Mich. St. Police Troopers Ass'n*., No. 166669 (Mich. Sep. 18, 2024).

71.     On or around November 18, 2024, Attorney Dlugos filed a motion to enforce the 2022 arbitration award in Ingham County Circuit Court, as MSP had still failed to comply with all the terms.

72.     Upon information and belief, on or around November 27, 2024, Insp. Gee-Cram contacted Arbitrator Opperwall and asked her to modify Tpr. Moryc's award.

73.     Upon information and belief, Insp. Gee-Cram asked Arbitrator Opperwall to change her 2022 ruling to find that MSP no longer had to pay Tpr. Moryc because of her lapse in Michigan Commission on Law Enforcement Standards (MCOLES) certification and to find that Tpr. Moryc would only receive the back pay in the award if she became MCOLES certified.

74.     Pursuant to the Uniform Arbitration Act, an arbitrator may only modify or correct an award on motion of a party under the following circumstances:

> (1) On motion to an arbitrator by a party to an arbitration proceeding, the arbitrator may modify or correct an award on any of the following grounds:
>
> (a) A ground stated in section 24(1)(a) or (c).
>
> (b) Because the arbitrator has not made a final and definite award on a claim submitted by the parties to the arbitration proceeding.
>
> (c) To clarify the award.
>
> (2) A motion under subsection (1) must be made and notice given to

14

all parties within 20 days after the moving party receives notice of the award.

M.C.L. 691.1700.  Or:

On motion made within 90 days after the moving party receives notice of the award under section 19 or within 90 days after the moving party receives notice of a modified or corrected award under section 20, the court shall modify or correct the award if any of the following apply:

(a) There was an evident mathematical miscalculation or an evident mistake in the description of a person, thing, or property referred to in the award.

(b) The arbitrator has made an award on a claim not submitted to the arbitrator and the award may be corrected without affecting the merits of the decision on the claims submitted.

(c) The award is imperfect in a matter of form not affecting the merits of the decision on the claims submitted.

M.C.L. 691.1704(1).

75.    None of these requirements applied to Insp. Gee-Cram's request.

76.    Further, the deadline for making such a motion was either 20 or 90 days from the date of the award, depending on the grounds, as listed above.

77.    Insp. Gee-Cram's motion, made over two and a half years after the arbitration award was issued, was well outside the required timeline of either 20 or 90 days.

78.    On December 18, 2024, a hearing was held in Ingham County Court before Judge James S. Jamo on MSP's motion to enforce Tpr. Moryc's 2022 arbitration award.

79.    On December 20, 2024, Judge Jamo ruled in MSPTA and Tpr. Moryc's favor and issued an order to enforce the arbitration award.

80.    On or around January 17, 2025, MSP filed a motion for relief from judgment with Ingham County Circuit Court, seeking to overturn Judge Jamo's December 20, 2024, order—

15

MSP's fifth attempt to overturn the 2022 arbitration award.

81.    On February 12, 2025, the motion for relief from judgment was heard by Judge Rosemarie Aquilina in Ingham County Circuit Court.

82.    At that hearing, MSP, through its counsel, falsely stated that Tpr. Moryc's MCOLES reactivation could proceed before the investigations into her were completed.

83.    MSP also falsely stated that Tpr. Moryc's lapse in MCOLES certification was because Tpr. Moryc did not attempt to keep it by working for another law enforcement agency.

84.    At both hearings, MSP's counsel was accompanied by Risk Management F/Lt. Richard Chaffee, who served as MSP's representative.

85.    F/Lt. Chafee has a law degree and knows MSP policies, so MSP had every opportunity to correct MSP's counsel if her understanding of the process was mistaken.

86.    As Tpr. Moryc had learned when she tried to obtain employment with UMPD in September 2023, according to MSP's supplemental employment rules, Tpr. Moryc was barred from working for another law enforcement agency while she was employed by MSP, even though she was on investigatory suspension.

87.    In addition, also in September 2023, MSP had told MSPTA that MCOLES would not reactivate her license until all appeals of her 2022 arbitration award were complete.

88.    MSP's counsel also made several other false statements at the hearing:

    a.    That MSP did not have a similar case in which an MSP employee had their MCOLES license lapse;

    b.    Tpr. Moryc could have applied for supplemental employment to maintain her MCOLES certification while the appeals were pending;

    c.    MSP could not legally comply with the order without Tpr. Moryc's MCOLES

certification (at the time, MSP employed 2 other male troopers whose MCOLES certification had lapsed, allowing them to complete administrative duties while they awaited their MCOLES reactivation);

d.  MSP did not have a position Tpr. Moryc could work in where MCOLES certification was not needed;

e.  Tpr. Moryc could have applied to get her MCOLES license back;

f.  Tpr. Moryc could have acted as a law enforcement officer while on suspension;

g.  Tpr. Moryc was not attempting to get her MCOLES license back;

h.  Tpr. Moryc was not barred from working at MSP.

89.    After the hearing, Judge Aquilina upheld Judge Jamo's order but modified it to require that Tpr. Moryc remain actively engaged in obtaining her MCOLES reactivation to stay on MSP's payroll and complete the MCOLES packet by March 14, 2025, otherwise Tpr. Moryc would be "forfeiting" her employment with MSP, based on MSP's false statements to the court.

90.    This modification placed an impossible obligation on Tpr. Moryc, as she could not comply with the order to actively engage in obtaining her MCOLES reactivation so long as MSP continued to appeal the 2022 arbitration award, according to MCOLES' own rules.

91.    As described in detail later in this Complaint, MSP also terminated Tpr. Moryc's employment a second time on February 13, 2025, the day after the hearing before Judge Aquilina.

92.    Therefore, per MCOLES rules, Tpr. Moryc also could not apply to reactivate her MCOLES certification because she had been terminated.

**MSP's Retaliation Against Tpr. Moryc In Other Fora from March 2023 to Present**

93.    Between 2021 and 2023, Tpr. Antcliff became sexually violent and physically abusive towards Tpr. Moryc but, due to MSP ignoring several of her prior complaints of sex

discrimination and harassment at the Lakeview Post, as well as its attempt to wrongfully terminate her and its ongoing fight to overturn the 2022 arbitration award, Tpr. Moryc was afraid to make a report as she feared MSP would not protect her and likely retaliate against her.

94.     Tpr. Antcliff's abuse continued to escalate but Tpr. Moryc feared leaving because of his power and authority over her within MSP, MSP's failure to address her prior complaints, and its ongoing efforts to terminate her and deny her back pay.

95.     On or around March 11, 2023, Tpr. Antcliff told Tpr. Moryc he would be staying at his sister's house in Grand Rapids, Michigan, and did not know when he would return.

96.     On or around that same date, Tpr. Antcliff disconnected Tpr. Moryc's cell phone so she could not make or receive phone calls or texts.

97.     Finally, Tpr. Moryc saw an opportunity to safely escape from Tpr. Antcliff and remove him from her home.

98.     Tpr. Moryc sent some of Tpr. Antcliff's belongings to his mother's house and asked his mother to notify him that if he attempted to regain entry to her home, she would file a motion for a personal protection order (PPO).

99.     On or around March 18, 2023, to intimidate her using his law enforcement power, Tpr. Antcliff returned to Tpr. Moryc's home to retrieve his patrol vehicle and uniforms from the driveway, escorted by MSP Tpr. Bower, a friend and former trainee of Tpr. Antcliff's.

100.    Tpr. Bower was in full uniform, arriving in a police car, acting in law enforcement capacity, at the request of Tpr. Antcliff.

101.    On or around March 23, 2023, Tpr. Moryc was contacted by MSP Lakeview Post Commander First Lieutenant Ryan Maki.

102.    F/Lt. Maki told Tpr. Moryc that Tpr. Antcliff had made comments to squad Sergeant

Randall Jordan, which Sgt. Jordan said he needed to report to F/Lt. Maki for guidance.

103.    F/Lt. Maki told Tpr. Moryc he did not want to see her get "jammed up" by the MSP if she did not allow Tpr. Antcliff to return to the residence to retrieve the rest of his belongings.

104.    F/Lt. Maki told Tpr. Moryc that Tpr. Antcliff intended to file a criminal complaint against Tpr. Moryc if she did not allow Tpr. Antcliff to return to the residence.

105.    F/Lt. Maki advised Tpr. Moryc to seek legal advice.

106.    These comments indicated to Tpr. Moryc that MSP and F/Lt. Maki that they intended to take Tpr. Antcliff's side against her, as a female employee, even though she was the victim of his abuse.

107.    Fearing MSP would not hesitate to open a retaliatory criminal investigation against her, Tpr. Moryc immediately contacted an attorney.

108.    After consulting with an attorney, Tpr. Moryc contacted F/Lt. Maki and advised him of the legal advice the attorney had provided, including her intent to file a PPO against Tpr. Antcliff if he attempted to enter the residence before the specified date.

109.    F/Lt. Maki responded with a heavy sigh at the mention of a PPO.

110.    On or around April 4, 2023, Assistant Post Commander Lt. Cory Zimmerman was assigned to oversee the civil standby at Tpr. Moryc's home while Tpr. Antcliff retrieved the rest of his belongings, which Tpr. Moryc had packed and placed in the garage.

111.    As a show of force and intimidation, Tpr. Antcliff brought his family and friends with him to assist him in retrieving his belongings.

112.    On or around April 9, 2023, Tpr. Moryc contacted F/Lt. Maki to file a complaint against Tpr. Antcliff for domestic violence and sexual abuse.

113.    MSP opened both criminal justice and an internal investigation into the complaint.

114.    In the criminal justice investigation, on or around April 11, 2023, MSP Detective Sergeant Kandyce Herr interviewed Tpr. Moryc.

115.    At that interview, Tpr. Moryc disclosed a lengthy history of emotional, physical, and sexual abuse by Tpr. Antcliff to D/Sgt. Herr.

116.    In violation of the Crime Victim Rights Act, M.C.L. 780.753, D/Sgt. Herr failed to use the MSP-required standard domestic violence incident report or provide Tpr. Moryc with required information in writing.

117.    Upon information and belief, on or around April 27, 2023, D/Sgt. Herr submitted a warrant request and a domestic violence report to the Ionia County Prosecutor's Office.

118.    Upon information and belief, D/Sgt. Herr violated MSP policy and law by failing to investigate Tpr. Antcliff for sexual assault against Tpr. Moryc.

119.    In her email to the Ionia County Prosecutor's Office, D/Sgt. Herr wrote that Tpr. Moryc and Tpr. Antcliff provided a significant amount of evidence in the investigation, most of which D/Sgt. Herr felt was not relevant to the investigation.

120.    D/Sgt. Herr also wrote that the evidence provided to her in the investigation which she felt was relevant to the case were the photos Tpr. Moryc took of her face after Tpr. Antcliff punched her in October 2022.

121.    In fact, Tpr. Moryc had provided significant additional relevant evidence to D/Sgt. Herr, including but not limited to domestic abuse police reports filed by Tpr. Antcliff's second ex-wife, evidence of the destruction Tpr. Antcliff caused in a December 2022 incident, and other documentation supportive documentation of  a history of domestic violence perpetrated by Tpr. Antcliff on her.

122.    On or around May 5, 2023, D/Sgt. Herr texted Tpr. Moryc to inform her the Ionia

County Prosecutor's Office had requested that a special prosecutor be assigned by the Michigan Attorney General's office to review the domestic violence report.

123.    On or around July 19, 2023, D/Sgt. Herr called Tpr. Moryc and told her that the Barry County Prosecutor's Office had declined to bring any criminal charges against Tpr. Antcliff.

124.    D/Sgt. Herr violated MSP policy and the law by failing to update Tpr. Moryc, a victim, of the case status, including the assignment of the Barry County Prosecutor's Office as the special prosecutor.

125.    Tpr. Moryc was never contacted by the Barry County Prosecutor's Office as a victim of domestic violence and sexual assault.

126.    In the internal investigation, MSP Professional Standards F/Lt. Brody Boucher[1] assigned Special Lieutenant Carissa Horan as the investigator.

127.    F/Lt. Brody Boucher was aware that, in 2021, Tpr. Moryc had filed a complaint of harassment against Spl/Lt. Horan but assigned her anyway.

128.    Upon information and belief, Spl/Lt. Horan intentionally hid her role as the investigator from Plaintiff by asking Spl/Lt. Ryan Tabaczka to conduct Tpr. Moryc's victim interview as a "favor."

129.    Upon information and belief, Spl/Lt. Horan provided Spl/Lt. Tabaczka with specific questions to ask Tpr. Moryc which were not relevant to the domestic abuse and sexual assault allegations.

130.    Upon information and belief, Spl/Lt. Tabaczka had previously investigated Tpr. Antcliff for failing to investigate a domestic assault.

131.    On or around August 17, 2023, Spl/Lt. Ryan Tabaczka interviewed Tpr. Moryc and

---

[1] F/Lt. Bouchet retired soon after, at which point newly promoted F/Lt. Nicole Bock took over supervision of the investigation.

misled her into believing he was the investigator assigned to the internal investigation.

132.    Spl/Lt. Tabaczka's primary focus of the investigation was Tpr. Moryc's time as a probationary trooper when Tpr. Antcliff was her Field Training Officer from 2016 to 2017, and not the domestic violence or sexual assault incidents she had reported.

133.    In the investigation, Tpr. Moryc disclosed to Spl/Lt. Tabaczka numerous instances of domestic violence and sexual assault Trp. Antcliff committed against her.

134.    Spl/Lt. Tabaczka asked Tpr. Moryc if she had ever been sexually assaulted by Tpr. Antcliff.

135.    In response, Tpr. Moryc graphically detailed multiple incidents.

136.    Tpr. Moryc asked Spl/Lt. Tabaczka to notify before and after he conducted his interview of Tpr. Antcliff as she feared retaliation.

137.    Spl/Lt. Tabaczka agreed to do so.

138.    Spl/Lt. Tabaczka never notified Tpr. Moryc either before or after his interview with Tpr. Antcliff.

139.    At his March 25, 2025 deposition, Spl/Lt. Tabaczka testified that F/Lt. Bock ordered him to cease all communication with Tpr. Moryc because Tpr. Moryc had made a "formal complaint," so he was not to have any direct contact with her and to save any communications he had with her.

140.    On or around September 1, 2023, Tpr. Moryc believed she saw Tpr. Antcliff driving through her neighborhood, traveling towards her house, and notified Spl/Lt. Tabaczka by text.

141.    Spl/Lt. Tabaczka did not respond.

142.    On or around September 4, 2023, Spl/Lt. Horan contacted Trp. Antcliff's second ex-wife, Nina Antcliff.

143.    Spl/Lt. Horan's questions to Ms. Antcliff were focused on Tpr. Moryc's time under Tpr. Antcliff as probationary trooper in 2016-2017.

144.    At no time during the interview did Spl./Lt. Horan ask Ms. Antcliff about any domestic violence or sexual assault against Tpr. Antcliff towards Tpr. Moryc or Ms. Antcliff.

145.    On or around September 5, 2023, Ms. Antcliff left Spl/Lt. Horan a voicemail stating that she would no longer be cooperating with the investigation.

146.    In the voicemail, Ms. Antcliff but accused Plaintiff and Tpr. Antcliff of committing perjury during the Antcliffs' 2018 divorce proceedings.

147.    Upon information and belief, neither Spl./Lt. Horan nor any other MSP employee responded to Ms. Antcliff's voicemail to clarify what she meant by her perjury accusation or, more importantly, to ensure Ms. Antcliff was safe and was not being abused or coerced by Tpr. Antcliff into withdrawing from the investigation.

148.    On or around September 14, 2023, F/Lt. Nicole Bock launched an internal investigation into Tpr. Moryc and Tpr. Antcliff for perjury, which was referred for a criminal investigation.

149.    On or around September 26, 2023, Sixth District Commander Captain Jason Nemecek provided his input to the internal investigative findings into Tpr. Moryc's domestic violence and sexual assault report against Tpr. Antcliff.

150.    Captain Nemecek found that Tpr. Antcliff had violated official MSP orders including the sexual harassment "quid pro quo" statute, while he was Tpr. Moryc's FTO.

151.    Captain Nemecek also found that Tpr. Antcliff had lied to command staff when questioned about the relationship he had with Tpr. Moryc in 2016.

152.    Captain Nemecek failed to determine or address whether Tpr. Antcliff had

23

committed acts of domestic or sexual assault against Tpr. Moryc.

153.    In September 2023, Tpr. Moryc applied for a law enforcement position with the University of Michigan Police Department (UMPD) because she had not received income from MSP since January 20, 2021.

154.    Soon after, Tpr. Moryc learned she had been chosen to move forward in the application process with UMPD.

155.    On or around September 27, 2023, Plaintiff contacted her union, MSPTA, regarding her MCOLES status and for assistance seeking MSP's approval to work for UMPD.

156.    MSPTA President Nate Johnson and MSPTA Vice President Sgt. Bob Tomassi told Tpr. Moryc that, per the terms of MSP's supplemental employment policy, she would not be allowed to work for another police department.

157.    MSPTA also notified Tpr. Moryc that MCOLES would not authorize her law enforcement certification until the lawsuit MSP had filed against her on February 24, 2022, to try to overturn her 2022 arbitration award, had concluded.

158.    On or around October 9, 2023, D/Sgt. Kailee Schuett contacted Tpr. Moryc and told her that D/Sgt. Schuett was investigating a complaint F/Lt. Bock had filed against Tpr. Moryc and Tpr. Antcliff alleging that they had committed perjury while testifying in the Antcliffs' 2018 divorce proceedings.

159.    D/Sgt. Schuett told Tpr. Moryc the perjury allegations stemmed from information obtained in the internal investigation from her domestic violence and sexual assault complaint against Tpr. Antcliff.

160.    On or around October 11, 2023, Tpr. Moryc was scheduled to attend a panel interview with the University of Michigan Police Department.

161.    Tpr. Moryc had to tell the panel she had to withdraw her application because MSP would not allow her to proceed with seeking another position and had filed a criminal investigation against her and MCOLES would not authorize her recertification.

162.    On or around October 13, 2023, Tpr. Moryc's criminal defense attorney, Patrick O'Keefe, contacted D/Sgt. Schuett to notify her that Tpr. Moryc had invoked her right not to provide a statement in the criminal perjury investigation.

163.    On or around December 6, 2023, Tpr. Antcliff was arrested and jailed by the Greenville Department of Public Safety after his current girlfriend, Jane Doe,[2] reported him for domestic assault.

164.    On or around December 7, 2023, Tpr. Antcliff was released from the Montcalm County Jail, placed on tether, and ordered to abide by the terms of the protective order put in place to protect Doe.

165.    On or around December 28, 2023, MSPTA Vice President Tomassi told Tpr. Moryc that she had to abide by the terms of MSP's supplemental employment and renew the supplemental employment application annually, even though MSP was not paying her.

166.    On or around January 10, 2024, Tpr. Antcliff resigned from MSP.

167.    On or around January 15, 2024, Tpr. Moryc filed an internal complaint with Inspector Sarah Krebs and Human Resources Division Director Stephanie Horton alleging the following:

   a.    Intimidation and harassment against F/Lt. Bock for lodging a malicious criminal investigation against Tpr. Moryc for perjury by using information obtained from Tpr. Moryc's domestic violence and sexual assault complaint; and

---

[2] Jane Doe is a pseudonym.

25

    b.   Violations of MSP policy and state law against Spl/Lt. Tabaczka and D/Sgt. Herr for failing to abide by domestic and sexual violence reporting standards.

168.    On or around January 18, 2024, Lieutenant Colonel Aimee Brimacombe assigned the complaint against F/Lt. Bock to Captain Cameron Henke for investigation.

169.    On or around March 8, 2024, D/Sgt. Schuett refused to provide Attorney O'Keefe with assistance in answering the Newaygo County Prosecutor's Office questions about Tpr. Moryc's criminal case unless Tpr. Moryc waived her right to remain silent and agreed to an interview with D/Sgt. Schuett.

170.    On or around March 13, 2024, Horton sent a copy of Tpr. Moryc's complaint against MSP command staff to Transparency and Accountability Division Commander Captain Thomas Deasy and Lt. Col. Brimacombe with the words "For discussion."

171.    On or around March 14, 2024, D/Sgt. Schuett told Attorney O'Keefe that the warrant request for perjury against Tpr. Moryc had been denied by the prosecuting attorney.

172.    Until that time, Tpr. Moryc had no idea that MSP was aggressively trying to charge Tpr. Moryc with a felony (perjury) despite a glaring lack of evidence to support the warrant request.

173.    That same day, Tpr. Moryc filed a complaint of discrimination and retaliation against MSP with the Michigan Department of Civil Rights (MDCR).

174.    On or around March 16, 2024, Capt. Deasy notified Tpr. Moryc that her complaint against F/Lt. Bock alleging harassment and intimidation was being closed without further investigation, saying it was "more than reasonable" for MSP to suspect that she had committed perjury.

175.    That day, Tpr. Moryc responded to Capt. Deasy's email, asking why MSP suspected she had committed perjury and seeking clarification as to why her complaint against Tpr. Antcliff

for sexual assault were not being investigated.

176.    On or around March 20, 2024, Tpr. Moryc contacted Horton to request that the domestic and sexual assault incidents be released to her as a survivor of domestic and sexual violence, in accordance with MSP Official Order and Procedure Manual 7-06[3] and M.C.L. 764.15c(2)(c).

177.    On or around March 25, 2024, Attorney O'Keefe filed a Notice of Intent to File Claims against MSP with the Michigan Court of Claims.

178.    On or around April 2, 2024, Capt. Deasy responded to Tpr. Moryc's March 16 email notifying her that he had asked a supervisor at First District Command to contact her regarding her concerns about the report and investigation.

179.    On or around April 3, 2024, Tpr. Moryc received a voicemail and a text message from Detective Lieutenant Erik Darling with First District Headquarters regarding her "complaints or concerns" about D/Sgt. Herr's investigation.

180.    Upon information and belief, Attorney O'Keefe's office contacted D/Lt. Darling to schedule a time to meet with Tpr. Moryc and Mr. O'Keefe, during which communication D/Lt. Darling stated that he had "no need" to meet on the issue.

181.    On or around April 29, 2024, Attorney O'Keefe sent a preservation of records letter and a request for Tpr. Moryc's employment file to MSP.

182.    On or around May 1, 2024, MSP was notified of Tpr. Moryc's MDCR complaint.

183.    By June 2024, because she had not received any income from her employment at MSP since January 20, 2021, and because MSP was preventing her from seeking any other

---

[3] "Victims of domestic violence may obtain a copy of the electronic incident report and Standard Domestic Relationship Incident Report (DV-001), for his or her case by contacting the law enforcement agency that took the original report." MICH. ST. POLICE, INVESTIGATING DOMESTIC VIOLENCE at 5 (2022), https://public.powerdms.com/MSP1917/documents/1989662.

employment, Tpr. Moryc had run out of money and was facing foreclosure of her home and was forced to take an emergency withdrawal From her 401K.

184.    On June 24, 2024, Tpr. Moryc, through Attorney O'Keefe, filed a complaint alleging sex discrimination and retaliation under the Elliott-Larsen Civil Rights Act against MSP in Eaton County Circuit Court.  *Moryc v. Mich. St. Pol*., No. 24-657-CD (Eaton Co. Cir. Ct. Jun. 24, 2024).

185.    That matter is still pending before Judge Kelly Morton.

186.    In August 2024, Tpr. Moryc learned for the first time of a high-profile scandal involving troopers at all levels of the MSP Flint Post.

187.    Sergeant Jarad Chiros, a man, was accused of having committed numerous criminal law violations, including sexual assault against subordinate female troopers.

188.    Upon information and belief, MSP never launched a criminal investigation into any of the serious criminal sexual assault allegations made against Sgt. Chiros.

189.    This directly contradicts MSP's response to sexual harassment allegations made against Tpr. Moryc, a woman, in 2020, in which MSP launched a campaign of character assassination against her.

190.    MSP's handling of the Chiros case spotlights a pattern of the discriminatory culture within the Department in which:

   a.    Female troopers are treated differently and worse than male troopers;

   b.    Female troopers' allegations of sexual assault are not taken seriously; and

   c.    Command staff retaliates against troopers who report the wrongdoing of male troopers, but not female troopers.

191.    On or around September 18, 2024, the Michigan Supreme Court denied MSP's

leave to appeal on the arbitration issue, which effectively reinstated Tpr. Moryc's 2022 arbitration award.

192.    On or around September 26, 2024, MSP notified Tpr. Moryc that she was to report to MSP Headquarters (HQ) on October 2, 2024, at 1:00 p.m. and ask for Sarah Alberts in Human Resources, and to bring identification to complete onboarding items.

193.    Tpr. Moryc appeared at MSP headquarters on October 2 as directed.

194.    Initially, Tpr. Moryc met with Alberts to begin the onboarding process in the cafeteria area of MSP headquarters.

195.    Labor Relations First Lieutenant Brian Buege was also present at the meeting.

196.    Immediately after completing the reinstatement process, F/Lt. Buege took Tpr. Moryc to another room to be fingerprinted and palm scanned.

197.    F/Lt. Buege told Tpr. Moryc new scans were required for MCOLES re-activation and the department.

198.    F/Lt. Buege also provided Tpr. Moryc with drug screening paperwork which he ordered her to submit to at a medical facility, which he said was also required by MCOLES.

199.    F/Lt. Buege then took Tpr. Moryc to a private room, where he told her "the reporting" had to stop, an apparent admission that her reports of domestic and sexual assault, discrimination, harassment, and retaliation were the reasons for MSP's ongoing campaign of retaliation against her.

200.    F/Lt. Buege then handed Tpr. Moryc a letter addressed to her from Jon Meyer, Director of MSP's Human Resources Division, stating that she was being placed under investigatory suspension with pay pursuant to Article 8, Part A of the MSP/MSPTA Collective Bargaining Agreement, effective immediately, because of her "participation in an event of

significant consequence to the Department and the public."  Ex. 2.

201.    Strangely, the letter stated that, even though Tpr. Moryc was being suspended, her work schedule was Monday to Friday, 8:00 a.m. to 5:00 p.m., with a one-hour lunch break from 12:00 to 1:00 p.m.

202.    Meyer's letter instructed Tpr. Moryc to remain available to MSP management during the stated work hours while on investigatory suspension, to request sick leave from a direct supervisor if she was unable to comply due to illness or health-related appointments and said her failure to comply with the provisions may result in lost time and disciplinary action.

203.    This paid investigatory suspension letter was a drastic change from the letter Tpr. Moryc received in 2020, in which she was not ordered to be made available to MSP on specific days and hours under threat of termination.  Ex. 3.

204.    While under the investigatory suspension, law enforcement officers cannot regain their MCOLES certification.

205.    At the meeting, F/Lt. Buege told Tpr. Moryc that the investigatory suspension was due to the perjury investigation that had been opened against Tpr. Moryc a year prior and that she would not be able to engage in the MCOLES reactivation process until the investigation was completed.

206.    F/Lt. Buege also told Tpr. Moryc that she was ordered to report for a drug test by 4:00 p.m. that same day, which she did.

207.    On or around October 9, 2024, Tpr. Moryc spoke with Dr. Suzanne Steele from Vault Screening & Drug Testing, which had completed the October 2 drug test.

208.    During the call, Tpr. Moryc notified Dr. Steele that she was prescribed medication to relieve symptoms of her ADHD.

209.    On or around October 16, 2024, Tpr. Moryc received a letter dated October 10, 2024, from MSP HR stating that MSP had a "potential safety concern related to the medication you disclosed" asking Tpr. Moryc to complete an enclosed "Essential Job Function Questionnaire" with her prescribing physician within ten days of the date of the letter, October 20, 2024.

210.    October 20, 2024, was a Sunday.

211.    The letter therefore provided Tpr. Moryc only two business days to schedule and complete the required doctor's appointment.

212.    Typically, MSP only requires the "Essential Job Function Questionnaire" to be completed when there is a serious concern about a trooper's ability to safely perform essential job functions.

213.    The letter provided no explanation as to why an ADHD diagnosis or related medication would create a serious or "public safety" concern about Tpr. Moryc's ability to perform essential job functions.

214.    MSP also ordered Tpr. Moryc to undergo a medical evaluation regarding her ability to perform basic tasks including conducting searches, completing physical activities, and understanding basic commands.

215.    As Tpr. Moryc is on investigatory suspension, her ability to complete these tasks and essential functions of her job as a trooper is irrelevant.

216.    On or around October 21, 2024, Lakeview Post Commander F/Lt. Michael Stephens contacted Tpr. Moryc and ordered her to appear at the MSP Ionia Detachment so he could serve her with two 48-hour administrative notices.

217.    Tpr. Moryc appeared as directed and F/Lt. Stephens presented her with two notices to sign.

218.    The first administrative notice demanded that Tpr. Moryc submit to an administrative interview regarding the perjury allegations.

219.    The second administrative notice demanded that Tpr. Moryc submit to an administrative interview for a retaliatory administrative complaint Sgt. Metivier made against her in 2021, accusing her of including him to participate in a 2021 MSP post-wide discrimination complaint in retaliation for an October 2020 criminal complaint he made against her.

220.    Both F/Lt. Bock and Capt. Deasy testified at their depositions in this matter that not all complaints against members receive a full investigation and that it is a discretionary decision.

221.    MSP chose to investigate a three-year-old retaliatory complaint made against Tpr. Moryc by Sgt. Metivier, while ignoring the complaints of domestic and sexual assault she made against Tpr. Antcliff.

222.    For these interviews, under Article 1, Section 1 of the MSPTA-MSP Collective Bargaining Agreement (CBA), Tpr. Moryc was only entitled to representation by MSPTA and not by Attorney O'Keefe.

223.    Upon information and belief, these administrative interviews, one related to a three-year-old allegation which had never been investigated previously, were intended to circumvent the civil discovery process in the Eaton County Circuit Court matter *Moryc v. Mich. St. Police*.

224.    On October 31, 2024, Tpr. Moryc reported to MSP headquarters in Lansing for the administrative interviews as instructed.

225.    The first interview was conducted by Spl./Lt. Christopher Tuckey in reference to the perjury allegation.

226.    Spl./Lt. Tuckey interrogated Tpr. Moryc harshly and poorly, repeatedly attempting to force her to respond to compound questions which required different answers.

32

227.    The second interview was conducted by Spl./Lt. Donald Pisha in reference to the 2021 retaliation complaint made by Sgt. Metivier.

228.    Spl./Lt. Pisha handed Tpr. Moryc a single sheet of paper, dated November 30, 2006, titled "Article 5, Disciplinary Procedures, Commander's Responsibility."

229.    Spl./Lt. Pisha demanded to know why Tpr. Moryc's allegations of discrimination and harassment were not completed on a written form as outlined in Section 5.1c of the document.

230.    Spl./Lt. Pisha told Tpr. Moryc her verbal complaints made to her supervisors earlier in her career did not comply with policy as they should have been submitted in written form according to the Commander's Responsibility sheet.

231.    This was not accurate, as complaints could be made verbally as well as in writing.

232.    Spl/Lt. Pisha provided Tpr. Moryc with three new Professional Standards Section investigation numbers in which he claimed Tpr. Moryc was the complainant: PSS-535-20, PSS-536-20, and PSS-365-21.

233.    Tpr. Moryc had no knowledge of and was unaware of the existence of these alleged complaints.

234.    Spl/Lt. Pisha refused to provide Tpr. Moryc with any information or detail regarding these alleged complaints.

235.    On or around November 4, 2024, F/Lt. Buege notified Tpr. Moryc that background criminal investigator Cherie Ballor had been assigned to complete Tpr. Moryc's required background check from August 2021 through October 2024 as part of her MCOLES recertification process.

236.    The timeline was specified as starting at August 2021, as that is when MSP had terminated Tpr. Moryc, and it was not necessary to investigate anything prior to that, as she had

been MCOLES certified for all MSP employment prior to August 2021.

237.    Tpr. Moryc's MCOLES certification had lapsed in around August 2023 as MSP had continued to fight her 2022 arbitration award in state court and she could not work.

238.    F/Lt. Buege instructed Tpr. Moryc to complete the MCOLES 27-page affidavit prior to her interview with Ballor.

239.    This made no sense, because Tpr. Moryc's MCOLES reactivation could not proceed until after the investigations against her were completed.

240.    When asked, F/Lt. Buege acknowledged Tpr. Moryc's MCOLES reactivation could not proceed with the open internal investigations but told Tpr. Moryc the MCOLES packet needed to be completed regardless.

241.    F/Lt. Buege also told Tpr. Moryc that MSP was still conducting calculations of the back pay owed to her through the arbitration award over a month after the Michigan Supreme Court rejected MSP's leave to appeal.

242.    On or around December 6, 2024, Tpr. Moryc contacted F/Lt. Buege and requested that he provide her with the original MCOLES application packet she submitted to MSP in 2016.

243.    F/Lt. Buege never responded to this request.

244.    On or around December 9, 2024, Tpr. Moryc had a phone conversation with F/Lt. Buege in which he admitted MSP wanted her to complete the MCOLES application packet despite the ongoing internal investigation to get the lengthy re-activation "process" started.

245.    Upon information and belief, this was so that MSP could ensure that her MCOLES application was denied as quickly as possible so that she could remain terminated even if MSP lost the 2022 arbitration appeal.

246.    On December 20, 2024, the same day Judge Jamo ruled in MSPTA's favor and

ordered MSP to comply with the 2022 arbitration award, MSP sent Tpr. Moryc a statement of charges and notice of proposed termination, finding through its investigation that it believed she had committed perjury during the Antcliffs' 2018.

247.    Again, MSP moved straight to termination of Tpr. Moryc without imposing any progressive discipline, despite the 2022 arbitration finding against it for doing just that previously.

248.    On or around January 7, 2025, MSP called Tpr. Moryc to a disciplinary conference led by Sixth District Captain Jason Nemecek.  The other disciplinary conference panel members were Insp. Gee-Cram and Human Resources Representative Jessica Mendez-Dunn.

249.    Again, Tpr. Moryc was not permitted to have Attorney O'Keefe present at the disciplinary conference and could only have MSPTA Sgt. Tomassi present as her representative.

250.    At the disciplinary conference, Capt. Nemecek and Insp. Gee-Cram began interrogating Tpr. Moryc with "gotcha"-type questions about information she provided to Spl/Lt. Tuckey during the October 31, 2024, administrative review.

251.    Upon information and belief, this was another attempt by MSP to circumvent the discovery process in the Eaton County Circuit Court matter *Moryc v. Mich. St. Police*.

252.    Capt. Nemecek asked Tpr. Moryc if Tpr. Antcliff should be charged with criminal sexual conduct (CSC), to which Tpr. Moryc responded, "Yes, I've already made that clear.  I made a CSC complaint."

253.    Tpr. Moryc reiterated to the discipline panel that she was a victim of domestic and sexual assault, and yet she continued to be embroiled in discipline conferences and legal battles while nothing had been done within MSP to investigate the abuse Tpr. Antcliff had perpetrated against her.

254.    The discipline panel repeatedly pressured Tpr. Moryc to provide them with a copy

of the written statement she had read, despite Sgt. Tomassi advising them that she would need to consult with Attorney O'Keefe before providing any written documents.

255.    Capt. Nemecek asked if there was anything that he should review, and Tpr. Moryc provided a copy of her original domestic violence report against Tpr. Antcliff that was not properly investigated by MSP.

256.    At that point, Tpr. Moryc realized Capt. Nemecek had been ready to decide on her termination before reading all relevant material contained in the investigation file, other than Spl/Lt. Tuckey's biased investigation report against her.

257.    On or around January 17, 2025, Sgt. Tomassi notified Tpr. Moryc that a follow up to the discipline conference was scheduled for January 28, 2025.

258.    Tpr. Moryc still had not received the back pay to which she was entitled per Judge Jamo's December 20, 2024, order, so on or around January 22, 2025, Sgt. Tomassi contacted Insp. Gee-Cram for an update on the status.

259.    On January 27, 2025, one day before the follow up discipline conference was scheduled to take place, Insp. Gee-Cram suddenly requested that conference to be rescheduled due to "personal issues."

260.    MSP then unilaterally rescheduled the follow up discipline conference to  February 13, 2025, just one day after the scheduled hearing on its motion for relief from judgment regarding the 2022 arbitration award.

261.    On or around February 7, 2025, Insp. Gee-Cram sent Sgt. Tomassi an email requesting that Tpr. Moryc provide all information about her interim employment between June 1, 2021, and September 18, 2024, to be used to calculate set off for her backpay.

262.    On or around February 13, 2025, at the follow up disciplinary conference which

took place the day after Judge Aquilina had again upheld Tpr. Moryc's 2022 arbitration award, after just five short minutes, Capt. Nemecek stated that he would uphold the termination decision against Tpr. Moryc.

263.    Just as in 2021, Tpr. Moryc's  employment with MSP was terminated due to manufactured allegations made in retaliation for her attempts to report relationship and sexual abuse, with no progressive discipline.

264.    Upon information and belief, MSP terminated Tpr. Moryc so that, even if it ultimately lost its appeal of the 2022 arbitration award, Tpr. Moryc still would not be able to reactivate her MCOLES certification.

265.    Later that day, MSPTA filed a grievance against MSP challenging the termination.

266.    Also at that conference, Sgt. Tomassi asked Insp. Gree-Cram to send Tpr. Moryc her 2015 MSP employment application information which was necessary for Tpr. Moryc to complete the MCOLES application packet.

267.    Insp. Gee-Cram agreed to do so.

268.    On or around February 24, 2025, Tpr. Moryc received a response to a Freedom of Information Act (FOIA) request she had made to the Oakland County Prosecutor's Office (OCPO) in reference to Tpr. Michael Patrick Floyd, the male trooper whose MCOLES license lapsed who was allowed to continue working at MSP, unlike Tpr. Moryc.

269.    The OCPO documents included Tpr. Floyd's criminal report, which included allegations of felonious assault, assault and battery, refusing to cooperate with the police, providing false identification to the police, providing knowingly false statements, stalking/harassment, witness tampering, abuse of power, filing a false complaint, and providing false identification to 911.

270.     Upon information and belief, MSPTA had also participated in an arbitration to contest MSP's termination of Tpr. Floyd, and received a favorable outcome.

271.     Unlike Tpr. Moryc, Tpr. Floyd had never been removed from MSP's payroll, so he had never stopped receiving pay from MSP.

272.     Unlike Tpr. Moryc, MSP never contested the arbitrator's award for MSPTA and Tpr. Floyd.

273.     Unlike Tpr. Moryc, Tpr. Floyd was allowed to work at MSP in an administrative capacity while awaiting the restoration of his MCOLES certification.

274.     Unlike Tpr. Moryc, MSP did not make any allegations against Tpr. Floyd that his numerous violations made him a threat to the "public interest."

275.     On or around February 27, 2025, MSP and MSPTA's attorneys met with Judge Aquilina in closed chambers to clarify the terms of the February 12 order.

276.     On March 6, 2025, Judge Aquilina entered an order enforcing the 2022 arbitration award and requiring Tpr. Moryc to submit her MCOLES application for reactivation by March 14, 2025, or forfeit her job with MSP.

277.     On or around March 11, 2025, Tpr. Moryc again contacted F/Lt. Buege, following up on her December 6, 2024 request that he provide her with the finger print/palm scan records he took on October 2, 2024 which he said was for her MCOLES application and the Employment Letter from MSP, which she was required submit with her current MCOLES application to comply with Judge Aquilina's February 12 order that she submit her MCOLES application by March 14 or lose her job with MSP.

278.     F/Lt. Buege did not respond to this request.

279.     On or around March 12, 2026, Tpr. Moryc contacted Attorney Dlugos for assistance

in acquiring the required documents from MSP to complete her MCOLES application.

280.    Attorney Dlugos contacted MSP's counsel to request a response.

281.    Less than an hour after Attorney Dlugos' call to MSP's counsel, F/Lt. Buege finally responded to Tpr. Moryc, telling her that that the live scan fingerprints he took of her on October 2, 2024, which he stated were for the MCOLES application process, were not done on the correct MCOLES form

282.    F/Lt. Buege also told Tpr. Moryc he would submit the MCOLES verification of employment document directly to MCOLES.

283.    Because of F/Lt. Buege's error or intentional oversight, Tpr. Moryc was forced to travel 50 miles to complete the MCOLES live scan fingerprint requirement on the very last day permitted by Judge Aquilina's order.

284.    That day, Tpr. Moryc arrived at the MCOLES office to submit her completed application packet by the court deadline, only to discover the office employee had left early for the day.

285.    Tpr. Moryc then mailed her MCOLES application packet via certified mail to ensure she met the court-ordered deadline.

286.    On March 18, 2025, Col. Grady, Lt. Col. Brimacombe, and Lt. Hinz filed a Motion to Quash Tpr. Moryc's Subpoenas for deposition, which had been sent to them on February 21, 2025, arguing that the Court of Appeals' holding in *Fitzpatrick v Secretary of State*, 176 Mich App 615, 440 NW2d 45 (1989), protected these three individuals from deposition by Tpr. Moryc.

287.    The Motion included sworn Affidavits from Col. Grady, Lt. Col. Brimacombe, and Lt. Hinz as exhibits.  Non-Parties' Mot to Quash Subpoenas and for Entry of a Protective Order, Ex A-C, March 18, 2025.

288.    In their sworn Affidavits, dated March 13, 2025, Col. Grady, Lt. Col. Brimacombe, and Lt. Hinz all attested that they had "no first-hand or unique knowledge related to the claims alleged by Ms. Moryc in the First Amended Complaint."

289.    According to MSP policy and testimony provided in subsequent depositions, these attestations by Col. Grady and Lt. Col. Brimacombe were false.

290.    Per MSP's Disciplinary Proceedings and Procedures Manual:

Section 1: Disciplinary Procedures

1.11 Relief from Duty

> a. After consultation with the commander of the Human Resources Division, work unit commanders or their authorized representative may relieve from duty, with pay, any subordinate member, either of their command or who is within their command jurisdiction, whenever it is necessary for the preservation of good order, efficiency, and discipline. This action is limited to violations that necessitate immediate action. In every instance, the commander or their representative shall immediately advise the Director, through channels, of such action stating the reason and the status of the involved member. The Director, upon receipt of such notification, may order the member suspended, if necessary, in accordance with Civil Service Rules and Regulations, as well as the appropriate collective bargaining agreement, or take such other action as is deemed appropriate. Such member shall not be restored to duty without authorization of the Human Resources Division Commander and the Director or the Director's designee….

> d. A member charged with a criminal offense may be suspended without pay by the Director or the Director's designee in accordance with Civil Service Rules and Regulations and any other applicable labor agreements.

> e. The Director or the Director's designee may take any action deemed necessary in accordance with Civil Service Rules and Regulations, as well as the appropriate collective bargaining agreement.

MICH. ST. POLICE, DISCIPLINARY PROCEEDINGS AND PROCEDURES MANUAL 03-03 at 5 (2024),

https://public.powerdms.com/MSP1917/documents/1995262.        And:        "Administrative

investigations are conducted under the authority of the Director…." *Id.* at 8.

    291.    And according to MSP's Official Order on Administrative Investigations:

    03-60-7 REQUIRED NOTIFICATIONS

        C.    Once a closing disposition has been determined in an administrative investigation, the commander of the PSS or their designee shall make the following notifications within three business days:…

        (4) The Director, members of the leadership team, members of the principal's chain of command, and the Labor Relations Section shall be notified of closing dispositions in a manner determined by the commander of the TAD.

MICH. ST. POLICE, OFFICIAL ORDER 03-60 – ADMINISTRATIVE INVESTIGATIONS at 4 (2024)

https://public.powerdms.com/MSP1917/list/documents/2926819.

    292.    Col. Grady is the Director of MSP.  STATE OF MICHIGAN, ABOUT MSP: MEET THE

DIRECTOR,  https://www.michigan.gov/msp/about-msp/meet-the-director (last visited Sep. 16,

2025).

    293.    According to emails received by Tpr. Moryc via a FOIA request, Lt. Col.

Brimacombe did have direct knowledge related to the First Amended Complaint.

    294.    On March 25, 2025, Tpr. Moryc took F/Lt. Nicole Bock's deposition in the Eaton

County Circuit Court matter *Moryc v. Mich. St. Police*, at which she swore under oath to tell the

truth.

    295.    At her deposition, F/Lt. Bock testified:

    Q.    And if a full investigation is conducted, then who are the findings presented to?

    A.    Upon conclusion of the investigation, the findings are presented to HR, labor relations, our Transparency and Accountability Division director who is my boss, Captain

41

Matt Williams; as well as executive level leadership, so Colonel Grady, and Lieutenant Colonel Brimacombe, and Lieutenant Colonel Sosinski.

…

Q.     So let's say, for example, your section found that a member, or a trooper, had violated one or more Official Orders, how would that get communicated to the people upstairs?

A.     Upon conclusion of the investigation, we would author a final disposition report, which is a case summary, as well as the findings based on the sections of the Code of Conduct and the sections of Official Orders. That gets sent via email to all of the stakeholders in that case, which would be executive leadership, HR, and -- as well as the involved member's command.

Q.     I see.  So when it comes to a violation of an Official Order, you're saying that the colonel's office and the lieutenant colonel's office would be notified?

A.     Yes.

296.    On March 31, 2025, Tpr. Moryc took Capt. Thomas Deasy's deposition in the Eaton County Circuit Court matter *Moryc v. Mich. St. Police*, at which he swore under oath to tell the truth.

297.    At his deposition, Capt. Deasy testified:

Q.     Okay.  So back in, let's say the fall of 2023, would have been the captain of the Transparency and Accountability Division?

A.     Yes.

Q.     So who reported to you at that time?

A.     In the fall of 2023.  Well, the Records Resource section, which is our FOIA people and our records management office, and the manager there at that time was Lori Hinkley, I believe.  Brody Boucher was the first lieutenant and commander of the Professional Standards section. Aimee Brimacombe was the first lieutenant in charge of the Risk Management section.

…

Q.    Okay.  And then I want to talk a little bit more about 5 the role of the Risk Management section under your command. What was your -- what were your expectations with respect to the Risk Management section when you were a captain over Transparency and Accountability?

A:    Well, the role -- the section was only two people, it was the analyst and then first lieutenant.  So, you know, the role was really to coordinate primarily with the AG's Office. Sometimes we would hire outside counsel to defend the department or its members. My expectations were that they would work with the AG's Office, coordinate things like, you know, depositions and gather discovery, and then kind of get a handle on, let's take a look at what we were getting sued for and make recommendations to, you know -- make policy adjustments or practice  adjustments, that kind of thing.

…

Q.    Who makes the ultimate decision to terminate a member?

A.    It's either the colonel or the HR director.

Q.    Okay.  So are you saying that there are instances where the HR director can terminate an employee, a member without the colonel's office's input?

A.    Well, so I'm not aware of any time we've terminated a member without the colonel at least being there and aware of the recommendation. The only people in the State system who can terminate somebody is somebody with authority, and that's the colonel; and then if the colonel delegates that authority, somebody like the HR director, which, in our case, I'm not sure if that agreement is still in place, but we have a service level agreement in the Civil Service that says the HR director can do things like appoint people for promotions and demote people and discipline people on behalf of the colonel.  I'm not aware of a colonel never being notified prior to stating the charges proposing discipline being served.

Q.    And that's just -- we're just talking about a statement of charges; right?

A.    Yes.

Q.    So the colonel is notified even where there's a statement of

charges regarding potential discipline against a member?

A.   No, I wouldn't say that.  Generally that happens at the lieutenant colonel level, which is discipline. When it comes to firing somebody, the colonel is always notified.  Whether the colonel -- you know, I've been there through a number of colonels; I think they all had a different approach to how hands on they are.  I don't know if I would call it approval. It's generally, here are the facts as we know them, and here's what we're proposing, and it's more of an opportunity for the colonel to veto than it is really an approval, from my experience.

…

Q.   I see. So because the complaint was filed against Tabaczka and Bock, it got assigned to Captain Henke?

A.   It was assigned to -- why Captain Henke, I don't know; I didn't make that decision. But we wanted to -- when I say "we," so the decision to have Captain Henke investigate it was made either by Colonel Grady or Lieutenant Colonel Brimacombe.  She is the one -- Lieutenant Colonel Brimacombe is the one who told me Captain Henke would be handling, not necessarily the investigation, but evaluate it, independent of whatever discussions they were having, because he's not involved in it. I wanted to have somebody outside of my division evaluate Trooper Moryc's complaint.

Typically when there's a complaint against somebody in Professional Standards, if we're going to do a full investigation, we'll assign somebody outside of the division, or I could conduct it.

In this case, I would have normally evaluated it, her complaint, to determine whether we were going to proceed with an administrative investigation; but she had made a previous complaint a couple years prior about being interviewed while she was in jail.  And so I was the one who sent her a letter explaining our decision not to investigate that one, and I wanted somebody else, rather than have the same person making this decision, I wanted somebody 12 outside of the division to take a look at it.  So I didn't make the decision to have Captain Henke do it.

Q.   You're saying either the colonel or the lieutenant colonel made that decision?

44

A:  Yes, yes.  I was going to assign -- I was going to have somebody outside my division do it anyway. They're the ones who decided on Captain Henke.  When I say "they," I'm not sure which, they didn't tell me, but Colonel Brimacombe is the one that told me that Captain Henke would be evaluating the complaint for us.

298.  On May 15, 2025, Tpr. Moryc took F/Lt. Richard Chaffee's deposition in the Eaton County Circuit Court matter *Moryc v. Mich. St. Police*, at which he swore under oath to tell the truth.

299.  At his deposition, F/Lt. Chaffee testified:

Q.  And then you're a licensed attorney; correct?

A.  I am.

Q.  All right. When did you get licensed to practice in Michigan?

A.  2022.

Q.  '22? Okay. You're currently the risk manager, is that how I understand it?

A.  I am.

Q.  What is the risk manager?  What does that job assignment entail?

A.  There are kind of two aspects of it.  One of them I would say wasn't as, like, built up, and that's one of the things they tasked me with, but kind of a proactive and reactive.  So litigation management would be like reactive, you know.  I'm kind of dealing with lawsuits on behalf of the agency as a client representative.

      …

Q.  Okay.  All right.  And when did you get hired as a first lieutenant in risk management?

A.  It would have been March of 2024.  And so I was the acting, if you will, from November of '23 until March of '24.

Q.  Okay.  What happened in November of '23 that made you the acting risk manager?

A.      The previous risk manager left the position, and it was -- it was vacant. So they moved me from legal resources, which is kind of like a -- like maybe brother-sister, to risk management under the same division. They moved me from legal resources over to risk management.

Q.      I see. Okay. And who was that position vacated by?

A.      Aimee Brimacombe.

… 

Q:      You have discussed Trooper Moryc with Lieutenant Colonel Brimacombe, is that what you're saying?

A:      Yes.

300.      Therefore, based on F/Lt. Bock, Capt. Deasy, and F/Lt. Chaffee's deposition testimony, emails provided by MSP, and MSP's own official policies and procedures, Col. Grady and Lt. Col. Brimacombe do have first-hand or unique knowledge related to the claims alleged by Tpr. Moryc in the First Amended Complaint and in this Third Amended Complaint.

301.      Should Col. Grady or Lt. Col. Brimacombe wish to assert that MSP's own official policies and procedures were not followed, that MSP's emails were inaccurate, or F/Lt. Bock, Capt. Deasy, and/or F/Lt. Chaffee's deposition testimony was false, then that would also be first-hand or unique knowledge related to the claims alleged by Tpr. Moryc in the First Amended Complaint and in this Third Amended Complaint.

302.      On March 25, 2025, Tpr. Moryc took Spl/Lt. Ryan Tabaczka's deposition in the Eaton County Circuit Court matter *Moryc v. Mich. St. Police*, at which he swore under oath to tell the truth.

303.      At the deposition, Spl/Lt. Tabaczka admitted he interviewed Tpr. Moryc in MSP's internal investigation as a "favor" to Spl/Lt. Carissa Horan.

304.      Spl/Lt. Tabaczka testified that Spl/Lt. Horan had provided him with a list of

questions to ask Tpr. Moryc.

305.    Spl/Lt. Tabaczka testified that he was still in possession of Spl/Lt. Horan's questions.

306.    Spl/Lt. Tabaczka testified that he had previously investigated Tpr. Antcliff for failing to investigate a domestic violence complaint.

307.    Spl/Lt. Tabaczka testified that his investigation into Tpr. Antcliff's failure to properly investigate a domestic violence complaint led to a finding of misconduct against Tpr. Antcliff.

308.    Spl/Lt. Tabaczka testified that he did not believe Tpr. Moryc had reported sexual assault against Tpr. Antcliff because Tpr. Moryc "never used the term rape."

309.    Spl/Lt. Tabaczka testified that he failed to follow up on Tpr. Moryc's report of sexual assault against Tpr. Antcliff.

310.    Spl/Lt. Tabaczka testified that MSP's Official Orders require him to report allegations of criminal misconduct by other MSP employees.

311.    Spl/Lt. Tabaczka testified that, after his interview with Tpr. Moryc, F/Lt. Nicole Bock told him not to have any direct contact with Tpr. Moryc and to save any communications he had with Tpr. Moryc.

312.    Spl/Lt. Tabaczka testified that he had received a text message from Tpr. Moryc after the interview, in which Tpr. Moryc said she feared for her safety because she thought she saw Tpr. Antcliff driving around her neighborhood.

313.    On April 2, 2025, Insp. Gee-Cram again sought a last-minute adjournment for "personal reasons," this time of the arbitration hearing scheduled for April 4, 2025, regarding MSPTA's grievance against MSP for terminating Tpr. Moryc a second time.

314.    The arbitration hearing is rescheduled for April 24, 2025.

315.    On or around April 7, 2025, Tpr. Moryc contacted F/Lt. Buege to follow up on MSP's calculation and payment of her back pay, as she had heard nothing since March 19, 2025, when she had provided MSP with the documents it requested.

316.    On or around April 8, 2025, F/Lt. Buege asks Tpr. Moryc for a statement of earnings from supplemental employment dating October 1, 2021, to December 31, 2021 to assist in calculating her backpay.

317.    No explanation was provided to Tpr. Moryc as to why this document was not initially requested.

318.    Regardless, Tpr. Moryc immediately complied with F/Lt. Buege's request.

319.    On May 13, 2025, Tpr. Moryc finally received MSP's proposed calculation of the back pay she was owed because of the 2022 arbitration award.

320.    In its calculations, MSP deducted approximately $8,500 in back pay for health benefits Tpr. Moryc never received.

321.    Through MSPTA, Tpr. Moryc began the process of challenging the inaccurate back pay calculations.

322.    On May 27, 2025, MSP notified Tpr. Moryc that her back paycheck was ready for her to pick up at MSP HQ.

323.    The check did not include the $8,500 in health benefits that were wrongly deducted.

324.    To date, despite numerous efforts, MSP has continued to withhold the wrongly deducted health benefits from Tpr. Moryc.

325.    On June 12, 2025, Tpr. Moryc attended an interview with Ballor in MSP's background investigation, which had to occur without an attorney as Attorney O'Keefe had

48

withdrawn from representation and Tpr. Moryc had not yet retained Attorney Abdnour.

326.    At the interview, Ballor gave Tpr. Moryc a consent form to search Tpr. Moryc's various social media.

327.    Tpr. Moryc was forced to sign the form without the advice of counsel.

328.    Beginning in August 2024 and into 2025, increasingly concerned about the corruption and cover-ups of discrimination, harassment, and retaliation she was experiencing, Tpr. Moryc began speaking with investigative reporter Todd Heywood of WLNS 6 News, a Lansing-area news station, as she had begun to believe that the only way MSP would be held accountable was through public outcry.

329.    Heywood began contacting MSP with questions sometime in fall 2024.

330.    On July 7, 2025, WLNS published the first in a multi-part series of articles about Tpr. Moryc's situation and other instances of corruption and dysfunction within MSP:

    a.   Todd Heywood, *'Big Boys' Club': Discontent in the Michigan State Police*, WLNS 6 NEWS (July 7, 2025), [https://www.wlns.com/6newsinvestigates/big-boys-club-discontent-in-the-michigan-state-police/](https://www.wlns.com/6newsinvestigates/big-boys-club-discontent-in-the-michigan-state-police/);

    b.   Todd Heywood and Karina Prieto, *'Disgusted': Michigan senator challenges MSP leader's claim of taking sexual harassment 'seriously' at the agency*, WLNS 6 NEWS (July 8, 2025), [https://www.wlns.com/6newsinvestigates/disgusted-michigan-senator-challenges-msp-leaders-claim-of-taking-sexual-harassment-seriously-at-the-agency/](https://www.wlns.com/6newsinvestigates/disgusted-michigan-senator-challenges-msp-leaders-claim-of-taking-sexual-harassment-seriously-at-the-agency/);

    c.   Todd Heywood, *'Big Boys' Club': 'Wolf in the hen house'*, WLNS 6 NEWS (July 8, 2025), [https://www.wlns.com/6newsinvestigates/big-boys-club-wolf-in-the-hen-house/](https://www.wlns.com/6newsinvestigates/big-boys-club-wolf-in-the-hen-house/);

d.  Todd Heywood, *'Big Boys' Club': 'I never wanted to cheat on my husband'*, WLNS 6 NEWS (July 9, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-i-never-wanted-to-cheat-on-my-husband/;

e.  Todd Heywood, *'Big Boys' Club': The 'womanizer'*, WLNS 6 NEWS (July 10, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-the-womanizer/;

f.  Todd Heywood, *'Big Boys' Club': 'Too much room in the law ... to discriminate'*, WLNS 6 NEWS (July 11, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-too-much-room-in-the-law-to-discriminate/;

g.  Todd Heywood, *'Big Boys' Club': 'The degradation of women'*, WLNS 6 NEWS (July 14, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-the-degradation-of-women/;

h.  Todd Heywood, *Frequently Asked Questions*, WLNS 6 NEWS (July 14, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-frequently-asked-questions/;

i.  Todd Heywood, *'The Big Boys' Club': 'Gender discrimination and harassment, including sexual'*, WLNS 6 NEWS (July 15, 2025), https://www.wlns.com/6newsinvestigates/the-big-boys-club-gender-discrimination-and-harassment-including-sexual/;

j.  Todd Heywood, *'Big Boys' Club': Former Michigan State Police trooper says it 'went too far'*, WLNS 6 NEWS (July 16, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-former-michigan-state-police-trooper-says-it-went-too-far/;

k.  Todd Heywood, *'Big Boys' Club': Former Michigan State Police trooper says,*

50

*'They crucified me'*, WLNS 6 NEWS (July 17, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-former-michigan-state-police-trooper-says-they-crucified-me/; and

l.   Shajaka Shelton, *'Big Boys' Club': 'Not just a rumor'*, WLNS 6 NEWS (Aug. 22, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-not-just-a-rumor/.

331.   The series featured extensive quotes and information from Tpr. Moryc detailing the retaliation and abuse she had suffered at the hands of MSP and its employees after making internal reports of discrimination and harassment, in violation of both MSP policies and state and federal law.

332.   On or around July 22, 2025, one of Tpr. Moryc's neighbors notified her that a plainclothes member of the MSP had driven around her neighborhood placing a business card with the handwritten note, "Call me," in each of Tpr. Moryc's neighbors' mailboxes.  Ex. 4.

333.   The individual placing the business cards in mailboxes was Ballor.

334.   None of Tpr. Moryc's neighbors were surveilled or interviewed when she first joined MSP in 2016.

335.   This type of invasive surveillance and interrogation is not standard in an MSP employee background investigation.

336.   Placing items without paid postage in a mailbox is a federal offense. 18 U.S.C. § 1725.

337.   On or around July 23, 2025, Tpr. Moryc's friend, Melissa Flinn, and her sister, Chelsea Moryc, contacted her to let her know they had just completed a phone interview with Ballor.

338.   Flinn and Chelsea Moryc told Tpr. Moryc that Ballor had asked whether they had

ever seen Tpr. Moryc "get angry" and ask what her response was to "anger."

339.    Flinn said Ballor also asked whether she had ever seen Tpr. Moryc "drink and drive."

340.    Flinn said no, and that if they drank together, Tpr. Moryc would sleep on Flinn's couch rather than drive home.

341.    Both Flinn and Chelsea Moryc told Tpr. Moryc that they told  Ballor they were concerned for Tpr. Moryc's safety if she were to return to MSP.

342.    Ballor was charged with investigating Tpr. Moryc only from her August 2021 date of separation from MSP.

343.    Chelsea told Tpr. Moryc that Ballor had asked about events that had occurred in 2020, which was outside the scope of Ballor's investigation.

344.    On July 28, 2025, Arbitrator Thomas J. Barnes issued a decision in the February 13, 2025 grievance proceeding.  Ex. 5.

345.    Barnes found for MSPTA and Tpr. Moryc, finding that MSP's determination that Tpr. Moryc had perjured herself during the Antcliffs' 2018 divorce proceeding was not substantiated by the evidence and ordering Tpr. Moryc to be immediately reinstated to work.

346.    Barnes' decision noted numerous instances of undue hostility by MSP and its employees against Tpr. Moryc.

347.    Barnes wrote,

> [I]n the investigation, the Department clearly did not pursue the facts regarding Grievant being placed with Officer Antcliff at the beginning of her training since it was well known in the Department that he was a womanizer. That was something that could have and should have been taken into account in reaching a conclusion of whether or not discharge was appropriate. While [Tpr. Moryc]'s entanglement with Officer Antcliff was voluntary, nevertheless, it is very likely we wouldn't be here today if she hadn't been assigned to

someone known to officers in the Department to be someone not to be trusted with women. Moreover, the internal investigations were tainted by the finding she had lied in Court, a conclusion I have rejected.

Ex. 5 at 19.

348.  Barnes wrote,

This case involved testimony not about police work, but about a divorce case in which [Tpr. Moryc] was not a party but was certainly an interested witness. This was off-duty conduct on a non-law enforcement civil lawsuit in which Grievant was not a party. She testified to the questions she was asked and nothing more. She didn't volunteer testimony and she did not answer any question untruthfully.

Additionally, but for the fact that one of the parties who was involved in the divorce proceeding, revealed five years later, in her opinion, that had [Tpr. Moryc] not testified truthfully, this case would have never seen the light of day. Disciplining someone, let alone discharging them nearly five years after they allegedly testified untruthfully (which I have determined not to be the case) does not find a precedent in any of the cases cited by the parties. While we know that testimony in this case was recorded in 2018 in the court transcript, that does not answer the deficits to be found in such dated testimony. First, discipline is normally to be timely meted out so that the employee understands the connection between their misconduct and the need for immediate action by the employee. Discharge of an employee nearly five years after the late discovery of a spurned spouse's claim of perjury is beyond the realm of the fair imposition of discipline. Even in the criminal law, there are statutes of limitations where criminals go free from their crimes because their conduct is not uncovered or discovered in time. Certainly at some point in time, an employee should be free of the threat of discipline where they even knowingly engaged in misconduct. Moreover, in this case it cannot be fairly said that [Tpr. Moryc] knowingly testified untruthfully five years previously. Further, one needs to consider the affect of the passage of time on an individual's ability to recollect exactly what happened in a prior proceeding five years previously. In other words, it is no surprise that investigatory interviews done nearly five years after someone is accused of a felony in untruthfully testifying that they wouldn't be able to recollect all of the details necessary to testify in internal interviews in a way which was 100% accurate. Memories fade, witnesses are not available or not called, and even the investigators

> are not always sure about the words that were used, as in this case,
> in the court proceeding. Further, when the individual being
> examined in the administrative investigations is asked different
> questions than were propounded to her in the court proceedings five
> years previous, it is not any surprise that the answers would be
> different and in some cases conflicting.

Ex. 5 at 20-21.

349.   Barnes wrote,

> In addition to the foregoing, there were facts that developed in the
> hearing as a whole that indicated the Department was not giving that
> [Tpr. Moryc] a fair shake. First off, I am troubled by the fact that the
> prior arbitration decision, where that [Tpr. Moryc] was given a 30-
> day suspension by very well respected Arbitrator Opperwall
> indicated, at the very least, a dislike for [Tpr. Moryc]. The Employer,
> under the CBA, was responsible for implementing an arbitration
> decision regardless of the outcome because it had agreed that
> decision would not be appealable if within the arbitrator's authority
> just as the Court of Appeals determined and the Supreme Court
> affirmed. It is well- known that arbitration decisions that are
> challenged are highly unlikely to succeed. While there is no
> evidence as to what the Employer was advised by its Counsel, I can
> easily opine that attorneys or representatives who are asked to
> challenge arbitrator's awards almost unanimously advise their
> clients that their chances of success are not good, for one, because
> they selected the arbitrator and agreed to be bound by his/her
> decision. Nevertheless, the Employer in this case marched ahead on
> a 30-day suspension in trying to overturn the previous Arbitrator's
> award.
>
> There is other evidence to suggest that the Employer similarly had
> some animus toward [Tpr. Moryc]. For example, for some reason
> unknown to the undersigned, the Employer maintained that [Tpr.
> Moryc]'s testimony regarding a suicide that she had attended on
> January 23, 2019, was exaggerated. As indicated above, I reviewed
> that testimony and found it to be anything but exaggerated. It was a
> horrible situation to which [Tpr. Moryc] testified. If the Employer
> thought that was an exaggeration, there should have been testimony
> at the hearing to establish that fact. Its own witness interviews
> established it had no such testimony or witness.
>
> Furthermore, the speculation that a judge in a divorce case would
> not have been able to make a proper decision on custody is purely
> that. The Circuit Judge here is very experienced and has done

54

numerous domestic cases involving child support and custody and property matters. Judge Kreeger has been the Montcalm County Circuit Judge for 17 years and the Chief Judge since 2009, and 17 years prior to becoming a judge, she was Director of the Office of Friend of the Court and Circuit Court Referee. Stellar credentials to assess witnesses in a divorce case! She certainly has heard plenty of witnesses, some who she has probably credited, and others of whom she has not credited based on their testimony in front of her. There is no question in my mind that she was perfectly able to make whatever determinations were necessary and whatever credibility determinations were necessary in her case. Any speculation on the part of the Employer in this case that the Judge could not ably do that is a further indication that [Tpr. Moryc] was not given a fair hearing in this matter.

Last and finally, it does not help the Employer's case that it sought two criminal warrants [against Tpr. Moryc], one in Newaygo County (perjury) the other in Barry County (assault), both of which the Prosecutors dismissed. Thus, the Employer wasn't able to get complaints issued, let alone a conviction on conduct that it thought was perjurious and an assault. That should have been a red flag to the Employer that perhaps it should have reviewed at least its characterization of the testimony given in Court on January 23, 2018.

Given all of the above, this case falls far short of the requirements needed to perfect a case for a just cause discharge. The fact that, as indicated above, the Department did not take an objective view of the [Tpr. Moryc]'s conduct in this case further taints the reasons for discipline. I have decided that based upon that and all of the facts that [Tpr. Moryc]  should not be disciplined in this case. [Tpr. Moryc] deserves a clean slate in this case and I expect she will take advantage of her opportunity to be an excellent Michigan State Police Trooper.

Ex. 5 at 22-24.

350.    On August 28, 2025, MCOLES background investigator Cherie Ballor sent Tpr.

Moryc the following request:

During an interview, it was alleged that you had bitten an in-law when they tried to step between you and another person during a verbal argument.  This incident occurred after a bachelorette party and was before you became a Trooper.  Can you provide an explanation or any details surrounding this incident.

351. Although Tpr. Moryc did not know what Ballor was referencing, the alleged incident would have occurred sometime in or before 2015, at least six years outside the range of the investigation's scope, which was August 2021 to present.

352. Tpr. Moryc responded as follows:

I have no recollection of the incident being alleged.

In addition and for the record, if this was at an alleged bachelorette party BEFORE I was a Trooper as you indicated in your email, this is well outside the August 2021 to present background investigation parameters that were stated repeatedly by F/Lt. Buege.

Was this something that was brought up or investigated in my 2015 department background investigation, since as you stated these allegations happened prior to my becoming a trooper?

Your email specifically stated "in-law", which would mean you have been speaking with my now ex-in-laws.  I have not spoken to my ex-husband or his family since our divorce was finalized in 2018.  I am the one who filed for divorce. We did not part on great terms, combined with the recent news segment releases in which my quid pro quo affair with former Trooper Antcliff was made public, my ex-husband and/or any members of his family would have every reason to want to retaliate against me.

353. Ballor responded as follows: "The incident was not in your previous background. It was disclosed during an interview.  I wanted to give you the opportunity to respond which will be included in the report."

354. Ballor never responded as to why she was investigating incidents beyond the purview of the August 2021 to August 2024 investigation scope or why she was interviewing witnesses who had not had any contact with Tpr. Moryc since 2018.

355. Given Ballor's background as a Lansing Police Department Captain with expertise in the dynamics of domestic violence, Tpr. Moryc was shocked that Ballor would allow her former abuser's family to attack her through allegations about her conduct that were not within the scope of the investigation.  *See* Ann Pierret, *Domestic violence calls up for surprising reason*, WILX 10

NEWS (Aug. 12, 2016), https://www.wilx.com/content/news/Domestic-violence-calls-up-for-surprising-reason-390030951.html.

356.    On September 11, 2025, Ballor notified Tpr. Moryc that she had completed the background investigation.

357.    On September 16, 2025, Tpr. Moryc contacted MSP Sgt. Caitlyn Hammond, who Ballor had advised was supervising the investigation, to request a copy of the investigation report.

358.    Sgt. Hammond did not respond.

359.    On September 18, 2025, Tpr. Moryc contacted MSP Recruitment and Selection employee Ken Plaga, who Ballor had provided as a secondary contact, to request a copy of the investigation report.

360.    Plaga did not respond.

**New Information About Past Unlawful Acts Discovered By Tpr. Moryc For the First Time in November 2024**

361.    On or around November 26 and 27, 2024, Attorney O'Keefe received records he had requested through the Freedom of Information Act from the previously unknown investigations conducted by MSP into allegations of sex discrimination and harassment made by Tpr. Moryc.  These included, but are not limited to, the following:

    a.  PSS-535-20, opened on February 21, 2020;

    b.  PSS-536-20, opened on September 25, 2020;

    c.  PSS-365-21, reported on May 17, 2021, but not opened for investigation;

    d.  PSS-321-21, reported on July 21, 2021; and

    e.  PSS-239-20, reported on April 9, 2023.

362.    Before Attorney O'Keefe obtained these records, Tpr. Moryc had never seen any of the investigative reports or evidentiary materials collected in these investigations and had no idea

the investigations related to PSS-535-20 and PSS-536-20 had even been conducted.

363.    The records are heavily redacted, and the specific allegations forming the basis for the investigations is for the most part impossible to determine.

364.    Upon review of the records, Tpr. Moryc learned the following information for the first time.

### PSS-535-20, opened on February 21, 2020

365.    Report PSS-535-20, which was completed on November 16, 2020, contained text conversations between former MSP Lakeview Post Troopers Kelly Julin (Escott) and Timothy Moreno.

366.    On July 19, 2019, Tpr. Julin sent Tpr. Moreno a text message stating that she did not want to be posted at the Sixth District Rockford Post because "I don't like the good ole boys club at Rockford."

367.    Therefore, Tpr. Moryc learned ofr the first time that MSP had notice as of at least November 16, 2020 that at least one other female trooper had concerns of sex discrimination and/or harassment within MSP Sixth District posts.

368.    On November 13, 2020, while the biased criminal investigation into Tpr. Moryc was just beginning, Capt. Dale Hinz determined her complaints of sex discrimination and harassment made in PSS-535-20 and PSS-536-20 should be closed as "Unfounded."

369.    Capt. Hinz referenced report PSS-083-20, the very first sex discrimination complaint Ms. Moryc made, as influencing his decision to close PSS-535-20 and PSS-536-20 as unfounded.

370.    Therefore, Tpr. Moryc learned for the first time that Capt. Hinz had found her subsequent reports of sex discrimination and harassment as unfounded simply because she had

made a similar prior report.

### PSS-536-20, opened on September 25, 2020

371.    MSP launched an investigation into all male employees of the Rockford Post where Tpr. Moryc worked at the time and notified them that Tpr. Moryc was the source of the complaint.

372.    Upon information and belief, a criminal complaint Tpr. Moryc's male colleagues made against her in October 2020 for engaging in horseplay of the exact same type in which they frequently engaged, was in direct retaliation for her reports of sex discrimination and harassment against them.

373.    Upon information and belief, on or around October 19, 2020, MSP and Sgt. Robert Metivier retaliated against Tpr. Moryc by launching a character assassination, career ending criminal investigation against her due to false allegations of misconduct made against her by Sgt. Metivier, who was one of the known worst perpetrators of discrimination and harassment against Tpr. Moryc at the Lakeview Post.

374.    Capt. Hinz knew Tpr. Moreno had admitted to watching homemade pornography on his cell phone while on duty in the common area of the Lakeview Post where troopers including Tpr. Moryc were able to observe him.

375.    Capt. Hinz also knew Troopers James Yates and Jacob Robison had admitted they had observed and participated in watching pornography with Tpr. Moreno on his cell phone while on duty in the common area of the Lakeview Post.

376.    Capt. Hinz was therefore aware of the hostile and discriminatory work environment male troopers were creating for Tpr. Moryc based on her sex at the Lakeview Post.

### PSS-365-21, reported on May 17, 2021

377.    Report PSS-365-21 contained evidence establishing that Capt. Deasy and Insp.

Gee-Cram declined to launch a full investigation into an incident outlined in Tpr. Moryc's complaint against Spl/Lt. Horan and D/Sgt. Fink, in which her life was put in mortal danger.

378.     Capt. Deasy stated that that the decision was partly due to Tpr. Moryc not alleging a specific violation of the Code of Conduct.

    a.     As the Commander of the Transparency and Accountability Division in 2021, Capt. Deasy was directly responsible for the Professional Standards Section.

    b.     When Tpr. Moryc filed the complaint against Spl/Lt. Horan in 2021, Spl/Lt. Horan was operating as a member of the Professional Standards Section.

    c.     As evidenced by testimony obtained in the Eaton County Circuit Court matter *Moryc v. Mich. St. Police*, any violations of MSP's Code of Conduct are determined by the Professional Standards Section after a full investigation has been conducted.

***PSS-321-21, reported on July 21, 2021***

379.     Within these records, Tpr. Moryc discovered the report number generated for her 2024 complaint against Professional Standards F/Lt. Nicole Bock, PSS-185-24.

380.     These records provide evidence that Lt. Col. Aimee Brimacombe directly inserted herself into the 2024 complaint against F/Lt. Bock, by personally assigning Tpr Moryc's complaint to her direct report Captain Cameron Henke, Division Commander of Special Investigations.

381.     MSP provided Capt. Henke with only certain complaints/investigations related to Tpr. Moryc to review in his investigation.

382.     These included reports into investigations of which Tpr. Moryc had never been made aware, which painted Tpr. Moryc as a predator (PSS-542-20), and those that made her look like she filed false harassment complaints that were concluded as "unfounded."

383.     MSP did not provide Capt. Henke with complaints/investigations in which any

allegations Tpr. Moryc had filed in which there was a finding against a respondent, or any complaints/investigations against her that were concluded as "unfounded."

384.    Upon information and belief, this was done to create bias against Tpr. Moryc.

385.    In these records, Tpr. Moryc learned former 6th District Commander Dale Hinz requested input from former Sixth District Inspector Cameron Henke, former F/Lt. Andrew Fias of the Lakeview Post, and former Lt. Ryan Maki, also of the Lakeview Post, regarding Tpr. Moryc's claims of sex harassment  and discrimination, which occurred from 2016 to 2020 while she worked at the Lakeview Post.

386.    These records provide evidence that former MSP Col. Joseph Gasper was provided with a copy of her complaint, which she did not know.

387.    Capt. Deasy closed the complaint as "exonerated without a full investigation."

388.    Capt. Deasy emailed Capt. Henke, "The summary was exactly what we needed."

**PSS-239-20, reported on April 9, 2023**

389.    On March 25, 2025, Tpr. Moryc took D/Sgt. Kandyce Herr's deposition in the Eaton County Circuit Court matter *Moryc v. Mich. St. Police*, at which she swore under oath to tell the truth.

390.    At her deposition, D/Sgt. Herr admitted that she never investigated former Tpr. Antcliff for sexual assault in connection with Tpr. Moryc's April 2023 complaint.

391.    D/Sgt. Herr also testified that she never interviewed Nina Antcliff as a "witness" to domestic violence or sexual assault because she was not aware of this allegation.

392.    D/Sgt. Herr also testified that she did not know of any police reports in which Nina Antcliff filed domestic violence complaints against Tpr. Antcliff.

393.    This testimony is contradicted by documentation Attorney O'Keefe obtained

related to PSS-239-20.

394.    In D/Sgt. Herr's report, No. 10-201-23, under the heading "REVIEW OF FILES PRESENTED BY TPR. MORYC", D/Sgt. Herr wrote that she reviewed the files presented by Tpr. Moryc in her complaint.

395.    D/Sgt. Herr's report mischaracterized the police reports Tpr. Moryc provided as "Police reports from issues between Antcliff and previous wife, none substantiated."

396.    In fact, D/Sgt. Herr had been provided with Greenville Department of Public Safety report #17-1800, reported on May 23, 2017 by Nina Antcliff, against her then-husband, Tpr. Antcliff.

397.    The Greenville Department of Public Safety classified Ms. Antcliff's complaint as domestic violence.

398.    That 2017 domestic violence complaint by Ms. Antcliff complaint led MSP to complete to an internal investigation into Tpr. Antcliff.

399.    As a result of the investigation, MSP made a finding that Tpr. Antcliff had engaged in battery of his wife and imposed a 5-day disciplinary suspension.

400.    At her deposition, D/Sgt. Herr also testified that MSP had never taken any disciplinary action against her for failing to comply with departmental standards in taking Tpr. Moryc's domestic violence complaint against Tpr. Antcliff.

401.    This directly contrasts with MSP's actions in other situations in which its employees had failed to take seriously or adhere to department standards in taking a domestic violence complaint.

402.    For example, at the completion of internal investigation PSS-538-20, MSP's Human Resource Division prepared the following Statement of Charges/Proposed Discipline

which was served on Tpr. Andrews on January 8, 2021:

> An Internal Affairs investigation, PSS-538-20, established that on October 14, 2020, you violated department policy when you changed the factual account in an incident report you had authored three days earlier.  After completing a Domestic Violence incident report on October 11, 2020, you were given a reasonable work order to properly complete the requirements of a Domestic Violence incident submission…Additionally, you failed to follow the requirements of Official Order No. 50, when you shirked your duties and failed to adequately investigate or take action on the reported domestic assault, failed to provide the victim with a UD-3-, failed to complete a DV-001, and failed to submit to the prosecutor for review within 48 hours.

403.    The Human Resources Division proposed the termination of Tpr. Andrews, which was upheld by Capt. Stephen O'Neill during a discipline conference on January 25, 2021.

### Additional Information Included in the Records

404.    The records included references to multiple additional internal complaint numbers assigned to complaints Tpr. Moryc had allegedly made, of which she had never been made aware and the status of which, to date, she has no knowledge: PSS-751-22, PSS-533-21, PSS-075-22, PSS-083-20, PSS-544-20, and PSS-646-20

405.    Upon information and belief, PSS-083-20 is an investigation into a report filed by another female trooper regarding a nonconsensual recording Tpr. Moreno made of she and Tpr. Moreno having sex.

406.    Upon information and belief, Tpr. Moryc is listed as a witness in the investigation, as Capt. Matt Williams interviewed her in the investigation in August 2020.

407.    The records included evidence that discovered Spl/Lt. Horan had launched two additional, retaliatory investigations against Tpr. Moryc while Tpr. Moryc was being criminally investigated in October 2020.

408.    Upon information and belief, Tpr. Moryc's name being included in the PSS-083-20 investigation report led to the criminal investigation and these two retaliatory internal investigations.

409.    In August 2021, Capt. Hinz chose to uphold Tpr. Moryc's first termination in retaliation for her coming forward with complaints of sex discrimination and harassment against Tpr. Moreno.

410.    Despite documented admissions by MSP employees that condoms had been placed in Tpr. Moryc's  backpack and that male employees were watching pornography while on duty in Tpr. Moryc's presence, both of which were unwelcome to Tpr. Moryc, Capt. Hinz determined Tpr. Moryc had not experienced sexual harassment or a hostile work environment.

## CAUSES OF ACTION

### COUNT I
**Violation of Title VII**
**Discrimination of the Basis of Sex**
**42 U.S. Code § 2000e-2 *et seq*.**
**(Defendant MSP)**

411.    Tpr. Moryc realleges and incorporates by reference the allegations contained in the previous paragraphs

412.    Tpr. Moryc is an employee within the meaning of Title VII.

413.    Tpr. Moryc, a woman, is a member of a protected class.

414.    MSP is an employer within the meaning of Title VII.

415.    Tpr. Moryc met, and many times exceeded, her employer's legitimate job performance expectations.

416.    Tpr. Moryc suffered numerous adverse employment actions.

417.    By the acts and omissions alleged herein, MSP discriminated against Tpr. Moryc in violation of Title VII by, on the basis of sex by failing to investigate her reports of sex discrimination, harassment, and abuse.

418.    Tpr. Moryc filed a charge with the Michigan Department of Civil Rights (MDCR) regarding the sex discrimination and retaliation she suffered at MSP.

419.    On June 23, 2025, the Equal Employment Opportunity Commission (EEOC) issued a Notice of Right to Sue regarding Charge No. 23A-2024-00781/MDCR #643570, which alleged that MSP had discriminated against Tpr. Moryc based on her sex, covering the period from August 17, 2023 to March 16, 2024.

**COUNT II**
**Violation of Title VII**
**Retaliation**
**42 U.S.C. § 2000e-3(a)**
**(Defendant MSP)**

420.    Tpr. Moryc realleges and incorporates by reference the allegations contained in the previous paragraphs.

421.    Title VII prohibits employers from retaliating against employees that have made or assisted in claims:

> It shall be an unlawful employment practice for an employer to discriminate against an of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

422.    Tpr. Moryc repeatedly opposed unlawful employment practices by MSP and other MSP employees by filing multiple complaints of sex discrimination, harassment, and retaliation, and participating in all such investigations of which she was made aware.

423.    MSP engaged in adverse action against Tpr. Moryc by:

    a.    Failing to pay her back pay she is owed in the form of health insurance premiums deducted from her paycheck while she was not receiving health insurance coverage from MSP;

    b.    Initiating false and retaliatory criminal and internal investigations against her;

    c.    Failing to allow her to return to work; and

    d.    Making false statements in legal proceedings against her.

424.    MSP and its employees engaged in this discrimination because she opposed unlawful employment practices and made charges and participated in investigations about her claims of sex discrimination, harassment, and retaliation.

425.    Tpr. Moryc filed a charge with the EEOC regarding the sex discrimination and retaliation she suffered at MSP.

426.    On July 7, 2025, the EEOC issued a Notice of Right to Sue regarding Charge No. 471-2025-05591, which alleged that MSP had retaliated against Tpr. Moryc due to her reports of sexual harassment, sexual assault, and sex discrimination, covering the period from October 1, 2024 to June 12, 2025.

**COUNT III**
**Violation of the Right to Substantive Due Process**
**Bodily Integrity**
**42 U.S.C. § 1983 and the**
**Fourteenth Amendment**
**(Defendants Grady, Brimacombe, Gee-Cram,**
**Hinz, Henke, Nemecek, Dillon, Darling,**
**Herr, Deasy, Williams, Bock, Sweeney, Fias,**
**Maki, Stephens, Buege, Davis, and Ziesman**
**in their individual capacities)**

427.    Tpr. Moryc realleges and incorporates by reference the allegations contained all prior paragraphs as if stated herein.

428.    Defendants are state actors and at all relevant times were acting under color of law.

429.    The Due Process Clause of the Fourteenth Amendment assures an individual the implied right to bodily integrity, including the right of the individual to be free of sexual assault, abuse, or molestation.   Tpr. Moryc enjoyed those rights.

430.    The acts committed by Tpr. Antcliff as alleged herein constitute a violation of these well-established, constitutionally protected rights of which a reasonable person in Defendants' position should have known.

431.    Pursuant to custom, policy, and/or practice, Defendants had, and continue to have, the ultimate responsibility and authority to properly investigate complaints levied against their employees, agents, and representatives.

432.    Defendants failed to fulfill and execute this responsibility and authority, thus amounting to deliberate indifference.

433.    Defendants' failure to address and properly respond to complaints about Tpr. Antcliff's sex discrimination, harassment, and abuse of prior victims, and its subsequent decision to place Tpr. Moryc under Tpr. Antcliff's supervision knowing that he had a history of abusing

women, led directly to Tpr. Moryc being victimized by Tpr. Antcliff's sexual assault, abuse, stalking, and molestation.

434.    Defendants' decision to investigate and discipline only Tpr. Moryc regarding the October 2020 incident, despite knowing that male troopers were engaging in similar horseplay, and that their complaint against her was made in retaliation for her complaints against them, led directly to Tpr. Moryc being wrongly terminated, criminally convicted, and jailed.

435.    Defendants' failure to address and properly respond to Tpr. Moryc's complaints other male troopers' sex discrimination, harassment, and abuse of prior victims, led directly to Tpr. Moryc being victimized by other male troopers' sex discrimination and harassment.

436.    Defendants ultimately failed to adequately investigate the complaints brought by Tpr. Moryc and other similarly situated victims upon information of Tpr. Antcliff's and other male troopers' sexual abuse, harassment, discrimination, and retaliation, which includes Defendants':

a.    Knowingly allowing Tpr. Antcliff to supervise Tpr. Moryc even though he had a history of abusing and discriminating against women;

b.    Failure to remove Tpr. Antcliff from a position of authority over subordinate female troopers who would be unlikely to complain about Tpr. Antcliff's conduct;

c.    Failure to perform a thorough investigation into Tpr. Antcliff and other troopers' improper conduct upon receiving complaints regarding their abuse; and

d.    Failure to thoroughly review and investigate all policies, practices, procedures, and training materials related to the circumstances surrounding the conduct of Tpr. Antcliff and other male troopers.

437.    Defendants failed to respond to reports of Tpr. Antcliff and other male troopers' sexual assault, abuse, harassment and molestation in a clearly unreasonable manner, and thereby failed to prevent such conduct and harm to Tpr. Moryc.

438.    Defendants tolerated, authorized, and/or permitted a policy, procedure, practice, or custom that allowed for the inadequate screening, insufficient supervision, and nonexistent discipline of Tpr. Antcliff and other male troopers such that they were was allowed to violate the rights of those such as Tpr. Moryc with impunity.

439.    Defendants' policies, practices, and customs contributed to Tpr. Moryc's harm by allowing Tpr. Antcliff and other male troopers' sexual abuse, discrimination, harassment, and retaliation to continue, thereby depriving Tpr. Moryc of her rights secured by the United States Constitution.

440.    Defendants' actions and inactions shock the conscience.

441.    Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.[4]

<u>**COUNT IV**</u>
**Denial of Equal Protection**
**42 U.S.C. § 1983 and the**
**Fourteenth Amendment**
**(Defendants Grady, Brimacombe, Gee-Cram,**
**Hinz, Henke, Nemecek, Dillon, Darling,**
**Herr, Deasy, Williams, Bock, Sweeney, Fias,**
**Maki, Stephens, Buege, Davis, and Ziesman**
**in their individual capacities)**

442.    Tpr. Moryc incorporates by reference the allegations contained in the previous paragraphs.

443.    Defendants are state actors and at all relevant times were acting under color of law.

---

[4] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

444.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

445.    As MSP Director, Col. Grady responsible for oversight of MSP and ensuring that MSP complied with its legal obligations.  He also supervised Lt. Col. Brimacombe.

446.    As MSP Deputy Director, Lt. Col. Brimacombe was responsible for oversight of MSP and ensuring that MSP complied with its legal obligations.  She also supervised Lt. Col. Hinz, Capt. Deasy, and Capt. Williams.

447.    As MSP Human Resources Inspector, Gee-Cram was responsible for ensuring that MSP complied with its legal obligations.  She also supervised F/Lt. Brian Buege.

448.    As Captain of the Sixth District and, later, Deputy Director of MSP's Field Services Bureau, Lt. Col. Hinz was responsible for oversight of the Sixth District and the Field Services Bureau and ensuring that MSP complied with its legal obligations.  He also supervised Capt. Nemecek, F/Lt. Sweeney, F/Lt. Fias, F/Lt. Maki, F/Lt. Stephens, Lt. Davis, and Sgt. Ziesman.

449.    As Commander of MSP's Special Investigation Division, Capt. Henke was responsible for oversight of the Special Investigations Division and ensuring that MSP complied with its legal obligations.  He also supervised Det. F/Lt. Dillon.

450.    As Commander of MSP's Sixth District, Capt. Nemecek was responsible for oversight of the Sixth District and ensuring that MSP complied with its legal obligations.  He also supervised F/Lt. Sweeney, F/Lt. Fias, F/Lt. Maki, F/Lt. Stephens, Lt. Davis, and Sgt. Ziesman.

451.    As Commander of MSP's First District Special Investigation Section, F/Lt. Dillon was responsible for oversight of the First District Special Investigation Section and ensuring that MSP complied with its legal obligations.  He also supervised Det. Lt. Darling.

452.    As Assistant Section Commander of MSP's First District Special Investigation Section, F/Lt. Dillon was responsible for oversight of the First District Special Investigation Section and ensuring that MSP complied with its legal obligations.  He also supervised Det. Lt. Herr.

453.    As Detective Sergeant of MSP's First District Special Investigation Section, Det. Sgt. Herr was responsible for ensuring that MSP complied with its legal obligations.

454.    As Commander of MSP's Transparency and Accountability Division, Capt. Deasy was responsible for oversight of the Transparency and Accountability Division and ensuring that MSP complied with its legal obligations.  Capt. Deasy also supervised F/Lt. Bock.

455.    As Commander of MSP's Transparency and Accountability Division, Capt. Williams was responsible for oversight of the Transparency and Accountability Division and ensuring that MSP complied with its legal obligations.  Capt. Deasy also supervised F/Lt. Bock.

456.    As Lieutenant of MSP's Professional Standards Division, F/Lt. Bock was responsible for ensuring that MSP complied with its legal obligations.  She also supervised Spl/Lt. Tabaczka, Spl/Lt. Tuckey, and Spl/Lt. Pisha.

457.    As Commander of the Lakeview Post, F/Lt. Sweeney was responsible for oversight of the Lakeview Post and ensuring that MSP complied with its legal obligations.  He also supervised all troopers within the Lakeview Post, including Tpr. Antcliff and other male troopers who sexually assaulted, harassed, discriminated, and retaliated against Tpr. Moryc.

458.    As Commander of the Lakeview Post, F/Lt. Fias was responsible for oversight of the Lakeview Post and ensuring that MSP complied with its legal obligations.  He also supervised all troopers within the Lakeview Post, including Tpr. Antcliff and other male troopers who sexually assaulted, harassed, discriminated, and retaliated against Tpr. Moryc.

459.    As Commander of the Lakeview Post, F/Lt. Maki was responsible for oversight of the Lakeview Post and ensuring that MSP complied with its legal obligations.

460.    As Commander of the Lakeview Post, F/Lt. Stephens was responsible for oversight of the Lakeview Post and ensuring that MSP complied with its legal obligations.

461.    As Commander of MSP's Recruiting and Selection Section, F/Lt. Buege was responsible for oversight of the Recruiting and Selection Section and ensuring that MSP complied with its legal obligations.

462.    As Assistant Post Commander of the Lakeview Post and Det. Lt. in the Sixth District, Lt. Davis was responsible for oversight of the Lakeview Post and ensuring that MSP complied with its legal obligations.  He also supervised all troopers within the Lakeview Post, including Tpr. Antcliff and other male troopers who sexually assaulted, harassed, discriminated, and retaliated against Tpr. Moryc.

463.    As Squad Sergeant, Sgt. Ziesman was responsible for oversight of the Lakeview Post and ensuring that MSP complied with its legal obligations.  He also supervised all troopers within the Lakeview Post, including Tpr. Antcliff and other male troopers who sexually assaulted, harassed, discriminated, and retaliated against Tpr. Moryc.

464.    Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to intermediate scrutiny.

465.    Defendants' discrimination against Tpr. Moryc on the basis of sex was not substantially or rationally related to any legitimate government interest.

466.    Defendants, in their individual capacities and under color of law, subjected Tpr. Moryc to violations of her liberty and property interests by:

a.  Knowingly allowing Tpr. Antcliff to supervise Tpr. Moryc even though he had a history of abusing and discriminating against women;

b.  Failure to remove Tpr. Antcliff from a position of authority over subordinate female troopers who would be unlikely to complain about Tpr. Antcliff's conduct;

c.  Failure to perform a thorough investigation into Tpr. Antcliff and other male troopers' improper conduct upon receiving complaints regarding their abuse;

d.  Failure to thoroughly review and investigate all policies, practices, procedures, and training materials related to the circumstances surrounding the conduct of Tpr. Antcliff and other male troopers;

e.  Failing to comply with the procedures and timelines outlined in their own internal policies, protocols, and orders;

f.  Engaging in direct discrimination, retaliation, and harassment of Tpr. Moryc;

g.  Failing to timely investigate and respond to Tpr. Moryc's complaints of sex discrimination, harassment, and retaliation;

h.  Investigating a retaliatory complaint against her and disciplining her for it, while failing to investigate and/or discipline her similarly situated male colleagues for similar allegations;

i.  Failing to ensure Tpr. Moryc was protected from retaliation;

j.  Failing to ensure that the effects of sex discrimination against her were fully remedied; and

k.  Failing to adequately train and supervise their staff with respect to responding to complaints of sex discrimination, harassment, and retaliation.

467.   Defendants' discrimination against Tpr. Moryc on the basis of sex endangered her safety, privacy, security, and well-being.

468.   Defendants' actions and inactions deprived Tpr. Moryc of her rights to equal dignity, liberty, and autonomy by treating her as a second-class citizen within MSP.

469.   Tpr. Moryc was denied MSP's protective services as a female victim of sex discrimination.

470.   This selective treatment was related to MSP's interest in covering up sexual misconduct and discrimination; in other words, this selective treatment was not substantially or rationally related to any legitimate government interest.

471.   It is clearly established that failing to properly investigate allegations of sex discrimination violates the Equal Protection clause.

472.   "A State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney v. Winnebago County Dept. of Soc. Servs*., 489 U.S. 189, 197 n.3 (1989).

473.   Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity. *Pearson*, 555 U.S. at 231.

<u>**COUNT V**</u>
**Retaliation**
**42 U.S.C. § 1983 and the**
**First Amendment**
**(Defendants MSP, Grady, Brimacombe,**
**Gee-Cram, Hinz, Henke, Nemecek, Herr,**
**Deasy, Williams, Bock, Stephens, and Buege**
**in their individual capacities)**

474.   Tpr. Moryc incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

475.   Defendants are state actors and at all relevant times were acting under color of law.

476.    Tpr. Moryc made comments to WLNS 6 News as a private individual on a matter of public interest: dysfunction and corruption within MSP.

477.    Whether speech by a public employee is protected depends on whether the speech was ordinarily within the course of his duties as a public employee, not whether it merely concerns those duties. *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345 (6th Cir. 2010).

478.    Tpr. Moryc's speech was protected by the First Amendment to the U.S. Constitution as it was not ordinarily within the course of her duties as an MSP employee.

479.    After Tpr. Moryc spoke to WLNS 6 News, Defendants engaged in retaliation against her including but not limited to:

a.    Terminating her employment;

b.    Failing to provide her with backpay owed to her due to MSP's wrongful withholding of health insurance premiums during a period when she was not insured by MSP;

c.    Interfering with her MCOLES investigation and expanding the scope beyond the August 2021-October 2024 period; and

d.    Making false statements about their knowledge of and involvement in the allegations included in the First Amended Complaint in the Eaton County Circuit Court matter *Moryc v. MSP*.

480.    Defendants' retaliation was designed to silence Tpr. Moryc and prevent her from further speaking out against MSP, which would likely prevent an ordinary person from continuing to engage in the exercise of free speech.

481.    Defendants' retaliation has had a chilling effect that acts as a deterrent to free speech.

482.    Tpr. Moryc's protected speech was a motivating factor in Defendants' retaliatory actions.

483.    Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.  *Pearson*, 555 U.S. at 231.

**COUNT VI**
**State Created Danger**
**42 U.S.C. § 1983 and the**
**Fourteenth Amendment**
**(Defendants Hinz, Sweeney, Davis,**
**and Ziesman in their individual capacities)**

484.    Tpr. Moryc realleges and incorporates by reference the allegations contained in all prior paragraphs as if stated herein.

485.    Defendants are state actors and at all relevant times were acting under color of law.

486.    According to United States Constitution, the Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of the law."

487.    Defendants deliberately subjected Tpr. Moryc to the care and/or supervision of Tpr. Antcliff—a known sexual predator—regardless of Defendants' knowledge that Tpr. Antcliff could and would cause harm to Tpr. Moryc as a woman.

488.    Defendants' conduct and culpability is blatant and extreme.

489.    As a result of Defendants' decisions to not investigate prior complaints about Tpr. Antcliff; to avoid corrective measures following Tpr. Antcliff's abuse; and to keep Tpr. Antcliff employed at and in a supervisory role at MSP, Tpr. Moryc became the foreseeable and certain victim of sexual assault.

490.    Defendants' decisions deprived Tpr. Moryc of a safe workplace and constitute affirmative actions intended to cause and/or increase the risk of harm done to Tpr. Moryc, including any physical and emotional injuries.

491.    Defendants acted with willful disregard for Tpr. Moryc's safety and have breached their fiduciary duty to protect employees, like Tpr. Moryc, from harm, by placing Tpr. Moryc in the hands of a sexual predator and thereby allowing Tpr. Antcliff's sexual assaults to occur.

492.    Defendants provided Tpr. Antcliff—a known sexual predator—the abhorrent opportunity to sexually assault Tpr. Moryc.

493.    Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.  *Pearson*, 555 U.S. at 231.

**COUNT VII**
**Failure to Train and Supervise**
**42 U.S.C. § 1983 and the**
**First and Fourteenth Amendments**
**(Defendants Grady, Brimacombe, Gee-Cram,**
**Hinz, Henke, Nemecek, Dillon, Darling,**
**Deasy, Williams, Bock, Sweeney, Fias, Maki,**
**and Stephens in their individual capacities)**

494.    Tpr. Moryc incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

495.    Defendants are state actors and at all relevant times were acting under color of law.

496.    It is Defendants' ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives.

497.    These duties include specific responsibilities relative to identifying, reporting, and/or addressing sexual misconduct, harassment, and retaliation in MSP locations, activities, and/or premises.

498.    Defendants failed to train and supervise their employees, agents, and/or representatives regarding the following duties:

a.  Perceiving, reporting, and stopping inappropriate sex discrimination, harassment, and retaliation in the workplace;

b.  Providing ready, diligent, and ongoing supervision over employees and other individuals;

c.  Reporting suspected incidents of sex discrimination, harassment, and retaliation;

d.  Properly investigating incidents of sex discrimination, harassment, and retaliation;

e.  Establishing and ensuring the safety of all MSP employees;

f.  Following MSP policies, procedures, orders, and state and federal law;

g.  Providing a safe environment for all MSP employees, free from sex discrimination, harassment, and retaliation;

h.  Properly training employees and agents to be aware of their individual duty to create and maintain a safe environment in MSP locations, activities, and/or premises;

i.  Payroll, proper withholding of health insurance benefits, proper backpay reimbursement, and other basic accounting and human resource functions.

499.    Defendants failed to adequately train MSP employees on those duties, leading to Defendants' violations of Tpr. Moryc's constitutional rights.

500.    This failure to train is the direct result of Defendants' deliberate indifference towards the well-being of its employees, including their physical, mental, and emotional health.

**COUNT VIII**
**Injunctive Relief**
**(Defendants Grady, Brimacombe, Gee-Cram,**
**Williams, Nemecek, and Stephens**
**in their individual capacities)**

501.    Tpr. Moryc incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

502.    Defendants' adverse actions against Tpr. Moryc were in direct response to her reports of sex discrimination, harassment, and retaliation, and her decision to speak out about corruption within MSP to WLNS 6 News.

503.    Defendants used their positions as high-level MSP administrators with power and influence over subordinate MSP employees to incite and encourage retaliation against Tpr. Moryc for her protected speech.

504.    Tpr. Moryc's right to free speech and expression under the law is one of which reasonable persons in these state officials' position would have known.

505.    Tpr. Moryc is seeking immediate reinstatement to a full-time position at MSP.

506.    Tpr. Moryc is also seeking an order enjoining MSP from interfering in any way with her MCOLES application, and from it considering anything beyond the August 2021 to August 2024 period with respect to her reinstatement.

507.    Tpr. Moryc is also seeking an order that MSP immediately compensate her for the $8,500 it is unlawfully withholding from her for health insurance premiums during a period when she was not insured by MSP.

508.    In the absence of such orders, Tpr. Moryc will continue to suffer irreparable injury.

509. Further, irreparable harm is presumed where 42 U.S.C. § 1983, 28 U.S.C. § 2201, and 5 U.S.C. §§702, 704, and 706 authorizes such relief to remedy the violations of Plaintiff's Constitutional rights.

510. The threatened injury to Tpr. Moryc outweighs any harm to Defendants.

511. Such an injunction is not averse to public policy as the public has an interest in MSP not retaliating against employees who file complaints of sex discrimination, harassment, and retaliation, and who speak out publicly about corruption within MSP.

512. Tpr. Moryc has no other adequate remedy at law to address the ongoing harm she is suffering.

## **DAMAGES**

513. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

514. As a direct and proximate result of the above-described conduct, Plaintiff suffered general, special, incidental, and consequential injuries and damages, past, present, and future, in excess of the jurisdictional threshold of this Court, an amount that shall be fully proven at the time of trial. These past, present, and future damages include, but are not limited to, the following:

a. Physical injury and suffering;

b. Pain, suffering, mental, and emotional distress;

c. Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, and humiliations;

d. Loss of her constitutional rights;

e. Loss of work, income, and employment opportunities;

f. Damage to her professional reputation;

g.  Weight loss;

h.  Post-traumatic stress disorder;

i.  Anxiety;

j.  Depression;

k.  Sleep disturbances and nightmares;

l.  Hypervigilance;

m.  Economic loss;

n.  Loss of the ordinary pleasures of everyday life;

o.  Loss of relationships;

p.  Travel and travel-related expenses;

q.  All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## RELIEF REQUESTED

For all the foregoing reasons, Plaintiff prays for judgment against Defendants as follows:

A.  For past, present and future non-economic damages in an amount to be determined at trial;

B.  For past, present, and future general, specific, incidental, and consequential damages in an amount to be determined at trial;

C.  For any appropriate statutory damages;

D.  For costs of this suit;

E.  For punitive damages, according to proof, as appropriate to the individual cause of action;

F.   For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

G.   For reasonable attorney fees, costs, and interest, to the fullest extent allowed by law;

H.   For such injunctive relief outlined above; and

I.   All such additional and/or further relief as this Court deems just and equitable under the circumstances.

**<u>JURY DEMAND</u>**

Now comes Plaintiff, by and through her attorneys, ABDNOUR WEIKER LLP, and demands a trial by jury.

Dated:    September 21, 2025    Respectfully Submitted,

*s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour (P78203)
ABDNOUR WEIKER LLP
325 E. Grand River Ave., Ste. 250
East Lansing, MI 48823
(517) 994-1776
liz@awlawohio.com

*Attorneys for Plaintiff*