**EXHIBIT 1**

**VOLUNTARY LABOR ARBITRATION**

In the matter of the arbitration between:

| | |
|---|---|
| **MICHIGAN DEPARTMENT OF STATE POLICE,** <br> Employer, <br> -and- | TA-012D-21/ PSS-542-20 <br><br> Grievant: Tpr. Megan V. Moryc <br><br> Issue: Discharge – Code of Conduct § 4.5, 4.6, & 4.25 |
| **MICHIGAN STATE POLICE TROOPERS ASSOCIATION,** <br> Union. _____/ | Arbitrator: Kathleen R. Opperwall |

**ARBITRATION OPINION AND AWARD**

An arbitration hearing was held on November 23, 2021, in East Lansing, Michigan, with the following individuals attending and/or testifying:

    <u>On behalf of the Employer</u>
    Insp. Lisa Gee-Cram, MSP Advocate
    Lt. Carissa Horan, Professional Standards Section
    Capt. Dale Hinz, 6th District Commander
    Patrick Arena, MSP Trooper
    Stephanie Horton, Human Resources Director
    Kristin Lesmeister, Labor Representative

    <u>On behalf of the Union</u>
    Timothy J. Dlugos, Attorney for MSPTA
    Megan V. Moryc, Grievant
    Robert Tomassi, MSPTA Vice President
    Aubree Kugler, Attorney for MSPTA

The record was closed on January 11, 2022, after receipt of the parties' post-hearing briefs.

ISSUE

Was there just cause for terminating the employment of Trooper Megan Moryc? If not, what is the appropriate remedy?

Hearing Record

The Michigan Department of State Police (MSP or Employer) and the Michigan State Police Troopers Association (MSPTA or Union) are parties to a collective bargaining agreement which covers Troopers and Sergeants.  The Grievant, Trooper Megan V. Moryc, began her employment with the MSP on March 27, 2016.  The Employer terminated her employment on August 9, 2021, based on an incident which had occurred on October 13, 2020.

The Statement of Charges on which the discharge was based gave the following description:

> An Internal Affairs investigation, PSS-542-20, established that on October 13, 2020, you violated department policy and the law by committing crimes of assault and sexual assault against three co-workers while attending an MSPTA event.  The investigation determined you committed two incidents of assault by forcefully hitting/kneeing the groin of two male co-workers.  Additionally, you committed two counts of CSC 4th (Force or Coercion) when you penetrated the anal cleft of two male co-workers, through their clothing.  You were charged with two counts of assault and battery and two counts of Criminal Sexual Conduct, 4th degree.  You pled no contest to two counts of assault and battery, dismissal of the CSC 4th degree charges, and were sentenced to 30-days in jail.

The Statement of Charges cited violations of Sections 4.5, 4.6, and 4.25 (OO No. 12) of the Code of Conduct.  These Code Sections read as follows:

> Individual Deportment
> Section 4.5    Members shall maintain a level of conduct in their personal and business affairs which is in keeping with the highest standards of the law enforcement profession.  Members shall conduct themselves at all times, both on and off duty, in a manner that will reflect favorably upon the department.  Conduct unbecoming a member shall include that which brings the department into disrepute or reflects discredit on the individual as a member of the department or that which impairs the efficiency of the department.

2

> Obedience to Law
> Section 4.6     Members shall not knowingly violate any laws of the United States, State of Michigan, ordinance of a unit of local government, laws of another state or country, or an order of any court.  If such a charge is shown to be factual, the fact that no criminal prosecution was instituted against a member shall not bar department discipline.  Likewise, the fact that a criminal prosecution did take place, regardless of outcome, shall not have a bearing on department discipline procedures that shall be conducted on an independent basis.  The results of any criminal proceeding shall be considered in any administrative hearing.
>
> Compliance with Official Orders
> Section 4.25    Members shall comply with all Official Orders, policies, and directives properly issued by the department authorities unless superseded by applicable Civil Service rule or contractual agreement.

The Official Order which was cited in the Statement of Charges was Order No. 12 which includes the Department's Anti-Harassment and Violence in the Workplace policies.

The Union filed a timely grievance on Tpr. Moryc's behalf.  The parties agreed that the issue in this case is whether there was just cause for the termination of Tpr. Moryc's employment.  The parties' contract includes the following provision at Article 8, Part A, Section 1:

> The Employer will utilize disciplinary action only for just cause toward employees who engage in violations of the Code of Conduct.  It is the intention of the Employer to utilize discipline by progression, when appropriate.

An administrative complaint had been filed on October 16, 2020, a few days after the incident.  The administrative investigation was suspended on October 19th while a criminal investigation went forward.  D/ F/ Lt. Mark Harris from the 7th District Headquarters conducted the criminal investigation.  On January 20, 2021, the Grand Traverse Prosecutor's Office issued charges against Tpr. Moryc for two counts of assault and battery, and two counts of criminal sexual conduct in the 4th degree.  Tpr. Moryc was

3

placed on unpaid suspension that day, as is permitted under Article 8 of the parties' contract.  On March 5, 2021, she pleaded no contest to two counts of assault and battery, and the two counts of criminal sexual conduct were dismissed.  On April 22, she was sentenced to 30 days in jail. She began this jail sentence on April 23, and was released on May 14, 2021, after serving 21 days.  The administrative investigation resumed at that point, conducted by Specialist/ Lt. Carissa Horan.

The incident occurred while Tpr. Moryc and the other troopers were attending an MSPTA quarterly meeting being held at the Grand Traverse Resort.  The quarterly meeting started on the evening of October 13, 2020, with a hospitality event which included an open bar.  Tpr. Moryc was attending with her boyfriend/domestic partner, Tpr. Trevon Antcliff.  Tprs. Moryc and Antcliff were both troopers at the MSP Lakeview Post.  A number of other troopers from the Lakeview Post were also attending, including Elie Awad, Patrick Arena, and Jacob Lewis.  As the hospitality event was wrapping up at about 10 pm, a group of them decided to take the hotel shuttle to the nearby Turtle Creek Casino. The group at that point also included Tpr. Arena's wife, and Tprs. Jake Yacoune and Nicholas VanderMolen who were not from the Lakeview Post.  Part of the incident occurred while the group was waiting for the shuttle in front of the hotel, and was caught on the hotel's security videos. Lt. Harris' criminal investigation report which included the videos was admitted as an arbitration exhibit.

The videos show seven or eight individuals moving around outside the hotel entrance.  Lt. Harris identified in his report the key points on the videos (Jt. Ex. 5, page 20). The videos do show Tpr. Moryc hitting Tpr. Yacuone in the groin area. They also

4

show her pushing her hand in the area of Tpr. Awad's buttocks. The videos also show Tpr. Antcliff coming over and intervening at several points. Lt. Harris' interview notes include Tpr. Awad telling him that Tpr. Moryc had kneed him in the genital area, and that he had prevented an attempt to put her finger up his butt by clenching his butt cheeks (Jt. 5, p.6). Tpr. Yacuone told Lt. Harris that Tpr. Moryc had struck him in the groin, causing him pain. Tpr. Yacuone described Tpr. Moryc as being highly intoxicated (Jt. 5, p. 10). Both Tpr. Awad and Tpr. Yacuone told Lt. Harris that Tpr. Moryc had apologized to them the next day.

The videos do not show an assault upon Tpr. Arena. Lt. Harris' interview notes indicate that Tpr. Arena told him that at an earlier point, when they were walking toward the front doors of the hotel, Tpr. Moryc, who was walking on his right, "took her left hand and placed her fingers in his buttcrack, wiggling them, and pushing them as far up as she could through his pants." He told Lt. Harris that when he jumped, Tpr. Moryc laughed about it. Tpr. Awad told Lt. Harris that he had been walking behind Tpr. Arena, and he saw Tpr. Moryc put her hand up or near Tpr. Arena's butt in what he described as a "credit card type swipe," after which he saw Tpr. Arena "jump a little in shock." Tpr. Yacuone, who had also been walking behind Tpr. Arena, told Lt. Harris that that he had seen Tpr. Moryc touch Tpr. Arena in the buttocks area, describing her hand as "blading upwards."

Tpr. Arena was the only one of the three troopers to testify at the arbitration hearing. He testified that Tpr. Moryc had wiggled her fingers up his butt crack. He also testified, at the arbitration hearing, that Tpr. Moryc had then also brought her hand around to his front like grabbing at his groin. Lt. Harris' notes from the criminal investigation had

5

not mentioned that. Tpr. Arena had mentioned that during his administrative interview by Lt. Horan, stating that Tpr. Moryc had "tried to touch the front," and he thought she had briefly made contact. The Statement of Charges had not included that allegation.

Tpr. Moryc did not dispute what the videos showed. She testified that she had been highly intoxicated. She testified that her actions had not been sexually motivated or done with a sexual intent. She had thought it was horsing around, but had obviously taken it too far. She testified that she was highly embarrassed by what she saw on the videos.

MSP Human Resources Director Stephanie Horton testified that she was not aware of another closely similar case, involving a sexual assault against two co-workers. She testified that Criminal Sexual Conduct in the 4th degree was a "high court misdemeanor," which would result in loss of licence under MCOLES if convicted. She pointed to Sections 12.2 D and 12.5 of Official Order No. 12. Section 12.2 D includes "unwanted physical contact" in the definition of sexual harassment. Section 12.5 prohibits workplace violence, which is defined to include "intentionally striking or otherwise causing physical injury or bodily harm" to an MSP member or member of the public. Director Horton testified that she believed termination was the only option in this case because of its seriousness and the situation in which it put other employees. She acknowledged that employees who pled guilty to a misdemeanor were not automatically terminated.

Capt. Dale Hinz, the 6th District Commander, had presided over the disciplinary conference and made the decision to uphold the proposed termination of employment. He testified that he had reviewed the statements by Tprs. Awad and Arena, and they had felt it had been a sexual assault. He testified that what kept coming to mind was that if the

gender roles had been reversed, and the CSC 4th charges had stuck, that trooper would be non-certifiable under MCOLES. He testified that Tpr. Moryc had explained that she was embarrassed, regretted her actions, and was not proud of what she had done. She had also said she was a hard worker, and he did not disagree with that.

Summary of Parties' Positions

It was the Employer's position that it had just cause for terminating Tpr. Moryc's employment based upon her criminal assaults upon her co-workers. The Employer argued that she had assaulted Tprs. Yacuone and Awad, and had sexually assaulted Tprs. Arena and Awad. The Employer emphasized that voluntary intoxication is not a defense. The Employer argued that Tpr. Moryc's conduct did constitute Criminal Sexual Conduct, a violation of Section 4.6 of the Code of Conduct. It also violated the MSP's policies against violence and sexual harassment. The Employer questioned whether Tpr. Moryc had truly taken responsibility for her actions. The Employer argued that Tpr. Moryc had compromised her ability to be a trusted co-worker or an effective trooper.

It was the Union's position that the Employer did not have just cause for terminating Tpr. Moryc's employment. The Union argued that the conduct could have been addressed through progressive discipline, as is called for in the parties' contract. Tpr. Moryc did not have prior discipline. It was an isolated incident, which was not premeditated. She was admittedly highly intoxicated. She thought at the time she was playing around. The Union argued that her actions were not sexually motivated, and did not constitute criminal sexual conduct. It was the Union's position that the burden of proof

7

should be "beyond a reasonable doubt," or "by clear and convincing evidence." The Union also argued that other somewhat comparable cases had not been treated as severely.

Discussion and Decision

The issue in this case is whether there was just cause for the termination of Tpr. Megan Moryc's employment. Article 8, Part A, Section 1 provides as follows:

> The Employer will utilize disciplinary action only for just cause toward employees who engage in violations of the Code of Conduct. It is the intention of the Employer to utilize discipline by progression, when appropriate.

Essentially, the dispute between the parties is over whether progressive discipline should have been applied rather than termination of employment.

The Employer emphasized that voluntary intoxication is not a defense. It is correct that voluntary intoxication does not excuse an employee's misconduct. However, intoxication does have a bearing on the analysis of just cause and on the analysis of whether progressive discipline is appropriate. It was clear from the evidence presented that Tpr. Moryc was highly intoxicated when the offenses occurred. The other troopers recognized that.

The Union argued that a standard of "beyond a reasonable doubt" should be applied, or alternatively a standard of "clear and convincing evidence." As the Union noted in its brief, many arbitrators do apply a higher standard when an employee has been accused of a crime. I believe it is appropriate in this case to apply a standard of "clear and convincing evidence" to the question of whether Tpr. Moryc committed CSC 4th.

As the Employer noted in its brief, the videos show Tpr. Moryc attempting to use control and manipulation techniques, which are tactics that law enforcement personnel are

8

trained in. During her administrative interview, Tpr. Moryc stated that Tpr. Awad was a defensive tactics instructor, and they had previously been involved in physical training (Jt. 5, page 45). The Employer argued that Tpr. Moryc's use of these techniques satisfied the CSC 4th element of the use of physical force. However, her use of these techniques could also be viewed, from her perspective, as a game or challenge.

      Tpr. Arena told Lt. Harris that when he jumped in surprise after Tpr. Moryc put her fingers in his buttcrack, Tpr. Moryc had laughed about it (Jt. 5, p. 7). Tpr. Yacuone told Lt. Horan that he did not think she was doing it for sexual gratification (Jt. 5, p. 40).

      The legal definition of CSC 4th includes "sexual contact," which is defined by the statute as involving an "intentional touching which can reasonably be construed as being for the purpose of sexual arousal or gratification, done for a sexual purpose, or in a sexual manner for: (i) revenge, (ii) to inflict humiliation, (iii) out of anger. MCLA 750.520a (q). It is not clear or obvious to me that Tpr. Moryc's actions met this definition. Her actions took place in a group setting, which included her boyfriend/domestic partner. She told the investigators, and testified at the arbitration hearing, that she thought it was a game of "grab ass." This is admittedly an odd factual circumstance. I am not prepared to conclude that her actions met the definition of CSC 4th.

      Whether her actions met the definition of CSC 4th is not, however, the crucial question. The Employer referred to CSC 4th as a "high misdemeanor," and sometimes as a "felony." MCLA 750.520e (2) provides that CSC 4th is a "misdemeanor punishable by imprisonment for not more than 2 years or a fine of not more than $500.00, or both." The MCOLES statute provides that the Commission shall revoke the license of a law

enforcement officer who has been "subjected to an adjudication of guilt for a violation or attempted violation of a penal law of this state or another jurisdiction that is punishable by imprisonment for more than 1 year." MCLA 28.609(12) (c).  The Employer is correct that a conviction of CSC 4th would result in license revocation. However, in the absence of such a conviction, the test which applies under the parties' contract is whether the Employer had just cause.  The Employer's contention that the actions could constitute CSC 4th does not supersede or replace the contractual standard of just cause.

The Employer argued in its brief that that Tpr. Moryc's actions also constituted CSC 3rd.  This had not been alleged in the Statement of Charges.  I do not think it is appropriate under the parties' contract to expand the charges in this manner beyond what was included in the Statement of Charges.  In any event, the analysis of just cause in this decision would nonetheless apply.

It is my conclusion that the evidence did support a conclusion that Tpr. Moryc violated Sections 4.6, 4.5, and 4.25 (OO No. 12) of the Code of Conduct.  Tpr. Moryc acknowledged with her plea in the criminal case that she had violated the law (Code 4.6). Having a member of the MSP charged and pleading to assault and sentenced to jail time did reflect poorly on the MSP (Code 4.5).  Her actions did meet the broader definition of "unwanted physical contact" under section 12.2 D, and "intentionally striking" under section 12.5 B of Official Order No. 12 (Code 4.25).

The key issue is whether under the totality of the circumstances the Employer had just cause for terminating Tpr. Moryc's employment.  Determining just cause requires

10

weighing a number of factors. A very significant factor, which is explicitly included in the parties' contract, is a consideration of whether progressive discipline is appropriate.

It is relevant that the incident was fueled by excessive drinking on Tpr. Moryc's part. Lt. Horan's report indicates that Sgt. Robert Metivier, who had been required to report the incident once he learned of it, stated that he believed that the incident would not have happened if Tpr. Moryc had not been drinking (Jt. Ex. 5, page 42).

The Employer has in other cases given another chance to employees who have committed offenses while under the influence of alcohol. Examples include the suspensions given to troopers in Union exhibits 1(O) and 2(B). This is often appropriate, because an employee who can turn around a drinking problem can significantly correct problem behavior. Tpr. Moryc testified that since the incident she has received counselling and alcohol treatment.

Several of the troopers stated in their interviews that they thought if a male trooper had assaulted several female troopers, it would be treated severely. Lt. Harris' report includes that "Arena felt as men this was laughed off but if a man had done this to a woman, they would be locked up with no bond. He didn't think Moryc should get a free pass on this" (Jt. 5, p.9). Lt. Harris' report also includes Tpr. Awad stating: "He does feel like something should be done and it wouldn't be tolerated if a man did this to a woman" (Jt. 5, p.7). This was also a factor in Capt. Hinz' thinking, per his testimony at the hearing.

The issue at this point is not whether the conduct should be tolerated or Tpr. Moryc should be given a free pass. The issue is whether discipline less than termination of employment is appropriate. She has not gotten a "free pass;" she was criminally charged,

and spent time in jail. Her situation should be evaluated on its own facts, rather than trying to imagine if the genders were reversed and hypothesizing what the penalty might be. It is not always possible or realistic to reverse the genders without changing the context and impact of what occurred. Most of the comparables presented by the parties involved troopers who had previous discipline or repeated offenses prior to being terminated.

I am considering that the events occurred in a group setting, observed by others in the group. The videos show the troopers continuing to interact with Tpr. Moryc. They told the interviewers that they were embarrassed by Tpr. Moryc's behavior. While they thought something should be done about her behavior, they also recognized that she had been highly intoxicated.

In the final analysis, it is my conclusion that while discipline was appropriate, termination was too severe. It was one incident at a time when Tpr. Moryc was highly intoxicated. It was not premeditated. She otherwise had a good record with no prior discipline. The conduct occurred off-duty, while she was not in uniform. It is my conclusion that considering the totality of the circumstances her conduct was not so serious as to require termination of employment. The parties' contract calls for progressive discipline when appropriate. It is my conclusion that progressive discipline is appropriate in this case.

The record shows that Tpr. Moryc was placed on unpaid suspension on January 20, 2021, the date the criminal warrants were issued. This status continued through the processing of the criminal case, her sentencing on April 22, 2021, and serving the jail term through May 14, 2021. Lt. Horan promptly completed the interviews of the main

individuals involved.  It is my conclusion that an unpaid suspension through May 31, 2021, would be appropriate discipline under the circumstances.  This covers the time when Tpr. Moryc was subject to criminal prosecution, and covers the time when she was serving the jail sentence.

The Employer shall offer Tpr. Moryc reinstatement and make her whole for the time period beginning June 1, 2021, to the date of reinstatement.  I am asking the parties to confer concerning whether reinstatement should be to the Lakeview Post or to a different assignment.  It may be that a re-assignment to a different post would be preferable for everyone involved.

The parties are directed to cooperate in calculating back pay, taking into consideration mitigation such as replacement employment during the time period involved. If there is a dispute concerning the remedy which cannot be resolved between the parties, a conference call can be arranged to address that issue.

I am assessing my arbitration fees to the Employer per Article 9, Section 10, since the basic dispute between the parties was the level of discipline, not whether misconduct had occurred.

The grievance is granted, and the discipline is reduced to an unpaid suspension through May 31, 2021.

February 3, 2022

*Kathleen R. Opperwall*

Kathleen R. Opperwall, Arbitrator