# EXHIBIT 5

VOLUNTARY LABOR ARBITRATION

IN THE MATTER OF ARBITRATION BETWEEN:

MICHIGAN STATE POLICE TROOPERS
ASSOCIATION (MSPTA),

     Union,                           Arbitrator Thomas J. Barnes, Esquire

and                              Grievance TA-01D-25/PSS-627-23
                                     (Trooper Megan Moryc Discharge)

MICHIGAN STATE POLICE,

     Employer

---

**OPINION AND AWARD**

**CHRONOLOGY**

|  |  |
|---|---|
| Date of Grievance: | February 13, 2025 |
| Date of Hearing: | April 24, 2025 |
| Location: | MSPTA Offices, East Lansing |
| Briefs Filed: | June 6, 2025 |

**COUNSEL FOR THE UNION**

Timothy J. Dlugos, Esq.
White Schneider PC
1223 Turner Street, Suite 200
Lansing, MI  48906
tdlugos@whiteschneider.com

**WITNESSES FOR THE UNION**

 Megan Moryc, Grievant and Trooper

**COUNSEL FOR THE EMPLOYER**

Lisa Gee-Cram, Advocate
Michigan State Police
Human Resources Division
7150 Harris Drive
Dimondale, MI  48821
GeeCramL@michigan.gov

**WITNESSES FOR THE EMPLOYER**

Ryan Tabaczka, Lt. Professional Standards
Chris Tuckey, Lt. Professional standards
Jason Nemecek, 6th District Captain

## BACKGROUND AND FACTS

Grievant was hired in March 2016 and as of July 2025, nine years later, finds herself the subject of a previous discharge which was reduced to a 30-day suspension by an arbitrator and now subject to a discharge in the present case.

We begin, in this case, with a Statement of Charges (SOC) which was issued on December 20, 2024, and is quoted exactly as follows:

> A Professional Standards Section (PSS) investigation, PSS-627-23, established that you violated department policy, and the law, when you perjured yourself while testifying, under oath, in a divorce proceeding of your (then) boyfriend when called by his attorney as a witness in defense of his alleged infidelity with you in 2017. You knowingly made false statements, while under oath, when describing your relationship to your (then) boyfriend in his 2018 divorce proceeding. Your testimony was germane to your (then) boyfriend's divorce proceeding, as the testimony was directly related to your (then) boyfriend's extramarital affair with you. You minimized your association with your (then) boyfriend and described the association only as friends and co-workers, despite your ongoing sexual involvement with one another. Additionally, your testimony relevant to a specific event in January 2017, was significantly exaggerated to explain why you and your (then) boyfriend were found, partially dressed, in the boyfriend's marital home by his wife.

> Further, after being given a directive during your administrative interview to fully and truthfully answer questions, you did not. You continued to misrepresent your relationship with your (then) boyfriend during the course of MSP's internal investigation, as well as follow up questions about your relationship during a previous administration investigation, PSS-239.23.

> Your fabricated interpretation of the meaning of "relationship", as it related to your involvement with your (then) boyfriend, was material in the court testimony and weaponized by you to defend your integrity during administrative investigation. Your display of unethical character is unbecoming and contrary to the high standards required of the law enforcement profession.

As a result of the above Statement of Charges, Grievant was charged with three violations of the Michigan State Police Department's Code of Conduct which is necessary to recite in full below:

**Individual Deportment (Section 4.5)** - Members shall maintain a level of conduct in their personal and business affairs, which is in keeping with the highest standards of the law enforcement profession. Members shall conduct themselves at all times, both on and of duty, in a manner that wilt reflect favorably upon the department. Conduct unbecoming a member shall include that which brings the department into disrepute or reflects discredit on the individual as a member of the department or that which impairs the efficiency of the department.

**Obedience to Law (Section 4.6)** - Members shall not knowingly violate any laws of the United States, State of Michigan, ordinance of a unit of local government, laws of another state or country, or an order of any court. If such a charge is shown to be factual, the fact that no criminal prosecution was instituted against a member shall not bar department discipline.  Likewise, the fact that criminal prosecution did take place, regardless of outcome, shall not have a bearing on department discipline procedures that shall be conducted on an independent basis. The results of any criminal proceeding shall be considered in any administrative hearing.

**Required Response to a Direct Order (Section 4.35/4.35a)-4.35:** Members shall **fully and truthfully** answer questions pertaining to job-related matters or to their conduct which is under investigation by the department when ordered to do so by a supervisor. Job related matters include on duty conduct, use of department materials, supplies, or equipment, and criminal conduct or other conduct that has a direct relationship to the member's position in the department. This provision does not abrogate rights existing under law or collective bargaining agreements. Members are subject to discipline, including discharge, for refusing to answer questions under this section, when advised that answers will not be used in any subsequent criminal proceedings and that refusal to answer will be considered insubordination.

As a result of the Charges, two internal investigations were undertaken and at the conclusion Labor Relations, having reviewed prior precedents, recommended termination which was affirmed by the District Director.  The grievance in this matter followed.

3

The paradigm misconduct in this matter was the Department's finding that Grievant committed perjury when she testified as a witness in her boyfriend/paramour's divorce trial on October 9, 2018 in the Montcalm Circuit Court before Judge Suzanne Kreeger as follows:

Stanton, Michigan

Tuesday, October 9,   2018 - 11:34 a.m.

THE COURT:          Before being seated, please raise your right hand for the oath.

Do you solemnly swear or affirm that your testimony here today will be the truth, the whole truth, and nothing but the truth, so help you God?

MS. MORYC:          I do.

. . .

Q     So at that time in January of 2017, how would you describe your relationship with Mr. Antcliff?

A     He was a really great, supportive partner.  He helped me, you know, process a lot of things and learn how to stay calm and, you know, do the job.

Q     Did you view him as more --

A     Despite the stress.

Q     -- than a partner, in the career sense?

A     I considered him like one of my best friends. I was going through a really hard time at that point that not a lot of people knew about.

Q     So when did your relationship with Mr. Antcliff become more than friends?  Because you're living together now, correct?

A     Correct.

Q     Okay.

A     I would say, like, towards the end of 2017.

4

Q       Okay.

A       When my marriage was ending.

Q       So November 2016, you started training under Trevin?

A       Correct.

Q       And a year later, you filed for divorce?

A       Correct.

Q       In June 2018, your divorce was final?

A       Correct.

Q       And you started dating Trevin end of 2017?

A       I don't remember exactly when.

Q       I think --

A       I don't, like, keep a calendar.

Q       I think your testimony stated the end of 2017, you started
        dating Trevin.

A       I said roundabout, I thought. Like I said, I don't mark it
        down.

Q       You don't remember?

A       Not exactly, no.


        That testimony remained interred until approximately five years later, on April 9, 2023,

when Grievant made a Complaint to her Department that she had been assaulted by her former

boyfriend and paramour, Trevin Antcliff.

5

That Complaint spawned two interviews, in which the Department concluded that Grievant had both lied at the divorce hearing when she testified as indicated above, and that she lied in the two investigations that were done referred to below.

**Incident No. 239-23**

As a result of the Complaint filed by the Grievant, a Blue Team Administrative Complaint Report (BTACR) was originated by Lt. Ryan Maki.  The Complaint was the result of a phone call from Grievant in which she alleged that Trooper Antcliff had assaulted her on October 19, 2022, about six months earlier.  As a result, an investigation was done and a Report was filed in accordance with the typical professional standards protocol.  The Report was authored, for the most part, by Spl./Lt. Tabaczka.

In conducting the investigation, several interviews with witnesses (mostly by phone) were had which described the relationship between Grievant and Antcliff during their time with the Department.  It was known that they had a personal relationship and in some cases it was described as widely known in the Department.  For example, in interviewing Sgt. Aaron McCormick, McCormick related that he knew about the rumors of Grievant and Antcliff being personally involved and he confronted Antcliff about them and said if there were any truth to the rumors, they needed to stop.  However, that incident resulted in the loss of their friendship.  He also recalled speaking with Sgt. Ziesman about the rumors and was certain Ziesman was aware of those rumors. Moreover, McCormick believed "everyone at the post was aware of these rumors and the situation was not properly handled."  Another witness in the interview, Cpt. Kevin Sweeney, said he was never aware of any issues concerning Trooper Antcliff during the Field Officer Training FTO program.  Sweeney further indicated that if he had been aware of inappropriate conduct between Grievant and Antcliff, he would have acted.  Further, Lt. Robert Davis was interviewed and Davis

6

acknowledged that Trooper Antcliff "had an established reputation for pursuing women."  Davis nevertheless went ahead and made the assignment of Grievant to Antcliff because another officer in the FTO program was single and he believed Antcliff's womanizing was off duty.  If he had been aware of the situation between Grievant and Antcliff, he would have immediately addressed the situation.

The interview with Sgt. Ziesman indicated that he was well aware of the relationship between Antcliff and Grievant and Antcliff pursuing a relationship with Grievant throughout her FTO training.  Ziesman reported the situation to both Lt. Sweeney and Lt. Davis.  Both Sweeney and Davis denied any such knowledge in their interviews.  In fact, Sweeney and/or Davis told Ziesman to "put [Antcliff] him on notice this is unacceptable." These not insignificant facts were not cited in Tabaczka's Report – even though are in the taped interviews (not done by Tabaczka). Ziesman further recalled a discussion where it was decided to assign Grievant to Antcliff in spite of his negative reputation with women since she was married and the other officer in the FTO program was single.

According to the Investigative Report, the matter was investigated and turned over to the Prosecuting Attorney; the Prosecuting Attorney concluded there was not sufficient evidence to establish a case against the Grievant and, therefore, refused to prosecute.  The case against Antcliff was scheduled for trial, but was ultimately resolved because he was involved in another unrelated domestic violence incident with another domestic partner which ultimately resulted in a plea deal and Antcliff resigning from the MSP.

While Lt. Tabaczka conducted most of the interviews regarding Grievant's Complaint of physical abuse by Antcliff, the investigation was started by Lt. Carissa Horan; however, Horan and Grievant did not get along and thus the major part of the investigation was done by Tabaczka.

7

Horan, however, did decide to interview Trooper Antcliff's former wife (Nina Antcliff) to determine whether or not he had been abusive toward her.  She was interviewed on September 4, 2023; nothing pertinent to this matter was uncovered.  However, the following day, Nina Antcliff left a voicemail for Lt. Horan which read as follows:

> Nina Antcliff, (231)250-4571.  I'm calling to not give you the answer you are hoping for.  When I got home last night and thought about it, I am put in an impossible position.  Megan testified on the stand that they did not have an affair.  So, either she is perjuring now, or she perjured herself then.  Either way, Trevin can use that to fight her, and I will get sucked in the middle, period.  I, I don't want to be sucked in the middle of them anymore.  I didn't want to be in the first place that's how the last six years have been a nightmare because of the two of them.  Trevin would have let me walked [sic] away, Megan wouldn't.  So, it's not that I don't want to help you but Trevin and sued me two years ago and it cost me my older son.  He told them I sued him, and he questioned a bunch of people, including the wedding party, from my son's wedding to back him up.  He sued me because he claimed Kels … he claimed he couldn't claim Kelsey on his taxes.  I didn't even know about court.  I got a bill for $8000, so I countersue … I did go back and ask the judge to rehear the case because he did claim her.  In the end he still won the money because of the trouble he went through to have to sue me.  Which, you can try to figure that out, he sued me falsely.  Yes, he did claim her.  Anyway, it's neither here nor there.  I havent' seen him in eight months because my son's wife is so upset, that her when it got tainted by the drama between Trevin and I, I can't even see my son.  So, if I help you, I will never see them.

As a result of that email, another investigation was started revolving around whether or not Grievant had committed perjury when she testified in the divorce proceedings (set forth above) and that investigation was also conducted by the Professional Standards Section and was Incident No. PSS627-23.

**PSS627-23 Investigation**

This investigation was conducted by Lt. Christopher Tuckey and constituted a Garrity hearing with counsel for the Grievant present.  As a result of this investigation, a criminal warrant was sought against both Antcliff and Grievant with the Prosecutor's Office.  The upshot of that, however, was that the Prosecutor decided that "Antcliff was not pursued due to a plea agreement.

8

Moryc unlikely to meet burden of proof at trial." The testimony at issue with regard to the court proceeding was set forth in detail above.

In the course of his investigation of Moryc, Tuckey asked, "When did you become involved in an emotional, romantic, sexual or otherwise non-professional relationship with Trooper Antcliff?" The response from Grievant was as follows: She didn't recall specific dates and explained "it didn't happen all at once and I don't, I don't know like I said those are all different, different aspects of relationship. Can you be more specific?" However, Tuckey did not break the question down any further, but asked the same question again, to which she responded:

> Like I said, we were best friends first. I don't … I know that we had sex, early on, but the status of the relationship, when it was emotionally established, when it was romantically established. It's all very blurred because so much went on, and we're talking eight years ago. It's hard for me to break down when I became emotionally invested or romantically invested with him.

When asked if she had been on the FTO program at the time she stated,

> For which part? Like, did we have sex when I was on FTO? At some point, yes. I do remember that.

She couldn't remember which part of the FTO program the sex occurred. When Lt. Tuckey asked the compound question a third time, counsel for Grievant requested again that he inquire about each type of relationship separately. Tuckey then rephrased his question by asking, "I am referring to anything that's a non-professional, co-worker type relationship." Grievant's response to that question was as follows: Trooper Moryc affirmed she was involved in a sexual relationship with Trooper Antcliff on January 23, 2017. When asked if she was involved in a dating relationship with him on that date, she answered: "Again, the term dating is very general. I don't, we didn't use the term dating."

She was asked to describe her relationship with him during that time:

The reason is simple.  Trevin Antcliff was my best friend, and I was having sex with him.  I was not asked if we were having sex.  For me, we were not in a dating or romantic relationship as Spl./Lt. Tabazcka characterized it.  The emotional and romantic entanglement occurred much later as I testified to.  Trevin Antcliff told you: we were (quote "dating") or in a (quote "romantic") relationship.  That was his perception.  As law enforcement agents, we all have been on a scene where everybody has a different perception of what their relationships were and are.  This is the case here.

As a result of all of the foregoing, Labor Relations did its due diligence including reviewing comparable cases and recommended to the District Director that Grievant be terminated.  The District Director upheld that recommendation and Grievant was terminated on February 13, 2025.  At the hearing, the District Director explained that part of his decision was based on his concern that he does not believe the Department retains "Brady" list employees.  However, he acknowledged on cross-examination that there were cases where they were retained but that he still didn't believe they should be kept.  As of the date of the arbitration hearing, Grievant had not appeared on any "Brady" list.  He further acknowledged he did not review comparable cases as he relies on Labor Relations to do that.

In addition to the foregoing, and while these proceedings were underway from 2016 through 2023, Grievant was terminated for unrelated misconduct.  As a result of an arbitration, her termination was overturned and the arbitrator substituted a 30-day suspension in accordance with the collective bargaining agreement.

**Prior Termination on August 9, 2021**

Grievant engaged in misconduct on October 13, 2020, in which she was convicted of assaulting and sexually assaulting three co-workers (police officers) while attending a Michigan State Police Troopers Association event in Traverse City where alcohol was present.  As a result of her misconduct, which was investigated by the Department, she was terminated on August 9,

2021.  She appealed that matter to arbitration and an arbitration hearing was held before Arbitrator

Kathleen Opperwall who has issued other prior decisions for the parties.   In her decision of

February 3, 2022, Arbitrator Opperwall concluded as follows:

> I am also considering that the events occurred in a group setting, observed by others
> in the group.   The videos show the troopers continuing to interact with Trooper
> Moryc.  They told the interviewers that they were embarrassed by Trooper Moryc's
> behavior.  While they thought something should be done about her behavior, they
> all recognized that she had been highly intoxicated.
>
> In the final analysis, it is my conclusion that while discipline was appropriate,
> termination was too severe.  It was one incident at a time when Trooper Moryc was
> highly intoxicated.  It was not premeditated.  She otherwise had a good record with
> no prior discipline.  The conduct occurred off-duty, while she was not in uniform.
> It is my conclusion that considering the totality of the circumstances, her conduct
> was not so serious as to require termination.   The parties' contract calls for
> progressive discipline when appropriate.   It is my conclusion that progressive
> discipline is appropriate in this case.

Opperwall Opinion at p. 12.

The Department not being satisfied with that decision and, contrary to the provision in the

collective bargaining agreement that the Arbitrator's decision is not appealable if within the

confines of the CBA, nevertheless appealed that decision to the Circuit Court.  The Circuit Court

overturned the Arbitrator's decision and predictably the Union appealed that matter to the Court

of Appeals.  The Court of Appeals unanimously reversed, reinstating the Arbitrator's award.  The

Department then appealed the Court of Appeals' decision to the Supreme Court, and the Supreme

Court summarily denied the appeal and the matter was sent back to the District Court to implement

the Arbitrator's Award.

11

## <u>APPLICABLE COLLECTIVE BARGAINING PROVISIONS</u>

**Article 4:  Management Rights**

It is agreed that, except as limited by terms of this Agreement, the Employer retains the right to manage the affairs of the Department and to direct the working forces. Such functions of Management include, but are not limited to, the right to:

> . . .

> c.    Direct the work of the employees covered by this Agreement, including the right to hire, to discharge, to suspend, or otherwise discipline employees for just cause, to transfer, to establish job duties, to determine the amount of work needed, the starting and quitting times, and the number of hours to be worked during any day, week, or pay period, subject to the provisions expressly set forth in this Agreement.

> . . .

> f.    Establish, modify, or delete rules, regulations, or policies necessary to the safe, orderly, and efficient operation of the Department, provided that such rules, regulations, or policies are not the subject of this Agreement.  Such rule, regulation, or policy shall not be inconsistent with the terms and provisions of this Agreement.

**Article 8:  Discipline and Affirmative Assistance**

Part A. Discipline and Misconduct

Section 1. Scope
The Employer will utilize disciplinary action only for just cause toward employees who engage in violations of the Code of Conduct. It is the intention of the Employer to utilize discipline by progression, when appropriate.

. . .

Section 3.  Application
The various disciplinary actions are described as follows:
. . .

c.    *Suspension or Discharge after Investigation.*  If an investigation establishes just cause for disciplinary action, a suspension without pay not to exceed 30 calendar days or a discharge may be issued after a disciplinary conference.

**Article 9:  Grievance Procedure**

. . .

Section 6.  Presenting a Grievance

…

The arbitrator shall have no authority except to pass upon alleged violations of the expressed written provisions of this Agreement, the unreasonableness or misapplication of a rule or regulation, that a work order was unreasonable and arbitrary or involves discrimination in application, or a claim of suspension, discharge, or demotion without just cause.

The arbitrator shall have no power or authority to add to, subtract from, ignore, or modify any of the terms of this Agreement and shall not substitute his or her judgment for that of the Employer where the Employer is given discretion by the terms of this Agreement.

. . .

The arbitrator may take steps necessary to correct any abuse or to provide a fair resolution to the grievance or issues presented; however, the arbitrator is without authority to change or rewrite any provisions of the Agreement or insert his or her wisdom for that of the Employer or Association. The arbitrator shall have no authority to award back pay for a period of time of more than 30 days from the date the written grievance was filed, except in instances of demotion, suspension, or discharge.

There shall be no appeal of the decision of the arbitrator if made in accordance with the jurisdiction and authority conferred upon the arbitrator by this Agreement.  However, any decision of the arbitrator, which a party fails to comply with, shall be enforceable by law.

## <u>ANALYSIS AND OPINION</u>

As indicated above, there are three forums in which Grievant is alleged to have not told the truth.  The first in a court proceeding and the latter two, an internal investigation and a Garrity hearing.  Each one deserves a complete review.

First, with regard to the court proceeding, the relevant portion of the testimony is set forth above.  I examine each question where Grievant is alleged to have perjured herself.[1]  First, I note

---

[1] Perjury is willingly telling a lie while under oath in a matter material to the point of inquiry – or willfully swearing falsely.

13

in the transcript there is no indication that the Grievant is in uniform nor is there any indication that she is testifying as a Michigan State Trooper although it is evident from the testimony that she certainly is a police officer.  Her testimony is in her boyfriend/paramour's divorce proceeding. The first question is, how would she describe her relationship with Mr. Antcliff.  Her answer was, "he was great, a supportive partner, he helped me process a lot of things, learn how to stay calm and you know, do the job."  That is an answer to the question that was asked.  The Department would say, well that's not a complete answer; that she should have acknowledged that at some point in December 2016 – January 2017 she was having sex with Trooper Antcliff.  She wasn't asked that question.

It's almost universally understood that lawyers, regardless of what side of the issue they are on – plaintiff, defendant, union, employer – instruct their witnesses not to volunteer information.  In fact, yours truly usually says at the beginning of an arbitration hearing – the best answers that you can give to your representative's questions are "yes and no."  If you want to elaborate upon that answer, you can indicate that you want to do that and typically it will be allowed.  If the attorney wants more information from you, he or she will ask you to elaborate. The other two appropriate answers typically are "I can't remember," which is sometimes the case when being asked about events that may be dated.  The last possible answer is "I can't answer that with a yes or no, can I explain further;" typically an arbitrator will allow that.  In this case, with regard to the first question, there was nothing inappropriate about the answer.  It was true.  There may have been more information that the Department would have liked and perhaps Ms. Antcliff, but there is nothing that was perjurious about that answer.

The next question was, "Did you view him as more than a partner in the career sense?" Her answer was that she considered him as one of her best friends.  She was going through a hard

14

time at that point that not a lot of people knew about.  There is nothing inappropriate about that answer.  He was more than a partner.  He was her best friend.  There is nothing perjurious about that answer.  Would the Department like to read more into it?  Of course they would.  Subsequent events would show that there was more to the story than revealed at that time.  But simply answering a question with an honest direct answer however minimalist, and as briefly as possible, is not under any circumstances, perjurious.

The next question was, "When did your relationship with Mr. Antcliff become more than friends?  Because you're living together now, correct?"  Her answer was, "I'd like to say toward the end of 2017 when my marriage was ending."  There is nothing inappropriate or untruthful about that answer at the time.  She simply answered that yes, her marriage was ending and she thought they were more than friends at the end of 2017.  Someone might have a different interpretation of that as events unfolded later on, but at the time that answer was a truthful answer.

The next question was in November of 2016, she trained under Trooper Antcliff to which she answered, "correct."  And a year later she was asked if she filed for divorce and she answered "correct" and she was asked if her divorce was final in June 2018 and she answered "correct" and when asked, "Did you start dating Trevin at the end of 2017?" her answer was, "I don't remember exactly when, I don't, like keep a calendar."  She said, "toward the end of 2017."  According to the question, she said "roundabout I thought.  Like I said, I don't mark it down."  When asked whether she remembered exactly, she said, "not exactly, no."

The Department has suggested that she should have revealed (the whole truth) that when asked the question about her relationship, she should have revealed that she was having sex with Trooper Antcliff in December 2016 – January 2017, but the fact of the matter was that she wasn't asked that question and there was no reason for her to volunteer it since she gave an answer that

15

typically any witness would give in answer to a specific question.  While the above questions and answers speak for themselves, adding additional doubt to the viability of such evidence is that it only came to light one month short of five years after the court record was closed.  It was not until September 5, 2023, wherein Ms. Antcliff in a voicemail alleged that Grievant had engaged in an affair and that she had perjured herself while on the witness stand five years earlier on October 9, 2018.[2]

While it may have been good investigative technique to inquire of Ms. Antcliff about whether she had been abused by her Trooper husband, nevertheless she made no mention of perjury in the interview that she had the day before.  It is of some significance that she only made that allegation outside of the interview and only when saying she didn't want to provide additional information and she didn't want to be involved in the proceedings any further.

In addition to the foregoing view that the Department took of Grievant's testimony on October 9, 2018, it alleged that Grievant exaggerated to the Court the importance of an event that both her and Trooper Antcliff were required to attend to the early morning of the day in which both of them were found present in Antcliff's home changing their clothes that had been bloodstained from attempted suicide that they had been dispatched to.  The Department characterized that testimony as exaggerated.

I have reviewed the various statements that were taken regarding that event and I have come to the conclusion that the Department evidence and conclusions fails that Charge.  In short, Officers Antcliff and Moryc were dispatched to a domestic relations situation and when they arrived, they found the alleged assaulter with a rifle and at one point were fearful of their lives

---

[2] The record does not disclose how or when she learned of information to form that opinion.

when they approached him and saw him exit the car with a rifle.  Nevertheless, shortly thereafter the victim shot himself through the head.  It is no exaggeration to say it was a bloody mess and for the Department to characterize the situation as exaggerated by the Grievant stretches credulity.  It was the dark of night, it was 40 degrees, it was the middle of the winter, it was on a dirt road, and in the footnote below, I quote the testimony given by the Grievant as to what they encountered.[3] The fact that the two officers made a traffic stop on the way home when a person in a vehicle tried to hit them and as a result, they issued two tickets does not strike me as abnormal in any way.  In

---

[3] We had been trying to find this guy who had been on his girlfriend's property, holding a rifle, threatening to kill the people and himself. We found out that he was alleged to have committed CSC of a four-year-old child, so we were trying to find him. We wound up going into Kent County with the other trainee and her FTO. So we came across this van on the way to his mother's house, and it was dark, and as we were approaching the vehicle, because it was, like, on a hill, and he was down, like, on this little, like, gravel-type bridge, I saw it first, and I yelled, "Someone is coming out of the car." And then next thing I knew, I saw, like, a rifle come out of the car, and I heard the other trainer, from the other car, yell, "Gun. Gun." And then a shot was fired, and he was down. And me, the other trainee, and the trainer rushed towards the car, and Trevin, you know, yelled, "Shots fired," over the radio. So as we were approaching this car, we had to make sure the gun was out of reach, because if he was still alive, we didn't know. And as we came upon the guy, he was lying there in, like, this dirt, water; snow mixture, and he had brain matter coming out from the back of his head. Well, that was the first time I had ever seen anything like that, and what I had noticed, he was still alive. And we didn't -- we weren't really sure how, because it was apparent there was a bullet wound through his head, and there was gray brain matter seeping out the bottom of his skull and running down the embankment and all in the snow and all in the gravel. And so some of us were kind of like, "Oh, my gosh." And Trevin was like, "Get the first-aid kit. We have to render first-aid because he's still convulsing and agonal breathing." So I ran and got my first-aid kit. And me and Trevin had gloves on, and I opened the first-aid kit, and it's cold, so my hands are cold, and I'm trying to unwrap the gauze packaging, but I couldn't really get it, because it was -- my hands were almost frozen, and I was trying not to get blood everywhere. So Trevin's hands were gloved, and he was actually holding the guy's head up off the ground so that I could -- since it was an entry and exit wound, there were two holes that we had to cover. So as Trevin is holding up this guy's head, while he's, like, convulsing, I was trying to apply pads and then take gauze and wrap it all the way around his head. Well, because of the circumstances, and the slush and the mud and, the water, you know, and my first time dealing with this kind of situation, the gauze was getting wet and there was blood seeping everywhere. And I remember, as I'm wrapping the gauze around his head, Trevin's hands were in •the way, and I accidently splashed his arms with it. And, you know, he's like, "Watch what you're doing with the blood." So we got it -- I got him wrapped up as well as I could with, you know, the circumstances that we had.

fact, they were simply performing their duties as they should even though they had blood stained uniforms.  There was no testimony other than that of the Grievant and Officer Antcliff that they were covered with blood,[4] which required their uniforms to be taken to the drycleaners.

The conclusion on the part of the Department that officers who have their uniforms badly stained in blood would not be likely to make a traffic stop does not meet the test of credibility.  In fact, if they had not made that traffic stop even with blood all over them and issued two tickets and that driver of the vehicle had run into someone and killed them and the evidence turned out to be that these two officers passed that scene at the time that the accident took place, there would be far more serious consequences.  The implication that the Department would suggest that I draw from the situation was that the Officers' uniforms were not that bloodstained and that therefore their appearance did not inhibit them from making the traffic stop.[5]  The facts are to the contrary.

The two internal investigations which were undertaken in this case totaled 48 transcribed single-spaced pages.  Both investigations were conducted by the Special Services Unit of the Michigan State Police and both of the primary investigators in those cases, Lts. Tabaczka and Tuckey testified at the arbitration hearing and affirmed the contents of their investigative reports.  Those reports, however, contained some shortcomings.  Among those were in the case of the Garrity hearing, an assumption that Grievant had perjured herself in her testimony at the divorce trial in 2018.  Further, some of the questions that were asked were compound questions of the

---

[4] Sgt. Rose who was also on the suicide scene "couldn't say they weren't covered in blood" and when reinterviewed stated "but I can't" recall.  Rose thought four officers worked on the dying suicidal person.  However, Officer Kelly was very affirmative that only Grievant and Antcliff did all the first aid work.  Tuckey's report failed to disclose this significant detail.  The tape recording of Trooper Kelly exactly recounts what Tuckey did not memorialize.

[5] The record does not disclose any Department contact with the ticketed driver.  Further, whether blood on a dark officer's uniform in the dark of night would have been noticed is unlikely.

18

Grievant, to which the Grievant and her counsel requested they be broken down.  Nevertheless, it was not possible for the Grievant to give an answer to all parts of the compound question without explaining her reasoning, which she did.  In addition, there were representations made by the investigators about what was said in the court proceedings that were not true at all since the court transcripts do not reveal the particular words being used that the investigators relied on.

Nonetheless, in spite of those shortcomings, I found the testimony of the two investigators to be credible and for the most part, they concluded that Grievant had not revealed all of the truth in regard to some of the questions that were asked.  While it is not necessary to detail all of those questions and answers, after reviewing everything, I conclude that the Grievant clearly could have been more forthcoming and clearly could have given more explanation for why she answered the questions in the way she did.  While I recognize she did provide a more coherent statement at the discharge conference which explained her answers that came terribly late in the process.  Grievant did offer her explanation of terms like romantic, emotional friends with benefits, dating and relationships.  I found her explanation to be convenient and at times parrying with the investigator. It is also the case, however, that in the investigation, the Department clearly did not pursue the facts regarding Grievant being placed with Officer Antcliff at the beginning of her training since it was well known in the Department that he was a womanizer.  That was something that could have and should have been taken into account in reaching a conclusion of whether or not discharge was appropriate.    While Grievant's entanglement with Officer Antcliff was voluntary, nevertheless, it is very likely we wouldn't be here today if she hadn't been assigned to someone known to officers in the Department to be someone not to be trusted with women.  Moreover, the internal investigations were tainted by the finding she had lied in Court, a conclusion I have rejected.

I have reviewed the numerous cases cited as precedent by both the Employer and Union in this matter.  As might be expected, the outcome depends on the specific facts of that particular case.  I did not find a case that was directly on point or even remarkably close to the facts and events in this case.  Many of the cases cited by the parties, if not most, involved misconduct by a police officer while performing law enforcement duties.  Some involved failure to tell the truth in internal investigations.  But nearly all those cases involve situations where an officer did not perform the core duties and responsibilities of his/her position as a Michigan State Police Trooper.  For example, there are cases involving misrepresentations and mischaracterizations and outright lies found in an officer's dailies.  There are cases involving an officer's misuse of his position as a police officer to influence witnesses or to influence other police officers.  There are situations involving officers using their position to advance the interest of particular citizens or friends and relatives.  There are other cases where an officer misrepresented his status as a police officer and didn't properly identify himself at a police scene or in some aspect of his duties.  There are cases involving police officers involved in assaults and batteries.  Still other cases involve officers who misused their position or were involved in sexual misconduct, of all persons, their step-daughter.  The Employer in its Post-Hearing Brief correctly points out that since 2016 no member has been recommended for any discipline less than termination for a violation of 4.35.

Arbitrators from 2016 on have however overturned terminations involving 4.35 violations.  Exhibit U-3 (Monroe, discharge reduced to 30 days) – Van Dagens, 9-17-24; Exhibit U-4 (Floyd, discharge overturned with no back pay since discharge) - McCargo 4-22-24; Exhibit U-5 (Reed, discharge overturned, no discipline, plus backpay) – Lett 12-16-22; Exhibit U-6 (Andrews discharge reduced to 20 day suspension then back pay) – Roumell 6-3-21.

This case involved testimony not about police work, but about a divorce case in which Grievant was not a party but was certainly an interested witness.  This was off-duty conduct on a non-law enforcement civil lawsuit in which Grievant was not a party.  She testified to the questions she was asked and nothing more.  She didn't volunteer testimony and she did not answer any question untruthfully.

Additionally, but for the fact that one of the parties who was involved in the divorce proceeding, revealed five years later, in her opinion, that had the Grievant not testified truthfully, this case would have never seen the light of day.  Disciplining someone, let alone discharging them nearly five years after they allegedly testified untruthfully (which I have determined not to be the case) does not find a precedent in any of the cases cited by the parties.  While we know that testimony in this case was recorded in 2018 in the court transcript, that does not answer the deficits to be found in such dated testimony.  First, discipline is normally to be timely meted out so that the employee understands the connection between their misconduct and the need for immediate action by the employee.  Discharge of an employee nearly five years after the late discovery of a spurned spouse's claim of perjury is beyond the realm of the fair imposition of discipline.  Even in the criminal law, there are statutes of limitations where criminals go free from their crimes because their conduct is not uncovered or discovered in time.  Certainly at some point in time, an employee should be free of the threat of discipline where they even knowingly engaged in misconduct.  Moreover, in this case it cannot be fairly said that the Grievant knowingly testified untruthfully five years previously.  Further, one needs to consider the affect of the passage of time on an individual's ability to recollect exactly what happened in a prior proceeding five years previously.  In other words, it is no surprise that investigatory interviews done nearly five years after someone is accused of a felony in untruthfully testifying that they wouldn't be able to

21

recollect all of the details necessary to testify in internal interviews in a way which was 100% accurate.[6]  Memories fade, witnesses are not available or not called, and even the investigators are not always sure about the words that were used, as in this case, in the court proceeding.  Further, when the individual being examined in the administrative investigations is asked different questions than were propounded to her in the court proceedings five years previous, it is not any surprise that the answers would be different and in some cases conflicting.

While I have indicated previously that Grievant had her own explanation for her answers, which I thought were sometimes too clever by half, nevertheless, her explanation of her answers were not absurd, or far-fetched, or unreasonable to more traditional observers in this day and age. The fact that I may not like her answers does not distract from the fact that they were her beliefs and her understanding of the questions and that her answers were responsive truthfully to the questions that were being asked including the compound questions.  Under these circumstances, I cannot conclude that discharge was anywhere near a proper discipline for the Grievant in this matter.  However, there is more.

In addition to the foregoing, there were facts that developed in the hearing as a whole that indicated the Department was not giving the Grievant a fair shake.  First off, I am troubled by the fact that the prior arbitration decision, where Grievant was given a 30-day suspension by very well respected Arbitrator Opperwall indicated, at the very least, a dislike for the Grievant.  The Employer, under the CBA, was responsible for implementing an arbitration decision regardless of the outcome because it had agreed that decision would not be appealable if within the arbitrator's authority just as the Court of Appeals determined and the Supreme Court affirmed.  It is well-

---

[6] Let alone where the questions are not the same or are compound.

known that arbitration decisions that are challenged are highly unlikely to succeed.  While there is no evidence as to what the Employer was advised by its Counsel, I can easily opine that attorneys or representatives who are asked to challenge arbitrator's awards almost unanimously advise their clients that their chances of success are not good, for one, because they selected the arbitrator and agreed to be bound by his/her decision.  Nevertheless, the Employer in this case marched ahead on a 30-day suspension in trying to overturn the previous Arbitrator's award.

There is other evidence to suggest that the Employer similarly had some animus toward Grievant.  For example, for some reason unknown to the undersigned, the Employer maintained that Grievant's testimony regarding a suicide that she had attended on January 23, 2019, was exaggerated.  As indicated above, I reviewed that testimony and found it to be anything but exaggerated.  It was a horrible situation to which Grievant testified.  If the Employer thought that was an exaggeration, there should have been testimony at the hearing to establish that fact.  Its own witness interviews established it had no such testimony or witness.

Furthermore, the speculation that a judge in a divorce case would not have been able to make a proper decision on custody is purely that.  The Circuit Judge here is very experienced and has done numerous domestic cases involving child support and custody and property matters.  Judge Kreeger has been the Montcalm County Circuit Judge for 17 years and the Chief Judge since 2009, and 17 years prior to becoming a judge, she was Director of the Office of Friend of the Court and Circuit Court Referee.  Stellar credentials to assess witnesses in a divorce case!  She certainly has heard plenty of witnesses, some who she has probably credited, and others of whom she has not credited based on their testimony in front of her.  There is no question in my mind that she was perfectly able to make whatever determinations were necessary and whatever credibility determinations were necessary in her case.  Any speculation on the part of the Employer in this

case that the Judge could not ably do that is a further indication that Grievant was not given a fair hearing in this matter.

Last and finally, it does not help the Employer's case that it sought two criminal warrants, one in Newaygo County (perjury) the other in Barry County (assault), both of which the Prosecutors dismissed.  Thus, the Employer wasn't able to get complaints issued, let alone a conviction on conduct that it thought was perjurious and an assault.  That should have been a red flag to the Employer that perhaps it should have reviewed at least its characterization of the testimony given in Court on January 23, 2018.

Given all of the above, this case falls far short of the requirements needed to perfect a case for a just cause discharge.  The fact that, as indicated above, the Department did not take an objective view of the Grievant's conduct in this case further taints the reasons for discipline.  I have decided that based upon that and all of the facts that Grievant should not be disciplined in this case.  Grievant deserves a clean slate in this case and I expect she will take advantage of her opportunity to be an excellent Michigan State Police Trooper.  Any remnants left of her prior case, including her requirements with MCOLES remain in effect.  Grievant has been out of law enforcement for some time and will require reorientation.  The record reflects excessive use of alcohol off duty by Grievant.  The Award addresses those issues/concerns.  In view of the outcome, I am assessing two thirds of the arbitrator's fees to the Michigan State Police and one third to the MSPTA due to Grievant's failed attempt at assault charges and the ensuing time and effort required of the Department to investigate.

## **AWARD**

Grievant is to be reinstated subject to Judge Acquilinas's Order regarding MCOLES requirements.[7]  Upon any reinstatement, I am requesting that Inspector Gee-Cram assign Grievant to a mentor who will assist her assimilation back into the Department and police work for a minimum of six months, longer if the Inspector believes a reasonable period should extend beyond that.

I am also ordering that the Employer and Union determine whether it is advisable for Grievant to be under an agreement with regard to alcohol testing for one year from the date of this Award.  If the parties are unable to agree, I will impose such a program.

No back pay and the previous arbitration Award remains in effect.

Retain jurisdiction for 60 days.

Respectfully submitted,

Dated: July 28, 2025

Thomas J. Barnes
P.O. Box 3699
Grand Rapids, MI  49501-3699

---

[7] My charter does not include matters within MCOLES domain.