UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MEGAN MORYC,

       Plaintiff,

                                    CASE NO. 1:25-CV-1127

v.

                                      HON. ROBERT J. JONKER

MICHIGAN STATE POLICE, et al.,

       Defendants.

_____/

## OPINION AND ORDER

### INTRODUCTION

Plaintiff Megan Moryc is a Michigan State Police trooper who alleges she has endured years of sexually harassing, discriminatory, and retaliatory conduct. The allegations in the First Amended Complaint are extensive, and there are also many named defendants. And in two motions to dismiss, the defendants contend that Plaintiff's eighty-four-page pleading is anything but the short and plain statement supporting a claim for relief contemplated by Rule 8 such that it is impossible for them to properly respond to the filing. (ECF Nos. 11, 14). The motions are fully briefed and ready for decision. For the following reasons, the Court will **GRANT** in part, the defense motions, as set out below.

### FACTUAL BACKGROUND

#### 1.  *Plaintiff's Allegations of Supervisory and Peer-on-Peer Sexual Harassment*

Plaintiff has been employed by the Michigan State Police (MSP) as a trooper since March 2016. After graduating from trooper school, Plaintiff was assigned to complete her training under the supervision of Trooper Trevin Antcliff at the MSP's post in Lakeview, Michigan. Plaintiff

claims the Lakeview Post was a known problem to the MSP.  In particular, Plaintiff contends the MSP knew that troopers assigned to the post regularly engaged in sexually boorish behavior and that Trooper Antcliff was a part of the problem.

Plaintiff says her personal experience was consistent with the MSP's known reputation as a hostile work environment.  Soon after her assignment to the posting in November 2016, her male colleagues began making sexual comments and jokes; placed condoms in her backpack; and watched pornography in the workplace.  And Plaintiff later learned that MSP staff assigned her to Trooper Antcliff out of a belief that Trooper Antcliff would leave Plaintiff alone because she was married. That belief, Plaintiff says, was unfounded.  Indeed, Trooper Antcliff took advantage of the distance between Plaintiff's posting and her residence, and he immediately propositioned her for dates and sex.  Plaintiff eventually relented and began a sexual relationship with Trooper Antcliff.

### 2.  *Plaintiff Reports the Peer-on-Peer Sexual Harassment and is Terminated Following Allegedly Retaliatory Complaints*

Plaintiff endured her peers' harassing behavior for several years.  But in February 2020, Plaintiff was unable to tolerate her peers' abusive conduct anymore.  She reported them to the MSP for engaging in sexual assaults, harassment and discrimination.[1]  The Complaint does not clearly lay out the steps of the investigation into her complaint of peer-on-peer harassment.  But at some point Captain Hinz—while he was the head of the MSP's Sixth District overseeing the Lakeview Post—determined that Plaintiff had not experienced sexual harassment or a hostile work environment.

---

[1] Plaintiff did not, at that point, make any complaints regarding Trooper Antcliff.

In October 2020—a few months after Plaintiff reported the peer-on-peer sexual harassment—an internal investigation was opened into complaints about Plaintiff's behavior at a union event.  According to records attached to the Complaint, during the event Plaintiff excessively drank.  And in an intoxicated state she forcefully hit or kneed the groin of two male-workers and also penetrated the anal cleft of a third male co-worker through his clothing.  She was criminally charged and, as Plaintiff states in the First Amended Complaint, the charges led to a conviction and a 30-day jail sentence.

Plaintiff does not appear to dispute she engaged in this conduct.  But she says her behavior at the union event was no worse than the conduct of her male colleagues that went undisciplined.  So, she claims the complaints made against her were retaliatory for the report she made about her male colleagues earlier in February.  Plaintiff contends subsequent materials received as part of a FOIA request confirmed as much.  Nevertheless, Plaintiff was suspended pending the results of the internal investigation.  At the conclusion of the investigation, the commander of the MSP's Sixth District—the district which oversaw the Lakeview Post—terminated Plaintiff's employment effective August 9, 2021.

Plaintiff claims the decision to terminate her was out of step with the progressive-discipline policy of the collective bargaining agreement between her union and the MSP.  Accordingly, her union filed a grievance on her behalf and proceeded to arbitrate the dispute.  On February 3, 2022, the arbitrator ruled in favor of Plaintiff and ordered that Plaintiff's termination be reduced to a two-month suspension with an award of backpay.  While the arbitrator agreed that Plaintiff's actions at the October 2020 union event violated the MSP's code of conduct, the arbitrator determined there was no just cause for Plaintiff's termination.  The arbitrator's reasoning primarily depended on Plaintiff's excessive drinking at the event, and the arbitrator's observation that there

were other instances in which the MSP had not terminated other employees who committed offenses while intoxicated.

The MSP elected to contest the arbitrator's February 3, 2022, ruling in State Court. Plaintiff alleges this was the first time the MSP sought to overturn an arbitration award in forty years. And her job was held in limbo while the litigation played out over the next three years.

### 3. *Plaintiff Eventually Terminates Her Relationship with Trooper Antcliff and Reports his Sexual Harassment, Sexual Assaults, and Domestic Assaults to the MSP*

Meanwhile, Plaintiff maintained a relationship with Trooper Antcliff. But as set out in detail in the Complaint, Plaintiff eventually terminated her relationship with Trooper Antcliff in 2023 after he became violent and committed domestic and sexual assaults. After terminating the relationship in April 2023, Plaintiff contemporaneously reported Trooper Antcliff to the MSP for his sexual harassment, as well as for committing domestic and sexual assaults. Criminal and internal investigations proceeded while the litigation over the arbitration proceedings continued.

The MSP's criminal investigation into Trooper Antcliff did not result in charges. It is not clear what the result of the internal investigation was. Plaintiff says that in September 2023, the Commander of the Lakeview Post gave "input" that Trooper Antcliff had committed quid pro quo sexual harassment and had lied to command staff when questioned. The First Amended Complaint does not go into any more detail than that. However Plaintiff does contend that approximately two months after the commander gave his input, Trooper Antcliff was arrested and jailed after another individual reported him for domestic assault. Then on January 10, 2024, Trooper Antcliff resigned from the MSP.

Plaintiff alleges the two investigations were deficient. Her primary complaint is that the investigations were focused on a case of supervisory quid pro quo sexual harassment, and the investigators did not fully appreciate, and sufficiently investigate, her reports of domestic and

sexual assaults.  As such, she says the MSP's two investigations failed to follow the proper procedure for complaints about domestic and sexual assaults.

### 4.  The MSP Investigates Plaintiff for Giving Perjured Testimony

In the fall of 2023—while the arbitration litigation was ongoing—Plaintiff says the MSP used the information gleaned from their investigations into Trooper Antcliff to open an internal investigation into whether Plaintiff had committed perjury during Trooper Antcliff's 2018 civil divorce proceedings.  In particular, during its internal investigation into Trooper Antcliff, a MSP detective interviewed Trooper Antcliff's ex-wife, Nina Antcliff.  After initially cooperating, Ms. Antcliff left a voicemail on the detective's phone to state that she would no longer participate in the investigation.  Among other things, Ms. Antcliff's voicemail expressed a belief that her ex-husband and Plaintiff had both committed perjury during her divorce proceedings.  The MSP eventually used this information, Plaintiff says, to terminate her employment a second time once the litigation over the arbitration award resulted in her favor.

Plaintiff learned of the perjury investigation on October 9, 2023, and on January 15, 2024, she filed an internal complaint against the MSP commander who initiated the investigation.  She claims the subsequent investigation into her was malicious, and an improper use of the information from the investigation into Trooper Antcliff.  Her complaint added that the MSP's earlier investigations into her complaints against Trooper Antcliff failed to abide by relevant reporting standards.  The Commander of the MSP's Transparency and Accountability Division closed Plaintiff's complaint regarding the perjury investigation two months later on March 16, 2024.  Plaintiff's allegations into the sufficiency of its investigations into Trooper Antcliff were referred to the Assistant Commander of the MSP's First District.  But dissatisfied with the perceived stonewalling, Plaintiff filed a complaint with the Michigan Department of Civil Rights.  Plaintiff

also filed a lawsuit against the MSP in State Court alleging state law violations relating to sex discrimination and retaliation.

### 5.  *Plaintiff is Placed Under Investigatory Suspension Following the MSP's Internal Perjury Investigation.*

On September 2024, the first round of litigation over Plaintiff's termination concluded. After a State Court judge initially vacated the arbitrator's decision, the Michigan Court of Appeals reversed and upheld the arbitrator's award.  The Michigan Supreme Court then denied the MSP's application for leave to appeal on September 18, 2024.  This meant that the February 3, 2022, arbitration award reducing Plaintiff's termination to a suspension was upheld.  In the ensuing weeks, Plaintiff pursued backpay and reinstatement.  Plaintiff claims matters did not proceed smoothly on either front.

For example, a week after the Michigan Supreme Court's decision, the MSP told Plaintiff to report to headquarters to begin the onboarding process for reinstatement.  Plaintiff appeared as directed on October 2, 2024, but shortly after arriving, Plaintiff was taken to a private room where the commander of MSP's Recruiting and Selection Section told her that "the reporting" had to stop.  The commander then handed Plaintiff a letter from MSP's Human Resources Division informing her that she was being placed under investigatory suspension.  The suspension was, she was told, related to the ongoing investigation into her testimony during Trooper Antcliff's divorce proceedings.

Approximately three weeks into her suspension, Plaintiff was contacted by the new commander of the Lakeview Post.  Her commander confirmed the earlier statement that Plaintiff was being investigated for perjury, and he added that she was also under investigation for filing what was alleged to be a retaliatory complaint of harassment against a peer.  On October 31, 2024, Plaintiff participated in two administrative interviews related to the investigations.  But she says

she was treated with hostility, and that she was given incorrect information about the MSP's internal procedures for reporting misconduct.

The internal investigation into the perjury charge moved into the disciplinary phase in December 2024.  On December 18, 2024, Plaintiff received a statement of charges with a proposed discipline of termination.  Plaintiff participated in a disciplinary conference on January 7, 2025, where she reiterated that she was a victim of domestic and sexual abuse; that MSP had failed to properly investigate her complaints about that abuse; and that she instead was embroiled in internal investigations and legal battles.  It became clear to Plaintiff during the conference as the panel members had not reviewed any materials outside of the October 31, 2024, administrative interviews.  The disciplinary conference concluded with no action taken.  A follow-up conference scheduled for January 28, 2025.

### 6.  *Plaintiff's Michigan Commission on Law Enforcement Standards Certification*

The First Amended Complaint spends a large amount of time discussing Plaintiff's Michigan Commission on Law Enforcement Standards Certification or MCOLES.  Though not expressly stated in the pleading, it appears that this certification is a mandatory requirement for active-duty law enforcement officers in Michigan.  In August 2023, Plaintiff's certification lapsed.  So once the Michigan Supreme Court upheld the arbitrator's decision in September 2024, Plaintiff's certification became a major point of contention.

It began, Plaintiff says, with a request from the MSP's Human Resources Division that the arbitrator modify her decision to make the backpay award contingent on Plaintiff successfully reactivating her certification.  This effort appears to have been abandoned, however, as a new round of litigation to enforce the original arbitration award was opened in Ingham County Court.  The second round of State Court litigation resulted in a decision enforcing the arbitrator's award.

The MSP then sought reconsideration, and during a February 12, 2025, hearing on that motion, the MSP represented to the State Court judge that Plaintiff's certification lapsed because she did not attempt to work for another law enforcement agency during her suspension, and that Plaintiff could reactivate her certification during her suspension.  Plaintiff claims these were both knowingly false representations.  She was barred from working for another law enforcement agency while she was employed by the MSP, even while on suspension.  And the MSP had previously told her union that Plaintiff could not reactivate her MCOLES certification until the litigation over the arbitration award was complete.

At the conclusion of the hearing, the State Court judge upheld the arbitrator's decision that reduced Plaintiff's termination for offenses while intoxicated to a suspension.  But the State Court judge included a caveat—based on the MSP's representations during the hearing—that Plaintiff submit a complete MCOLES reactivation packet within approximately thirty days.  Failure to do so would constitute a forfeiture of Plaintiff's employment with the MSP.

### 7. *Plaintiff Is Terminated a Second Time and Arbitrates the Decision; To Preserve her Rights, Plaintiff Goes Forward with Reactivating her MCOLES Certification.*

The day after the State Court judge's decision on the motion for reconsideration, the MSP's disciplinary committee held its follow-up conference Plaintiff's perjury charge.  In short fashion, the Committee upheld the proposed discipline of termination.  In so doing, Plaintiff contends that this disciplinary process ran against the provisions of the collective bargaining agreement's progressive disciplinary policy—as had her first termination.  Through her union she grieved the termination and initiated arbitration proceedings under the CBA's provisions.

Plaintiff's termination complicated the already complex matters relating to her MCOLES certification—a process that Plaintiff still believed could not be completed while the MSP pursued investigations and litigated the arbitration results.  Nevertheless, she went about with the

reactivation process to avoid forfeiting her employment.  On March 11, 2025, Plaintiff contacted the MSP's Recruitment and Selection Section for records that were required to be included in her application packet.  She did not immediately receive a response; only after Plaintiff enlisted the assistance of counsel did she receive a response that the requested information was not on the proper form for the MCOLES packet.  So, Plaintiff had to travel fifty miles to the MCOLES office to submit the information in proper form on the last day before she would be deemed to have forfeited her employment.  But when she arrived, she discovered the unnamed office employee had left early for the day.  Plaintiff was forced to submit her recertification packet by certified mail to timely comply with the February 12, 2025, State Court order.

In addition to the materials that she was required to submit as part of the MCOLES recertification process, Plaintiff was informed the MSP would perform a background check as part of the certification process.  It appears the MSP initiated this process soon after the Michigan Supreme Court's decision in the earlier arbitration proceedings.  Indeed, on November 4, 2024, the Commander of the MSP's Recruiting and Selection Section told Plaintiff that a criminal investigator had been assigned to perform a background check for the period between August 2021 (when Plaintiff was first terminated) and October 2024.  Plaintiff says the commander acknowledged the then-ongoing investigation into the perjury complaint meant that Plaintiff could not go forward with her reactivation, but he nevertheless told Plaintiff that the MSP wanted to get the lengthy process started.

### 8.  *An Arbitrator Overturns Plaintiff's Termination for Perjury*

An arbitration hearing over the grievance relating to Plaintiff's termination for perjury took place on April 24, 2025.  On July 28, 2025, the arbitrator issued a decision in Plaintiff's favor. The arbitrator determined that the MSP's conclusion Plaintiff gave perjured testimony was not

substantiated by the evidence and ordered Plaintiff's immediate reinstatement, subject to the caveat included in the State Court judge's order that Plaintiff reactivate her MCOLES certification.

### 9.  *Plaintiff Speaks to the Media*

Around the same time the arbitrator vacated Plaintiff's termination for perjury and ordered reinstatement in July 2025, a local news station began publishing a series of articles about corruption and dysfunction within the MSP, and an alleged lack of confidence in the MSP's command staff.  Several articles mentioned Plaintiff by name, and they further included her accounts of discrimination and retaliation within the MSP.

After these articles were published, Plaintiff says she became aware of several concerning events.  First, the investigator hired to perform the background check began placing her business card with a notation to "call me" in the mailboxes of her neighbors.  Placing items in a mailbox outside the U.S. Postal mail system, Plaintiff observes, is a federal offense.  Second, Plaintiff says the investigator expanded the investigation beyond the timeline that was given to her.  In particular, two of Plaintiff's acquaintances told her they had been interviewed by the investigator and asked about events that took place before 2021.  The investigator also asked Plaintiff directly about the events that were outside the scope of the investigation.  The investigator's questions suggested to Plaintiff that she had been speaking with her ex-husband and his family and perhaps Trooper Antcliff as well and, it seems, perhaps accepting their accounts without question.  Plaintiff told the investigator that she did not part on good terms with her ex-husband and he and his family would have every reason to retaliate against her.

On September 11, 2025, Plaintiff was notified that the background investigation was complete.  Plaintiff tried, without success, to obtain a copy of the investigation report.  This lawsuit was filed ten days later, on September 21, 2025.  It is unclear, at this point, whether Plaintiff has

successfully reactivated her MCOLES certification and returned to active duty or whether there are any other outstanding matters that must be resolved first.

## PROCEDURAL HISTORY

The operative First Amended Complaint was filed on October 12, 2025.  (ECF No. 5). Based on the foregoing allegations, Plaintiff avers that Defendants—the Michigan State Police and twenty individual defendants employed by the Michigan State Police—violated her constitutional and statutory rights.  Plaintiff seeks various forms of relief, including injunctive relief that, *inter alia*, awards immediate reinstatement.

On January 6, and 20, 2026, the Michigan State Police and eighteen of the twenty individual defendants filed the two instant motions to dismiss or, in the alternative, for a more definite statement under FED. R. CIV. P. 12(e).  (ECF Nos. 11, 14).  Two of the individual Defendants—Davis and Henke—have since retired from the Michigan State Police.  Those Defendants have not yet been served; Plaintiff seeks an extension of time within which to serve those defendants.  (9).  Plaintiff has also responded in opposition to the two motions to dismiss (ECF No. 17) and Defendants have filed a combined reply.  (ECF No. 19).

## LEGAL STANDARDS

Defendants' primary argument for dismissal in this case arises not under Rule 12, but rather under Rule 8, for "failure to plead claims and allegations with clarity, because of which the defendants lack[ ] 'fair notice' of [the] claims and 'the grounds upon which they rest.'"  *Kensu v. Corizon, Inc.*, 5 F.4th 646, 650 (6th Cir. 2021) (discussing the difference between motions to dismiss under Rule 8 and those arising under Rule 12).  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement" of a claim designed to "give the defendant fair notice" of the claim against him. *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  The Supreme

Court has clarified that to meet that standard, a complaint must allege sufficient facts to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Each allegation must be simple, concise, and direct." *Kensu*, 5 4th at 649 (quoting Fed. R. Civ. P. 8(d)(1)).

"What is a short and plain statement of a claim or a simple, clear, and direct allegation will, of course, depend on the totality of the circumstances: more complicated cases will generally require more pleading. What Rule 8 proscribes is *obfuscation* of the plaintiff's claims." *Id*. at 651 (emphasis in original). "The key is whether the complaint is so verbose, confused and redundant that its true substance, if any, is well disguised." *Id*. (quoting *Gillibeau v. City of Richmond*, 417 F.2d 426, 431 (9th Cir. 1969) (citation modified)). Put differently, "[a] plaintiff must not append so many limbs and outward flourishes to a pleading that neither court nor defendant can easily identify the soul of the claim." *Id.* at 653.

## DISCUSSION

Plaintiff has clearly made efforts to offer a comprehensive description of nearly a decade's worth of events. But instead of charting a navigable path, the First Amended Complaint largely leaves it up to the reader to find their own way amidst a labyrinth of convoluted and complex allegations. Standing alone, length and imprecision are not necessarily fatal so long as the pleading is not completely obfuscated. But the defense says this is one of those cases where the soul of Plaintiff's claims cannot be identified—that Plaintiff has failed to link the voluminous alleged facts and events to the various causes of action asserted and the defendants named—such that the First Amended Complaint falls short of meeting Rule 8.

The Court agrees, in part. There is no doubt that the First Amended Complaint could have and should have been presented in a more succinct manner. But as set out above, it is possible

(albeit with effort) to discern the overall sequence of events that Plaintiff says gives rise to the claims alleged, and to make out the government officials Plaintiff says were involved in those events.  It is the case that matters become vaguer and more jumbled when it comes to the causes of action invoked.  The primary shortcoming here, in the Court's mind, is that the First Amended Complaint is needlessly complicated by a misapprehension of the law on the Section 1983 claims.

For example, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  Among other things, this means that government officials may not be held liable for the unconstitutional conduct of their subordinates solely under a theory of respondeat superior or vicarious liability.  The First Amended Complaint runs against this well-established law.  It names as defendants numerous individuals who have no factual allegations alleged as to them beyond the fact that they are employed by the Michigan State Police.  Other government-official defendants appear to be in the case solely by virtue of their supervisory authority, without any allegations that meet the minimum required to constitute active conduct by a supervisory authority.  As further set out below, the Court grants the defense motion to the extent it seeks dismissal of those defendants and claims that run counter to this pleading essential.

Correcting for this deficiency, the First Amended Complaint becomes much more manageable.  And the linkage between the factual allegations and the remaining defendants and causes of action are clarified such that a more definite statement—Defendants' alternative request for relief—is not required.

### 1. Lack of Personal Involvement

Plaintiff fails to make any specific factual allegations against Defendants Dillon, Sweeney, Davis, and Ziesman.  Plaintiff makes only the most negligible allegations against several other

13

Defendants beyond their title and position within the MSP's command. These are Defendants Williams, Henke, Darling, Fias, and Stephens.  The Court dismisses the Section 1983 claims against all these defendants (the only claims raised against them) for lack of personal involvement. The Court also dismisses Defendant Horan from the case.  While there are several factual allegations alleged with respect to this defendant, Defendant Horan is not named in any of the causes of action contained in the First Amended Complaint.

It is a basic pleading essential that a plaintiff attribute factual allegations to particular defendants. *See Twombly*, 550 U.S. at 544 (holding that, in order to state a claim, a plaintiff must make sufficient allegations to give a defendant fair notice of the claim). Where a person is named as a defendant without an allegation of specific conduct, the complaint is subject to dismissal.  *See Gilmore v. Corr. Corp. of Am.*, 92 F. App'x 188, 190 (6th Cir. 2004) (dismissing complaint where plaintiff failed to allege how any named defendant was involved in the violation of his rights); *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing plaintiff's claims where the complaint did not allege with any degree of specificity which of the named defendants were personally involved in or responsible for each alleged violation of rights); *Griffin v. Montgomery*, No. 00-3402, 2000 WL 1800569, at *2 (6th Cir. Nov. 30, 2000) (requiring allegations of personal involvement against each defendant); *Rodriguez v. Jabe*, No. 90-1010, 1990 WL 82722, at *1 (6th Cir. June 19, 1990) ("Plaintiff's claims against those individuals are without a basis in law as the complaint is totally devoid of allegations as to them which would suggest their involvement in the events leading to his injuries"). Because Plaintiff's claims fall far short of the minimal pleading standards under FED. R. CIV. P. 8 (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"), her complaint must be dismissed against Defendants Dillon,

Sweeney, Davis, and Ziesman because the First Amended Complaint is totally devoid of allegations as to them.

The Court also dismisses Defendants Williams, Henke, Darling, Fias, and Stephens from this case because the minimal allegations against them demonstrate a cursory and tangential role, at most, in the complained of events that are wholly insufficient under Rule 8 to demonstrate a constitutional violation.   Plaintiff's allegations regarding Defendants Henke and Darling, for example, are simply that they participated in the MSP's investigations of Plaintiff's complaints about other MSP investigations. For example, she says Defendant Henke, who held various positions during the events at issue, was assigned to investigate Plaintiff's complaint about the perjury investigation, and Plaintiff says that MSP did not give him all relevant materials to the investigation.   Plaintiff's allegations regarding Defendant Darling are similarly scant.   She contends that Defendant Darling, the Assistant Commander of MSP's First District Special Investigation Section, sent a communication to Plaintiff on April 3, 2024, regarding the complaint she made earlier that year about the way the criminal investigation into Trooper Antcliff was conducted.  Plaintiff, through counsel, responded with an offer to meet with Defendant Darling, but Defendant Darling responded there was "no need."  That investigation was subsequently closed by a different officer.   Likewise the only allegations regarding Defendant Stephens are that while he was the commander of the Lakeview Post, he performed a ministerial role of serving Plaintiff with the two administrative notices requiring her to appear for the interviews relating to the perjury investigation.

Plaintiff also says that Defendant Henke, along with Defendant Fias, were asked by Captain Hinz for their input into Plaintiff's complaints of peer-on-peer sexual harassment.  Plaintiff does

not say what that input, if any, was given, although she does state that Captain Hinz ultimately determined that Plaintiff had not experienced sexual harassment or a hostile work environment.

Plaintiff's allegations about Defendant Williams are similarly minimal.  She claims only that that before he was made the Commander of MSP's Transparency and Accountability Division, he interviewed Plaintiff during an investigation into a separate complaint made by a different female MSP Trooper.  Plaintiff reckons that her participation in that investigation may have played some part in the subsequent complaints and investigations made against her, but she does not ascribe any of that conduct to Defendant Williams.  In total, the actions by Defendants Williams, Henke, Darling, Fias, and Stephens are too attenuated from the constitutional harms Plaintiff alleges.  These defendants also are dismissed.[2]

Finally, even though general allegations are brought against Defendant Horan, none of the specific counts in the First Amended Complaint include Defendant Horan.  As such, Defendant Horan is properly dismissed as well.

### 2.  *Supervisory Liability*

To the extent Defendant seeks to tag Defendants Henke, Dillon, Darling, Williams, Sweeney, Fias, Stephens, Davis, and Ziesman with liability for any supervisory roles they may have had within the MSP's command structure, the short and conclusory allegations in the First Amended Complaint fail to plead such with sufficient clarity to pass muster under Rule 8.  And because Plaintiff fails to allege that Defendants Grady and Brimacombe were personally involved

---

[2] Because the Court dismisses Defendants Davis and Henke, Plaintiff's motion regarding these two defendants (ECF No. 9) is moot.

in the complained of events beyond their mere right to control employees, these two defendants are properly dismissed as well.[3]

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

The Sixth Circuit repeatedly has summarized the minimum required to constitute active conduct by a supervisory official:

> "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee,* 199 F.3d at 300 (emphasis added) (internal quotation marks omitted). We have interpreted this standard to mean that "at a minimum," the plaintiff must show that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

---

[3] Plaintiff alleges that Defendant Grady has served as Director of the MSP since September 2023 and that Defendant Brimacombe as the Chief Deputy Director of the MSP since December 2023. Based on deposition testimony from State Court proceedings and the MSP's internal procedures, Plaintiff says that they would have been notified, and thus have first-hand knowledge of her claims.

*Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (quoting *Shehee*, 199 F.3d at 300, and citing *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008)); *see also Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995) (citing *Rizzo v. Goode*, 423 U.S. 362, 375–76 (1976), and *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)); *Walton v. City of Southfield*, 995 F.2d 1331, 1340 (6th Cir. 1993); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).  In addition, merely bringing a problem to the attention of a supervisory official is not sufficient to impose such liability. *See Shelly v. Johnson,* 684 F. Supp. 941, 946 (W.D.Mich.1987) (Hillman, C.J.), *aff'd* 849 F.2d 228 (6th Cir.1988).

Against this backdrop, Plaintiff has also failed to state a Section 1983 claim against the above named defendants under a supervisory liability theory.  Plaintiff fails to allege any facts showing that these defendants encouraged or condoned the conduct of their subordinates, or authorized, approved or knowingly acquiesced in the conduct.  Indeed, she fails to allege any facts at all about their supervisory conduct.  The vague and conclusory allegations of supervisory responsibility are insufficient to demonstrate that these defendants were personally involved in the events Plaintiff complains about.  Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983.  *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555.  Because Plaintiff's § 1983 action is premised on nothing more than respondeat superior liability, his action fails to state a claim.

The above reasoning also leads to the dismissal of Count VII which alleges a Section 1983 failure to train claim under the First and Fourteenth Amendments.  Here, Plaintiff simply alleges the defendants named in that count had the "ultimate responsibility and authority to train and supervise" and that they failed to properly train their subordinates in several specified ways. (*See* First Am. Compl. ¶¶ 511-517).  Nothing more is alleged.  Because Plaintiff fails to allege any facts

18

that would show these defendants authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers, she fails to plead a failure to train and supervise claim consistent with Rule 8.

### 3.  *Group Pleading*

Defendants also contend that the organization of the First Amended Complaint violates Rule 8. They point out that, as styled, the various causes of action begin with the Count, the specific claim, and the specific defendants named in that count.  Count III, for example, is a Fourteenth Amendment claim brought against all 19 individual defendants in their individual capacities. Defendants observe the remainder of the Count then treats those defendants as a single group called "Defendants."  This practice, they contend, means that they cannot have "fair notice" of the claims against them.  There is no categorical prohibition against group pleading.  But Defendants argue that the First Amended Complaint's use of group pleading in this case fails to satisfy Rule 8 and amounts to a "shotgun pleading."  As an example, Defendants point out that Plaintiff alleges in this count that the individual defendants, including Defendants Williams and Deasy, "had, and continue to have, the ultimate responsibility and authority to properly investigate complaints levied against their employees, agents, and representatives."  (First. Am. Compl. ¶ 447, ECF No. 5, PageID.273),  Defendants are perplexed how Defendant Deasy can be alleged to "continue to have" the "ultimate responsibility" to investigate complaints when Plaintiff earlier alleged that Defendant Williams took over for Defendant Deasy as Commander of MSP's Transparency and Accountability Division in October 2024.  (*See* First Am. Compl. ¶¶ 22-23, ECF No. 5, PageID.210-211).

The Sixth Circuit Court of Appeals has noted that a plaintiff's failure to "connect specific facts or events with the various causes of action she asserted" can violate Rule 8 of the Federal

Rules of Civil Procedure.  *Lee v. Ohio Educ. Ass'n*, 951 F.3d 386, 393 (6th Cir. 2020).  The decision determined this style of pleading "violated Rule 8(a)(2)'s requirement that [the plaintiff] provide the defendants 'adequate notice of the claims against them and the grounds upon which each claim rests.'"  *Id.* at 392-93 (quoting *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018)).  Other courts have found a pleading fails to satisfy Rule 8 where it is "virtually impossible for a defendant to know which allegations of fact are intended to support which claims for relief." *K.O. v. G6 Hosp., LLC*, 728 F. Supp. 3d 624, 640 (E.D. Mich. 2024) (quoting *Arnold v. CooperSurgical, Inc.*, 681 F. Supp. 3d 803, 824 (S.D. Ohio)).  In such situations, the pleading "overwhelm[s] defendants with an unclear mass of allegations and make[s] it difficult [or] impossible for the defendants to make informed responses to the plaintiff's allegations."  *Id.* (quoting *A.B. v. Hilton Worldwide Holdings, Inc.*, 484 F. Supp. 3d 921, 943 (D. Or. 2020)).

So summary reference to a single, five-headed 'Defendants' does not support a reasonable inference that each Defendant is liable[.]"  *Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019) (citing *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011) ("This Court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right.").  Accordingly, "this method of pleading is generally prohibited."  *See McCausland v. Charter Twp. of Canton*, No. 23-1479, 2024 WL 3045525, at *2 n.2 (6th Cir. June 18, 2024) (citing *Boxill* and observing the complaint in that case "is generally confusing, conclusory, and imprecise.  For many counts in the complaint, plaintiffs make general allegations against all "Defendants" rather than pleading who exactly is responsible for what.").

Yet when a plaintiff alleges that multiple defendants engaged in the same conduct, these allegations will give "adequate notice" to the defendants if they "raise a reasonable expectation that discovery will reveal evidence to support their claims." *Faloba v. Ultium Cells LLC*, No. 4:24-CV-01569, 2025 WL 1042699, at *19 (N.D. Ohio Apr. 8, 2025) (examining collective conduct pleading and quoting *Hale v. Enerco Grp., Inc.* 2011 WL 49545, at *4 (N.D. Ohio Jan 5, 2011).

In this case, the Court is satisfied that the First Amended Complaint is not fatally flawed by the use of group pleading.  This is particularly so after the defendants who were not personally involved in the complained of events are accounted for.   Accordingly, the Court does not find the First Amended Complaint's use of group pleading to constitute an independent basis for dismissal.

### 4.   *Other Matters*

Beyond the above discussion applicable to the entirety of the First Amended Complaint, the Court observes several discrete areas of the First Amended Complaint that  falter under Rule 8's standard.

First, Plaintiff brings a separate claim for injunctive relief against numerous defendants in their individual capacities.  This claim is simply a demand for injunctive relief and alleges no separate cause of action.  The Court therefore dismisses Count VIII to the extent it is brought as a cause of action.   *See Lucido v. U.S. Bank Nat'l Ass'n,* No. 15-13697, 2016 WL 3667955, at *8 (E.D. Mich. July 11, 2016).

Next, Plaintiff names the Michigan State Police as one of the Defendants in the Count V First Amendment Retaliation claim.  Plaintiff may not maintain a Section 1983 claim against the MSP.  The Michigan State Police is an agency of the state of Michigan, protected by sovereign immunity.  *See Lavrack v. City of Oak Park*, No. 98-1142, 1999 WL 801562, at *2 (6th Cir. Sept.28, 1999); *see also Scott v. Michigan*, 173 F. Supp. 2d 708, 714 (E.D. Mich. 2001) (finding

the Michigan State Police is an arm of the state of Michigan entitled to Eleventh Amendment immunity); *Jones v. Robinson,* No. 12-12541, 2012 U.S. Dist. LEXIS 113652, at *8, (E.D. Mich. Aug.13, 2012) (also finding Michigan State Police Department is a state agency immune from suit under § 1983); *Haddad v. Fromson*, 154 F. Supp. 2d 1085, 1091 (W.D. Mich. 2001) (explaining that the Michigan State Police is a department of the State of Michigan "created by statute," and is thus entitled to Eleventh Amendment immunity) (citing Mich. Comp. Laws § 16.250)), *overruled on other grounds*, *Lapides v. Bd. of Regents of the Univ. Sys. of Georgia*, 535 U.S. 613 (2002). Moreover, the Sixth Circuit has observed that the Michigan State Police is not a "person" subject to suit under § 1983. *Lavrack,* 1999 WL 801562 at *2 (*citing Howlett v. Rose,* 496 U.S. 356, 383 (1990)). Accordingly, the MSP is properly dismissed from Count V of the First Amended Complaint.

The Court also dismisses Count VI, the Fourteenth Amendment State Created Danger claim, for failure to plead such with sufficient clarity. The theory here appears to be that these Defendants knowingly placed Plaintiff under the supervision of Trooper Antcliff, whom they knew to be a sexual predator. Plaintiff brings this claim against Defendants Hinz, Sweeney, Davis, and Ziesman. As noted above, Plaintiff makes no factual allegations regarding the latter three defendants. And she makes no allegations that suggest Captain Hinz was involved in that decision either. To the extent Plaintiff depends on the group pleading contained in the cause of action here, the Court finds such to be wholly conclusory and insufficient to pass muster under Rule 8.

## CONCLUSION

For all these reasons, the Court **grants** the defense motions (ECF No. 11 and 14) to the extent set out above. Defendants Grady, Brimacombe, Henke, Dillon, Darling, Williams, Sweeney, Fias, Stephens, Horan, Davis, and Ziesman are dismissed as Defendants from this case.

The Court also dismisses the MSP from Count V based on Eleventh Amendment Immunity; the State Created Danger claim in Count VI, the Failure to Train claim in Count VII, and the Injunctive Relief claim in Count VIII to the extent the latter is brought as an independent cause of action and not a demand for relief.   The case shall proceed on the remaining claims and defendants.

Plaintiff's motion regarding Defendants Davis and Henke (ECF No. 9) is dismissed as moot.

**IT IS SO ORDERED.**


Dated:   March 6, 2026                      /s/ Robert J. Jonker
                                          ROBERT J. JONKER
                                          UNITED STATES DISTRICT JUDGE