UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

MEGAN MORYC,

     Plaintiff,

v

MICHIGAN STATE POLICE, a
Department of the State of Michigan;
JAMES F. GRADY II; AIMEE
BRIMACOMBE; LISA GEE-CRAM; DALE
HINZ; CAMERON HENKE; JASON
NEMECEK; MICHAEL DILLON; ERIC
DARLING; KANDYCE HERR; THOMAS
DEASY; MATTHEW WILLIAMS;
NICOLE BOCK; KEVIN SWEENEY;
ANDREW FIAS; RYAN MAKI; MICHAEL
STEPHENS; CARISSA HORAN; BRIAN
BUEGE; ROBERT DAVIS; and SCOTT
ZIESMAN; officially and in their personal
capacities,

     Defendants.

No. 1:25-cv-1127

HON. ROBERT J. JONKER

MAG. PHILLIP J. GREEN

---

| | |
|---|---|
| Elizabeth K. Abdnour (P78203) | Mary A. Waddell (P70545) |
| Nicole Cote (P86815) | Ryan Wier (P83886) |
| ABDNOUR WEIKER LLP | Shelley M. McCormick (P80311) |
| Attorneys for Plaintiff | Assistant Attorneys General |
| 325 E. Grand River Ave., Suite 250 | Attorneys for Defendants |
| East Lansing, MI  48823 | MI Dep't of Attorney General |
| 517.292.0067 | State Operations Division |
| liz@education-rights.com | P.O. Box 30754 |
| nicole@education-rights.com | Lansing, MI  48909 |
| | 517.335.7573 |
| | waddellm1@michigan.gov |
| | wierr2@michigan.gov |
| | mccormicks@michigan.gov |

/

**ANSWER TO AMENDED COMPLAINT, AFFIRMATIVE DEFENSES AND
<u>RELIANCE ON JURY DEMAND</u>**

NOW COMES Defendants Michigan State Police (MSP), Gee-Cram, Hinz, Nemecek, Herr, Deasy, Bock, Maki, and Buege (collectively, "Defendants") by their attorney, Mary A. Waddell, Assistant Attorney General, and in answer to Plaintiff's Amended Complaint states as follows:

## PRELIMINARY STATEMENT

To the extent the Complaint refers to "Defendants" collectively or otherwise attributes allegations to multiple Defendants without identifying the specific conduct of each answering Defendant, such allegations fail to provide adequate notice of the claims asserted against each Defendant.  Accordingly, unless expressly admitted herein, Defendants deny any allegation that purports to attribute to conduct to each Defendant without specifically identifying the Defendant.

## INTRODUCTION

1.     Megan Moryc is a dedicated, hardworking Michigan State Police (MSP) Trooper and lifelong Michigan resident.  She joined Michigan State Police in 2016 because she wanted to help keep our State safer and give back to the community. She successfully made it through the challenging MSP Trooper School, which MSP itself compares to "military boot camp."

**ANSWER:    This paragraph contains multiple and compound allegations; to the extent any allegation is directed to the Defendants it is denied, and Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them pursuant to Federal Rule of Civil Procedure 8(b)(5).**

2

2.     From the beginning, Michigan State Police set Tpr. Moryc up for failure.  After Trooper School, Tpr. Moryc was assigned to the MSP Lakeview Post in Montcalm County, Michigan.  While the majority of Tpr. Moryc's male counterparts were assigned to a post within their top three choices, Tpr. Moryc was assigned to her fourteenth choice.  Despite MSP's promise to try to keep married couples and families close to home, Tpr. Moryc was forced to arrange separate housing away from her husband, as the Lakeview Post was almost two hours away from Marshall, Michigan, where they lived.  This caused significant strain on Tpr. Moryc's marriage.

**ANSWER:     This paragraph contains multiple and compound allegations; to the extent any allegation is directed to the Defendants it is denied, and Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them pursuant to Federal Rule of Civil Procedure 8(b)(5).**

3.     Unbeknownst to her, the second supervisor she was assigned in November 2016, Tpr. Trevin Antcliff was a known sexual harasser who had a reputation for engaging in inappropriate communications and conduct with women. MSP reportedly assigned Tpr. Moryc to Tpr. Antcliff's supervision because she was married, and by some flawed logic believed her marital status would protect her from harassment.  It did not.

**ANSWER:     This paragraph contains multiple and compound allegations; to the extent any allegation is directed to the Defendants it is denied, and**

**Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them pursuant to Federal Rule of Civil Procedure 8(b)(5).**

4.      Tpr. Antcliff began sexually harassing Tpr. Moryc almost immediately. He repeatedly propositioned her for dates and sex, knowing she lived almost two hours away from her husband.  Eventually, she felt powerless to continue resisting the advances of her supervisor, who was also vital in determining whether she was permitted to make it past probationary status as an employee, and she agreed to begin a sexual relationship with him.  This decision broke up her marriage.  Their relationship continued, and Tpr. Antcliff became increasingly abusive.  Tpr. Moryc feared reporting the abuse to MSP, as she was afraid both parties would be terminated.  Tpr. Antcliff's abuse escalated until Tpr. Moryc feared for her life.

**ANSWER:     This paragraph contains multiple and compound allegations; to the extent any allegation is directed to the Defendants it is denied, and Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them pursuant to Federal Rule of Civil Procedure 8(b)(5).**

5.      Tpr. Moryc also experienced rampant sexual harassment and discrimination from other MSP employees in the workplace.  She was repeatedly forced to endure sexual comments and jokes, condoms being placed in her backpack, male troopers watching pornography in the workplace, and lewd comments about her female coworkers.  Eventually, Tpr. Moryc could not take the abuse anymore,

and in February 2020, she filed the first of a series of reports of sexual assault, harassment, and discrimination against other MSP employees.  Due to Tpr. Antcliff's abuse and threats, Tpr. Moryc was not safely able to report his sexual assault, discrimination, and harassment to MSP until April 2023, after she ended their relationship.

**ANSWER:     This paragraph contains multiple and compound allegations; to the extent any allegation is directed to the Defendants it is denied, and Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them pursuant to Federal Rule of Civil Procedure 8(b)(5).**

6.     Almost immediately after making her first report in February 2020, Tpr. Moryc became the victim of a sustained, unrelenting retaliation by MSP employees from within the Lakeview Post all the way up to the very top of MSP. The retaliation continues to this day, as MSP has not allowed Tpr. Moryc to work since 2021, unlawfully withheld health insurance payments from her paycheck for periods during which she was not covered by MSP insurance, attempted to interfere with her law enforcement certification recertification process, repeatedly violated her rights under her collective bargaining agreement, and misrepresented information in Michigan courts of law, among a long series of retaliatory acts.

**ANSWER:     This paragraph contains multiple and compound allegations; to the extent any allegation is directed to the Defendants it is denied, and Defendants otherwise lack knowledge or information sufficient to form a**

**belief as to the truth of the allegations and therefore deny them pursuant to Federal Rule of Civil Procedure 8(b)(5).**

7. Despite it all, Tpr. Moryc wants nothing more than to return to work and get back to the job of keeping Michiganders safe from abuse from bad actors and holding wrongdoers accountable. After all she has been through, it is difficult to imagine anyone more qualified for the job than Tpr. Moryc.

**ANSWER:  This paragraph contains multiple and compound allegations; to the extent any allegation is directed to the Defendants it is denied, and Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them pursuant to Federal Rule of Civil Procedure 8(b)(5).**

## JURISDICTION AND VENUE

8. This Court has original jurisdiction over Plaintiff's federal and Constitutional claims under 28 U.S.C. §§ 1331 and 1361.

**ANSWER:  No  response is required as this allegation contains a legal conclusion.**

9. This Court has the authority to grant declaratory and injunctive relief and to compel or set aside agency action to address duties arising under the Constitution, laws, or treaties of the United States. 42 U.S.C. § 1983, 28 U.S.C. § 2201 and 5 U.S.C. §§ 702, 704, and 706.

**ANSWER:  No response is required as this allegation contains a legal conclusion.**

6

10.     Pursuant to 28 U.S.C. § 1391(b), venue lies in the Western District of Michigan as the events giving rise to this action occurred in and around the Counties of Montcalm, Ionia, and Gratiot, State of Michigan.

**ANSWER:     Defendants do not contest venue.**

## PARTIES

11.     Plaintiff Megan Moryc is a current resident of Ionia County, Michigan. From 2016 to 2018, Plaintiff was a resident of Montcalm County, and from 2018 to present, Plaintiff has been a resident of Ionia County.  At all relevant times, Plaintiff has been a resident of the State of Michigan and an employee of Michigan State Police, working within the Lakeview Post which covers Montcalm, Ionia, and Gratiot Counties.

**ANSWER:     This paragraph contains multiple and compound allegations; to the extent any allegation is directed to the Defendants it is denied, and Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them pursuant to Federal Rule of Civil Procedure 8(b)(5).**

12.     Defendant Michigan State Police (MSP) was at all relevant times and continues to be a Department of the State of Michigan, headquartered in Eaton County, State of Michigan, organized and existing under the laws of the State of Michigan.

**ANSWER:     Defendant MSP admits that it is a Department of the State of Michigan and that it is currently headquartered in Eaton County.**

13.     At all relevant times, Defendant Colonel James F. Grady II, in his official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  From September 2023 to present, Col. Grady has served as the Director of MSP.

**ANSWER:     No response is required as Plaintiff's claims against Col. James Grady II have been dismissed.**

14.     At all relevant times, Defendant Lieutenant Colonel Aimee Brimacombe, in her official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of her employment.  From December 2023 to present, Lt. Col. Brimacombe has served as the Chief Deputy Director of MSP.

**ANSWER:     No response is required as Plaintiff's claims against Lt. Col. Aimee Brimacombe have been  dismissed.**

15.     At all relevant times, Defendant Lisa Gee-Cram, in her official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of her employment.  At all relevant times, Gee-Cram has served as Inspector of MSP's Human Resources Division.

**ANSWER:     Defendant Gee-Cram admits that she is an employee of the Michigan State Police, holding the rank of Inspector.  Defendant Gee-Cram cannot respond to the remaining allegations as she lacks knowledge or**

**information sufficient to form a belief as to the truth of the allegations and therefore denies them pursuant to Federal Rule of Civil Procedure 8(b)(5).**

16.    At all relevant times, Defendant Lieutenant Colonel Dale Hinz, in his official capacity, worked within Kent and Eaton Counties, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  At all relevant times until around August 2021, Lt. Col. Hinz served as the Captain (first in command) of MSP's Sixth District. Since around August 2021 to March 2024, Lt. Col. Hinz served as Deputy Director of MSP's Field Services Bureau.

**ANSWER:    Defendant Hinz admits that he is employed by the Michigan State Police and has worked in Kent and Eaton Counties.  Defendant Hinz further admits that he served as the Captain of the MSP's Sixth District April 2020 until April 2022 and further admits that he served as Lieutenant Colonel (Deputy Director) of MSP's Field Operations Bureau from April 2022 until April 2024.**

17.    At all relevant times, Defendant Captain Cameron Henke, in his official capacity, worked within Kent and Eaton Counties, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  At all relevant times until around August 2021, Capt. Henke served as the Inspector (second in command) of MSP's Sixth District.  At all relevant times since around August 2021 to present, Capt. Henke

9

has served as Commander of MSP's Special Investigation Division within the Field Operations Bureau.

**ANSWER:    No response is required by these Defendants as Henke was never served and  was dismissed sua sponte by the Court.**

18.    At all relevant times, Defendant Captain Jason Nemecek, in his official capacity, worked within Kent County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  At all relevant times until around September 2022, Capt. Nemecek served as the Inspector (second in command) of MSP's Sixth District.  At all relevant times from September 2021 to September 2022, Capt. Nemecek served as Inspector of Equity & Inclusion Officer and Commander of Recruiting and Selection.  At all relevant times from September 2022 to August 2023, Capt. Nemecek served as Inspector of MSP'S Sixth District.  At all relevant times since around August 2023 to present, Capt. Nemecek has served as Commander of MSP's Sixth District.

**ANSWER:    Defendant Nemecek admits.**

19.    At all relevant times, Defendant Detective First Lieutenant Michael Dillon, in his official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  At all relevant times, Det. F/Lt. Dillon has served as the Commander of MSP's First District Special Investigation Section.

10

**ANSWER:    No response is required as Defendant Dillon was dismissed by the Court.**

20.    At all relevant times, Defendant Detective Lieutenant Erik Darling, in his official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  At all relevant times, Det. Lt. Darling has served as the Assistant Section Commander of MSP's First District Special Investigation Section.

**ANSWER:    No response is required as Defendant Darling was dismissed by the Court.**

21.    At all relevant times, Defendant Detective Sergeant Kandyce Herr, in her official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of her employment.  At all relevant times, Det. Sgt. Herr has served as a Detective Sergeant within MSP's First District Special Investigation Section.

**ANSWER:    Defendant Herr admits.**

22.    At all relevant times, Defendant Captain Thomas Deasy, in his official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  At all relevant times until approximately October 2024, Capt. Deasy served as the Commander of MSP's Transparency and Accountability Division.

**ANSWER:    Defendant Deasy admits that he was employed by Michigan State Police working with Eaton County between October 2020 to October 2024.**

23.    At all relevant times, Defendant Captain Matthew Williams, in his official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  At all relevant times since approximately October 2024, Capt. Williams has served as the Commander of MSP's Transparency and Accountability Division.

**ANSWER:    No response is required as Defendant Williams was dismissed by the Court.**

24.    At all relevant times, Defendant First Lieutenant Nicole Bock, in her official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of her employment.  At all relevant times since around August 2023, F/Lt. Bock has served as a First Lieutenant within MSP's Professional Standards Division.

**ANSWER:    Defendant Bock admits.**

25.    At all relevant times, Defendant First Lieutenant Kevin Sweeney, in his official capacity, worked within Montcalm County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.   From approximately July 2016 to approximately

12

February 2020, F/Lt. Sweeney served as the Commander of the Lakeview Post.

**ANSWER:** **No response is required as Defendant Sweeney was dismissed by the Court.**

26.     At all relevant times until around September 2022, Defendant First Lieutenant Andrew Fias, in his official capacity, worked within Montcalm County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.   From approximately June 2020 to approximately September 2022, F/Lt. Fias served as the Commander of the Lakeview Post.

**ANSWER:** **No response is required as Defendant Fias was dismissed by the Court.**

27.     At all relevant times, Defendant First Lieutenant Ryan Maki, in his official capacity, worked within Montcalm County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.   From approximately September 2022 to approximately August 2024, F/Lt. Maki served as the Commander of the Lakeview Post.

**ANSWER:** **Defendant Maki admits that he is an employee of the Michigan State Police and that he was the Assistant Post Commander at the Lakeview Post from September 2021 until October 2022, the Post Commander at the Lakeview Post from October 2022 until November 2023.**

13

**Since November 2023, Defendant Maki has been the Commander of the Sixth District's Special Investigation Section.**

28.     At all relevant times, Defendant First Lieutenant Michael Stephens, in his official   capacity, worked within Montcalm County, State of Michigan, and was an agent and/or employee   of MSP, acting or failing to act within the scope, course, and authority of his employment. At all   relevant times since approximately January 2024, F/Lt. Stephens has served as the Commander of   the Lakeview Post.

**ANSWER:     No response is required as Defendant Stephens was dismissed by the Court.**

29.     At all relevant times, Special Lieutenant Carissa Horan worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  At all relevant times from October 2020 to September 2023, Spl/Lt. Horan was a Spl/Lt. with the MSP Professional Standards Section.

**ANSWER:     No response is required as Defendant Horan was dismissed by the Court.**

30.     At all relevant times, First Lieutenant Brian Buege, in his official capacity, worked within Eaton County, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  At all relevant times, F/Lt. Buege has served as the Commander of MSP's Recruiting and Selection Section.

14

**ANSWER:    Defendant Buege admits that he is employed as a First Lieutenant by the Michigan State Police and was the Commander of MSP's Recruiting and Selection from March 2023 until May 2024 and is currently assigned to Human Resources Division in Labor Relations.**

31.    At all relevant times, Lieutenant Robert Davis, in his official capacity, worked within Montcalm and Kent Counties, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment.  At all relevant times until around 2020, Lt. Davis served as the Assistant Post Commander of the Lakeview Post.  At all relevant times since around 2020, Lt. Davis has served as Detective Lieutenant in the Sixth District.

**ANSWER:    No response is required by these Defendants as Defendant Davis was never served and was dismissed sua sponte by the Court.**

32.    At all relevant times, Sergeant Scott Ziesman, in his official capacity, worked within Ingham and Eaton Counties, State of Michigan, and was an agent and/or employee of MSP, acting or failing to act within the scope, course, and authority of his employment. At all relevant times, Sgt. Ziesman served as Squad Sergeant of the Lakeview Post.

**ANSWER:    No response is required as Defendant Ziesman was dismissed by the Court.**

## APPLICABLE LAW AND POLICIES

33.    Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 *et seq.*, states that it shall be an unlawful employment practice for an employer:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

34.    Under Title VII, 42 U.S.C. § 2000e-2, the term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person.

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

35.    Under Title VII, 42 U.S.C. § 2000e, the term "employee" means an individual employed by an employer.

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

36.    The First Amendment to the United States Constitution provides that Congress shall make no law "abridging the freedom of speech." U.S. Const. amend. I.

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

37.    First Amendment retaliation claims apply to public officials speaking as private citizens on matters of public concern.  *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017); *Garcetti v. Ceballos*, 547 U.S. 410 (2006).

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

38.    For a public employee in the Sixth Circuit to "prove a First Amendment retaliation claim, [she] must show: (1) [s]he engaged in protected speech; (2) the defendant took an adverse action against h[er]; and (3) there is a causal connection between the protected speech and the adverse action." *Josephson v. Ganzel*, 115 F.4th 771, 783 (6th Cir. 2024).

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

39.    While a public employee's  speech may conflict with an "employer's interests in running an efficient workplace . . . the First Amendment protects a public employee's speech if: (1) the speech was on a matter of public concern; (2) the speech was not made pursuant to the employee's official duties; and, assuming the employee can satisfy the first two elements, (3) the employee's interest in speaking

on a matter of public concern outweighs the employer's interest in promoting the efficiency of the public services it performs through its employees." *Id.* at 783-84 (internal citations omitted).

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

40.    In *Kentucky v. Graham*, the Supreme Court held that personal-capacity suits seek to impose personal liability upon a government official for actions they take under color of state law. Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which [a government official] is an agent." 473 U.S. 159, 165 (1985) (quoting *Monell v. Dep't of Soc. Svcs. of the City of New York*, 436 U.S. 658, 690 n.55 (1978).

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

41.    To establish municipal liability under section 1983, a plaintiff must establish that (1) they have suffered a deprivation of a constitutionally protected interest and (2) that the deprivation was caused by an official policy, custom, or usage of the municipality. *Monell*, 436 U.S. at 694.

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

42.    The Fifth Amendment to the U.S. Constitution provides that "No person shall be… deprived of life, liberty, or property, without due process of law…." U.S. Const. amend. V.

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

43.    The Fourteenth Amendment to the U.S. Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

## FACTUAL ALLEGATIONS

**Background Information**

44.    Plaintiff Megan Moryc has been employed as a Trooper by MSP since March 2016.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

45.    In around November 2016, MSP assigned Tpr. Moryc to the second and shadow phase of her field training under the supervision of Field Training Officer (FTO) Trooper Trevin Antcliff at the MSP Lakeview Post in Lakeview, Michigan.

**ANSWER:    MSP admits in or around November 2016, Trooper Trevin Antcliff was assigned as Moryc's Field Training Officer for the second phase of Moryc's field training.  MSP also admits that Trevin Antcliff was Moryc's Field Training Officer during the shadow phase of Moryc's field**

**training but MSP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies them pursuant to Federal Rule of Civil Procedure 8(b)(5).**

46. The Lakeview Post is overseen by MSP's Sixth District Headquarters Grand Rapids Post.

**ANSWER: MSP denies for the reason that the allegation is untrue.**

47. The Sixth District is overseen by MSP's Field Operations Division.

**ANSWER: MSP denies for the reason that the allegation is untrue.**

48. The Field Operations Division is overseen by the Director and Deputy Director of MSP.

**ANSWER: MSP denies for the reason that the allegation is untrue.**

49. At the time Tpr. Moryc began in 2016, Tpr. Antcliff had a reputation within MSP for being dangerous to women.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

50. Upon information and belief, MSP assigned Tpr. Moryc to Tpr. Antcliff because she was married at the time and MSP staff believed that would protect her from any unwanted advances by Tpr. Antcliff.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

20

51.     Tpr. Moryc's marital status did not protect her.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

52.     Tpr. Antcliff began a campaign of pressure and coercion until Tpr. Moryc ultimately surrendered to a sexual and romantic relationship with him, ultimately moving into Tpr. Moryc's home in September 2018 after her relationship with her ex-husband had deteriorated.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

53.     Starting in mid 2016 through October 2020, Tpr. Moryc was repeatedly forced to endure sexual comments and jokes, condoms being placed in her backpack, male troopers watching pornography in the workplace, and lewd comments about her female coworkers from male troopers within the Lakeview Post.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

54.     Eventually, Tpr. Moryc could not take the abuse anymore, and in February 2020, she filed the first of a series of reports of sexual assault, harassment, and discrimination against other MSP employees.

**ANSWER:     MSP denies for the reason that the allegation is untrue.**

55.     Tpr. Moryc's male colleagues filed both internal and criminal complaints against her in October 2020 for engaging in horseplay of the exact same type in which they frequently engaged.

**ANSWER:     MSP denies for the reason that the allegation is untrue.**

56.     MSP immediately suspended Tpr. Moryc when those complaints were filed against her.

**ANSWER:     MSP admits that Moryc was placed on paid suspension on or about October 19, 2020 due to complaints that she criminally assaulted her colleagues.**

57.     The criminal charges led to a criminal conviction against Tpr. Moryc and a 30-day jail sentence.

**ANSWER:     MSP admits.**

58.     As will be described later in this Complaint, Tpr. Moryc only learned that the complaint against her was made in retaliation for filing complaints of sex discrimination against the male troopers when she received responses to a FOIA request her former attorney made in November 2024.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

59.     Although Tpr. Moryc has technically been employed by MSP since 2016, she has been on administrative leave since October 19, 2020, on which date her badge was taken away, and has not been returned to her.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

60.    MSP terminated Tpr. Moryc on August 9, 2021, without going through the progressive discipline process identified in the Michigan State Police Troopers Association (MSPTA)-MSP collective bargaining agreement.

**ANSWER:    Defendant MSP admits Moryc was terminated on August 9, 2021 but MSP lack knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

61.    As a result, MSPTA filed a grievance on behalf of Tpr. Moryc, and MSPTA and MSP had entered voluntary labor arbitration to resolve the grievance.

**ANSWER:    MSP admits that MSPTA filed a grievance on behalf of Moryc and participated in arbitration concerning the grievance but MSP lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

62.    On February 3, 2022, the arbitrator, Kathleen Opperwall, had found for Tpr. Moryc and MSPTA, reducing Tpr. Moryc's termination to a two-month unpaid suspension and awarding Tpr. Moryc reinstatement to her position and back pay.  Ex. 1.

**ANSWER:    MSP admits that on February 3, 2022, the arbitrator issued an award but MSP lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation therefore deny it**

**pursuant to Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers that the award speaks for itself.**

63.    MSP has been fighting compliance with the 2022 arbitration award since the day it was issued.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

64.    To date, MSP has not allowed Tpr. Moryc to return to duty and has engaged in a years-long pattern of discrimination and retaliation for reporting and speaking out against sex discrimination and harassment within MSP.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

65.    In February 2022, Arbitrator Opperwall found that former Capt. Hinz's decision to terminate Tpr. Moryc was too severe, citing Tpr. Moryc's clean disciplinary record and finding MSP's disparate use of progressive discipline as cause to overturn the termination decision and reinstate Tpr. Moryc with back pay.

**ANSWER:    MSP admits that on February 3, 2022, the arbitrator issued an award but MSP lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers that the award speaks for itself.**

66.    At that point, for the first time in forty years, MSP chose to break the negotiated rules of the MSPTA-MSP CBA and sought to overturn Arbitrator Opperwall's arbitration award in the Ingham County Circuit Court.

**ANSWER:   MSP admits that it sought to vacate the arbitration award in the Ingham County Circuit Court but denies the remainder of the allegation for the reason that it is untrue.**

67.   On September 19, 2022, Ingham County Circuit Court Judge James Jamo reversed Arbitrator Opperwall's arbitration decision. *Mich. St. Police v. Mich. St. Police Troopers Ass'n.*, No. 22-136-CZ (Ingham Co. Cir. Ct. Sep. 19, 2022).

**ANSWER:   MSP admits that on September 19, 2022, Judge James Jamo vacated the arbitration award but MSP lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

68.   MSPTA appealed Judge Jamo's decision to the Michigan Court of Appeals.

**ANSWER:   MSP admits.**

69.   On December 28, 2023, the Michigan Court of Appeals issued a unanimous decision reversing and remanding Judge Jamo's decision. *Mich. St. Police v. Mich. St. Police Troopers Ass'n.*, No. 363241 (Mich. App. Dec. 28, 2023).

**ANSWER:   MSP admits that the Michigan Court of Appeal reversed Judge Jamo's decision and remanded the matter.**

70.   On February 8, 2024, in MSP's unprecedented third, but not final, attempt to vacate Tpr. Moryc's arbitration award, for the first time ever, MSP sought leave to appeal the Michigan Court of Appeals' decision to the Michigan Supreme Court.

**ANSWER:      MSP admits that it filed an application for leave to appeal to the Michigan Supreme Court but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

71.      On September 18, 2024, the Michigan Supreme Court denied MSP's request for leave to appeal. *Mich. St. Police v. Mich. St. Police Troopers Ass'n.*, No. 166669 (Mich. Sep. 18, 2024).

**ANSWER:      MSP admits.**

72.      On or around November 18, 2024, Attorney Dlugos filed a motion to enforce the 2022 arbitration award in Ingham County Circuit Court, as MSP had still failed to comply with all the terms.

**ANSWER:      MSP admits that Attorney Dlugos filed a motion but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

73.      Upon information and belief, on or around November 27, 2024, Insp. Gee-Cram contacted Arbitrator Opperwall and asked her to modify Tpr. Moryc's award.

**ANSWER:      Defendant Gee-Cram admits that she contacted Arbitrator Opperwall but denies that she asked her to modify the arbitration award for the reason that the allegation is untrue.**

74.     Upon information and belief, Insp. Gee-Cram asked Arbitrator Opperwall to change her 2022 ruling to find that MSP no longer had to pay Tpr. Moryc because of her lapse in Michigan Commission on Law Enforcement Standards (MCOLES) certification and to find that Tpr. Moryc would only receive the back pay in the award if she became MCOLES certified.

**ANSWER:     Defendant Gee-Cram denies for the reason that the allegation is untrue.**

75.     Pursuant to the Uniform Arbitration Act, an arbitrator may only modify or correct an award on motion of a party under the following circumstances:

> (1) On motion to an arbitrator by a party to an arbitration proceeding, the arbitrator may modify or correct an award on any of the following grounds:
>
>> (a) A ground stated in section 24(1)(a) or (c).
>>
>> (b) Because the arbitrator has not made a final and definite award on a claim submitted by the parties to the arbitration proceeding.
>>
>> (c) To clarify the award.
>
> (2) A motion under subsection (1) must be made and notice given to all parties within 20 days after the moving party receives notice of the award.

M.C.L. 691.1700.  Or:

> On motion made within 90 days after the moving party receives notice of the award under section 19 or within 90 days after the moving party receives notice of a modified or corrected award under section 20, the court shall modify or correct the award if any of the following apply:
>
>> (a) There was an evident mathematical miscalculation or an evident mistake in the

> description of a person, thing, or property referred to in the award.
>
> (b) The arbitrator has made an award on a claim not submitted to the arbitrator and the award may be corrected without affecting the merits of the decision on the claims submitted.
>
> (c) The award is imperfect in a matter of form not affecting the merits of the decision on the claims submitted.

M.C.L. 691.1704(1).

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

76.    None of these requirements applied to Insp. Gee-Cram's request.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

77.    Further, the deadline for making such a motion was either 20 or 90 days from the date of the award, depending on the grounds, as listed above.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

78.    Insp. Gee-Cram's motion, made over two and a half years after the arbitration award was issued, was well outside the required timeline of either 20 or 90 days.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

79.    On December 18, 2024, a hearing was held in Ingham County Court before Judge James S. Jamo on MSP's motion to enforce Tpr. Moryc's 2022 arbitration award.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

80.    On December 20, 2024, Judge Jamo ruled in MSPTA and Tpr. Moryc's favor and issued an order to enforce the arbitration award.

**ANSWER:    MSP admits that Judge Jamo issued an order confirming the arbitration award but denies the remainder of the allegation as untrue.  In further response, MSP avers that the order speaks for itself.**

81.    On or around January 17, 2025, MSP filed a motion for relief from judgment with Ingham County Circuit Court, seeking to overturn Judge Jamo's December 20, 2024, order—MSP's fifth attempt to overturn the 2022 arbitration award.

**ANSWER:    MSP admits that it filed a motion for relief from judgment but denies the remainder of the allegation for the reason that it is untrue.**

82.    On February 12, 2025, the motion for relief from judgment was heard by Judge Rosemarie Aquilina in Ingham County Circuit Court.

**ANSWER:    MSP admits.**

83.    At that hearing, MSP, through its counsel, falsely stated that Tpr. Moryc's MCOLES reactivation could proceed before the investigations into her were completed.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

84.    MSP also falsely stated that Tpr. Moryc's lapse in MCOLES certification was because Tpr. Moryc did not attempt to keep it by working for another law enforcement agency.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

85.    At both hearings, MSP's counsel was accompanied by Risk Management F/Lt. Richard Chaffee, who served as MSP's representative.

**ANSWER:    MSP admits.**

86.    F/Lt. Chafee has a law degree and knows MSP policies, so MSP had every opportunity to correct MSP's counsel if her understanding of the process was mistaken.

**ANSWER:    MSP admits that F/Lt. Richard Chaffee has a law degree and knows MSP policies but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it under FRCP 8(b)(5).**

87.    As Tpr. Moryc had learned when she tried to obtain employment with UMPD in September 2023, according to MSP's supplemental employment rules, Tpr. Moryc was barred from working for another law enforcement agency while she was employed by MSP, even though she was on investigatory suspension.

**ANSWER:     MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

88.   In addition, also in September 2023, MSP had told MSPTA that MCOLES would not reactivate her license until all appeals of her 2022 arbitration award were complete.

**ANSWER:     MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

89.   MSP's counsel also made several other false statements at the hearing:

a. That MSP did not have a similar case in which an MSP employee had their MCOLES license lapse;
b. Tpr. Moryc could have applied for supplemental employment to maintain her MCOLES certification while the appeals were pending;
c. MSP could not legally comply with the order without Tpr. Moryc's MCOLES certification (at the time, MSP employed 2 other male troopers whose MCOLES certification had lapsed, allowing them to complete administrative duties while they awaited their MCOLES reactivation);
d. MSP did not have a position Tpr. Moryc could work in where MCOLES certification was not needed;
e. Tpr. Moryc could have applied to get her MCOLES license back;
f. Tpr. Moryc could have acted as a law enforcement officer while on suspension;
g. Tpr. Moryc was not attempting to get her MCOLES license back;
h. Tpr. Moryc was not barred from working at MSP.

**ANSWER:     MSP denies that its counsel made any false statements at the hearing for the reason that it is untrue.**

90.   After the hearing, Judge Aquilina upheld Judge Jamo's order but modified it to require that Tpr. Moryc remain actively engaged in obtaining her

MCOLES reactivation to stay on MSP's payroll and complete the MCOLES packet by March 14, 2025, otherwise Tpr. Moryc would be "forfeiting" her employment with MSP, based on MSP's false statements to the court.

**ANSWER:** **MSP admits that Judge Aquilina issued an order but lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers that the order speaks for itself.**

91.     This modification placed an impossible obligation on Tpr. Moryc, as she could not comply with the order to actively engage in obtaining her MCOLES reactivation so long as MSP continued to appeal the 2022 arbitration award, according to MCOLES' own rules.

**ANSWER:** **MSP denies for the reason that the allegation is untrue.**

92.     As described in detail later in this Complaint, MSP also terminated Tpr. Moryc's employment a second time on February 13, 2025, the day after the hearing before Judge Aquilina.

**ANSWER:** **MSP admits.**

93.     Therefore, per MCOLES rules, Tpr. Moryc also could not apply to reactivate her MCOLES certification because she had been terminated.

**ANSWER:** **No response is required as this allegation contains a legal conclusion.**

94.    Between 2021 and 2023, Tpr. Antcliff became sexually violent and physically abusive towards Tpr. Moryc but, due to MSP ignoring several of her prior complaints of sex discrimination and harassment at the Lakeview Post, as well as its attempt to wrongfully terminate her and its ongoing fight to overturn the 2022 arbitration award, Tpr. Moryc was afraid to make a report as she feared MSP would not protect her and likely retaliate against her.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

95.    Tpr. Antcliff's abuse continued to escalate but Tpr. Moryc feared leaving because of his power and authority over her within MSP, MSP's failure to address her prior complaints, and its ongoing efforts to terminate her and deny her back pay.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

96.    On or around March 11, 2023, Tpr. Antcliff told Tpr. Moryc he would be staying at his sister's house in Grand Rapids, Michigan, and did not know when he would return.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

97.   On or around that same date, Tpr. Antcliff disconnected Tpr. Moryc's cell phone so she could not make or receive phone calls or texts.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

98.   Finally, Tpr. Moryc saw an opportunity to safely escape from Tpr. Antcliff and remove him from her home.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

99.   Tpr. Moryc sent some of Tpr. Antcliff's belongings to his mother's house and asked his mother to notify him that if he attempted to regain entry to her home, she would file a motion for a personal protection order (PPO).

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

100.   On or around March 18, 2023, to intimidate her using his law enforcement power, Tpr. Antcliff returned to Tpr. Moryc's home to retrieve his patrol vehicle and uniforms from the driveway, escorted by MSP Tpr. Bower, a friend and former trainee of Tpr. Antcliff's.

**ANSWER:    MSP admits that Trooper Bower conducted an officer standby but MSP lacks knowledge or information sufficient to form a belief as to**

**the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

101.   Tpr. Bower was in full uniform, arriving in a police car, acting in law enforcement capacity, at the request of Tpr. Antcliff.

**ANSWER:    MSP admits that Trooper Bower conducted an officer standby as directed by his Sergeant.**

102.   On or around March 23, 2023, Tpr. Moryc was contacted by MSP Lakeview Post Commander First Lieutenant Ryan Maki.

**ANSWER:    Defendant Maki lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

103.   F/Lt. Maki told Tpr. Moryc that Tpr. Antcliff had made comments to squad Sergeant Randall Jordan, which Sgt. Jordan said he needed to report to F/Lt. Maki for guidance.

**ANSWER:    Defendant Maki lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

104.   F/Lt. Maki told Tpr. Moryc he did not want to see her get "jammed up" by the MSP if she did not allow Tpr. Antcliff to return to the residence to retrieve the rest of his belongings.

**ANSWER:** **Defendant Maki lacks knowledge or information sufficient to form a belief as to the truth of the allegation  and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

105.   F/Lt. Maki told Tpr. Moryc that Tpr. Antcliff intended to file a criminal complaint against Tpr. Moryc if she did not allow Tpr. Antcliff to return to the residence.

**ANSWER:** **Defendant Maki lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

106.   F/Lt. Maki advised Tpr. Moryc to seek legal advice.

**ANSWER:** **Defendant Maki admits.**

107.   These comments indicated to Tpr. Moryc that MSP and F/Lt. Maki that they intended to take Tpr. Antcliff's side against her, as a female employee, even though she was the victim of his abuse.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

108.   Fearing MSP would not hesitate to open a retaliatory criminal investigation against her, Tpr. Moryc immediately contacted an attorney.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

109. After consulting with an attorney, Tpr. Moryc contacted F/Lt. Maki and advised him of the legal advice the attorney had provided, including her intent to file a PPO against Tpr. Antcliff if he attempted to enter the residence before the specified date.

**ANSWER:    Defendant Maki lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

110. F/Lt. Maki responded with a heavy sigh at the mention of a PPO.

**ANSWER:    Defendant Maki lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

111. On or around April 4, 2023, Assistant Post Commander Lt. Cory Zimmerman was assigned to oversee the civil standby at Tpr. Moryc's home while Tpr. Antcliff retrieved the rest of his belongings, which Tpr. Moryc had packed and placed in the garage.

**ANSWER:    MSP admits that Lt. Cory Zimmerman was assigned to conduct a civil standby on April 4, 2023 for Antcliff to retrieve his belongings but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it.**

112. As a show of force and intimidation, Tpr. Antcliff brought his family and friends with him to assist him in retrieving his belongings.

**ANSWER:    MSP admits that Antcliff brought family members to assist him but MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

113.    On or around April 9, 2023, Tpr. Moryc contacted F/Lt. Maki to file a complaint against Tpr. Antcliff for domestic violence and sexual abuse.

**ANSWER:    Defendant Maki admits that on April 9, 2023,  Moryc contacted him to file a complaint for domestic violence but denies that Moryc alleged sexual abuse for the reason that it is untrue.**

114.    MSP opened both criminal justice and an internal investigation into the complaint.

**ANSWER:    MSP admits that both internal and criminal investigations were commenced in response to Moryc's allegation of domestic violence but MSP lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

115.    In the criminal justice investigation, on or around April 11, 2023, MSP Detective Sergeant Kandyce Herr interviewed Tpr. Moryc.

**ANSWER:    Defendant Herr admits as it relates to the criminal investigation.**

116.    At that interview, Tpr. Moryc disclosed a lengthy history of emotional, physical, and sexual abuse by Tpr. Antcliff to D/Sgt. Herr.

**ANSWER:**    **Defendant Herr lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

117.    In violation of the Crime Victim Rights Act, M.C.L. 780.753, D/Sgt. Herr failed to use the MSP-required standard domestic violence incident report or provide Tpr. Moryc with required information in writing.

**ANSWER:**    **No response is required as this allegation contains a legal conclusion.**

118.    Upon information and belief, on or around April 27, 2023, D/Sgt. Herr submitted a warrant request and a domestic violence report to the Ionia County Prosecutor's Office.

**ANSWER:**    **Defendant Herr admits that on April 27, 2023, she submitted a warrant request, her investigative report, and all materials submitted by Moryc and Antcliff to the Ionia County Prosecutor, but Defendant Herr lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

119.    Upon information and belief, D/Sgt. Herr violated MSP policy and law by failing to investigate Tpr. Antcliff for sexual assault against Tpr. Moryc.

**ANSWER:**    **Defendant Herr denies for the reason that the allegation is untrue.**

39

120.    In her email to the Ionia County Prosecutor's Office, D/Sgt. Herr wrote that Tpr. Moryc and Tpr. Antcliff provided a significant amount of evidence in the investigation, most of which D/Sgt. Herr felt was not relevant to the investigation.

**ANSWER:    Defendant Herr admits that she wrote in an email, "Both Moryc and Antcliff presented large files, most of which no evidence to this incident" but denies the allegation as written for the reason that it is untrue and avers the email speaks for itself.**

121.    D/Sgt. Herr also wrote that the evidence provided to her in the investigation which she felt was relevant to the case were the photos Tpr. Moryc took of her face after Tpr. Antcliff punched her in October 2022.

**ANSWER:    Defendant Herr admits that in the email to the Ionia County Prosecutor's office, she indicated that "I have attached the photos she took of her face" but denies the allegation as written for the reason that it is untrue and avers the email speaks for itself.**

122.    In fact, Tpr. Moryc had provided significant additional relevant evidence to D/Sgt. Herr, including but not limited to domestic abuse police reports filed by Tpr. Antcliff's second ex-wife, evidence of the destruction Tpr. Antcliff caused in a December 2022 incident, and other documentation supportive documentation of  a history of domestic violence perpetrated by Tpr. Antcliff on her.

**ANSWER:    Defendant Herr admits that Moryc provided additional materials that Defendant Herr forwarded to the prosecutor's office, but**

40

**Defendant Herr denies that the materials were relevant for the reason that the allegation is untrue.**

123. On or around May 5, 2023, D/Sgt. Herr texted Tpr. Moryc to inform her the Ionia County Prosecutor's Office had requested that a special prosecutor be assigned by the Michigan Attorney General's office to review the domestic violence report.

**ANSWER:     Defendant Herr admits.**

124. On or around July 19, 2023, D/Sgt. Herr called Tpr. Moryc and told her that the Barry County Prosecutor's Office had declined to bring any criminal charges against Tpr. Antcliff.

**ANSWER:     Defendant Herr admits.**

125. D/Sgt. Herr violated MSP policy and the law by failing to update Tpr. Moryc, a victim, of the case status, including the assignment of the Barry County Prosecutor's Office as the special prosecutor.

**ANSWER:     Defendant Herr denies for the reason that the allegation is untrue.**

126. Tpr. Moryc was never contacted by the Barry County Prosecutor's Office as a victim of domestic violence and sexual assault.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

127.   In the internal investigation, MSP Professional Standards F/Lt. Brody Boucher[1]  assigned Special Lieutenant Carissa Horan as the investigator.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

128.   F/Lt. Brody Boucher was aware that, in 2021, Tpr. Moryc had filed a complaint of harassment against Spl/Lt. Horan but assigned her anyway.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

129.   Upon information and belief, Spl/Lt. Horan intentionally hid her role as the investigator from Plaintiff by asking Spl/Lt. Ryan Tabaczka to conduct Tpr. Moryc's victim interview as a "favor."

**ANSWER:    No response is required as Defendant Horan has been dismissed by the Court.**

130.   Upon information and belief, Spl/Lt. Horan provided Spl/Lt. Tabaczka with specific questions to ask Tpr. Moryc which were not relevant to the domestic abuse and sexual assault allegations.

**ANSWER:    No response is required as Defendant Horan has been dismissed by the Court.**

---

[1] F/Lt. Boucher retired soon after, at which point newly promoted F/Lt. Nicole Bock took over supervision of the investigation.

42

131.    Upon information and belief, Spl/Lt. Tabaczka had previously investigated Tpr. Antcliff for failing to investigate a domestic assault.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

132.    On or around August 17, 2023, Spl/Lt. Ryan Tabaczka interviewed Tpr. Moryc and misled her into believing he was the investigator assigned to the internal investigation.

**ANSWER:    MSP admits that Spl/Ryan Tabaczka interviewed Moryc but it lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

133.    Spl/Lt. Tabaczka's primary focus of the investigation was Tpr. Moryc's time as a probationary trooper when Tpr. Antcliff was her Field Training Officer from 2016 to 2017, and not the domestic violence or sexual assault incidents she had reported.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

134.    In the investigation, Tpr. Moryc disclosed to Spl/Lt. Tabaczka numerous instances of domestic violence and sexual assault Trp. Antcliff committed against her.

43

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

135.    Spl/Lt. Tabaczka asked Tpr. Moryc if she had ever been sexually assaulted by Tpr. Antcliff.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

136.    In response, Tpr. Moryc graphically detailed multiple incidents.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

137.    Tpr. Moryc asked Spl/Lt. Tabaczka to notify before and after he conducted his interview of Tpr. Antcliff as she feared retaliation.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

138.    Spl/Lt. Tabaczka agreed to do so.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

139.    Spl/Lt. Tabaczka never notified Tpr. Moryc either before or after his interview with Tpr. Antcliff.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

140.    At his March 25, 2025 deposition, Spl/Lt. Tabaczka testified that F/Lt. Bock ordered him to cease all communication with Tpr. Moryc because Tpr. Moryc had made a "formal complaint," so he was not to have any direct contact with her and to save any communications he had with her.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

141.    On or around September 1, 2023, Tpr. Moryc believed she saw Tpr. Antcliff driving through her neighborhood, traveling towards her house, and notified Spl/Lt. Tabaczka by text.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

142.    Spl/Lt. Tabaczka did not respond.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

143.    On or around September 4, 2023, Spl/Lt. Horan contacted Trp. Antcliff's second ex-wife, Nina Antcliff.

**ANSWER:    No response is required as Defendant Horan has been dismissed by the Court.**

144.    Spl/Lt. Horan's questions to Ms. Antcliff were focused on Tpr. Moryc's time under Tpr. Antcliff as probationary trooper in 2016-2017.

**ANSWER:    No response is required as Defendant Horan has been dismissed by the Court.**

145.    At no time during the interview did Spl./Lt. Horan ask Ms. Antcliff about any domestic violence or sexual assault against Tpr. Antcliff towards Tpr. Moryc or Ms. Antcliff.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

146.    On or around September 5, 2023, Ms. Antcliff left Spl/Lt. Horan a voicemail stating that she would no longer be cooperating with the investigation.

**ANSWER:    MSP admits that Antcliff left a voicemail but lacks knowledge or information sufficient to form a belief as to the remainder of the allegation and therefore denies it under Federal Rule of Civil Procedure 8(b)(5).**

147.    In the voicemail, Ms. Antcliff but accused Plaintiff and Tpr. Antcliff of committing perjury during the Antcliffs' 2018 divorce proceedings.

**ANSWER:     MSP admits that Antcliff accused Plaintiff and Trooper Antcliff of committing perjury.**

148.   Upon information and belief, neither Spl./Lt. Horan nor any other MSP employee responded to Ms. Antcliff's voicemail to clarify what she meant by her perjury accusation or, more importantly, to ensure Ms. Antcliff was safe and was not being abused or coerced by Tpr. Antcliff into withdrawing from the investigation.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the remainder of the allegation and therefore deny it under Federal Rule of Civil Procedure 8(b)(5).**

149.   On or around September 14, 2023, F/Lt. Nicole Bock launched an internal investigation into Tpr. Moryc and Tpr. Antcliff for perjury, which was referred for a criminal investigation.

**ANSWER:     Defendant Bock admits.**

150.   On or around September 26, 2023, Sixth District Commander Captain Jason Nemecek provided his input to the internal investigative findings into Tpr. Moryc's domestic violence and sexual assault report against Tpr. Antcliff.

**ANSWER:     Defendant Nemecek admits.**

151.   Captain Nemecek found that Tpr. Antcliff had violated official MSP orders including the sexual harassment "quid pro quo" statute, while he was Tpr. Moryc's FTO.

**ANSWER:      Defendant Nemecek admits that he opined that Trooper Antcliff had violated MSP official orders while he was Moryc's FTO but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations.**

152.   Captain Nemecek also found that Tpr. Antcliff had lied to command staff when questioned about the relationship he had with Tpr. Moryc in 2016.

**ANSWER:      Defendant Nemecek admits that he opined that Trooper Antcliff had lied to command staff when questioned about the relationship he had with Moryc as her FTO but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations.**

153.   Captain Nemecek failed to determine or address whether Tpr. Antcliff had committed acts of domestic or sexual assault against Tpr. Moryc.

**ANSWER:      Defendant Nemecek lacks knowledge or information sufficient to form a belief as to the truth of the allegation.**

154.   In September 2023, Tpr. Moryc applied for a law enforcement position with the University of Michigan Police Department (UMPD) because she had not received income from MSP since January 20, 2021.

**ANSWER:      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

155.   Soon after, Tpr. Moryc learned she had been chosen to move forward in the application process with UMPD.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

156.   On or around September 27, 2023, Plaintiff contacted her union, MSPTA, regarding her MCOLES status and for assistance seeking MSP's approval to work for UMPD.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

157.   MSPTA President Nate Johnson and MSPTA Vice President Sgt. Bob Tomassi told Tpr. Moryc that, per the terms of MSP's supplemental employment policy, she would not be allowed to work for another police department.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

158.   MSPTA also notified Tpr. Moryc that MCOLES would not authorize her law enforcement certification until the lawsuit MSP had filed against her on February 24, 2022, to try to overturn her 2022 arbitration award, had concluded.

**ANSWER:**    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

159.    On or around October 9, 2023, D/Sgt. Kailee Schuett contacted Tpr. Moryc and told her that D/Sgt. Schuett was investigating a complaint F/Lt. Bock had filed against Tpr. Moryc and Tpr. Antcliff alleging that they had committed perjury while testifying in the Antcliffs' 2018 divorce proceedings.

**ANSWER:**    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

160.    D/Sgt. Schuett told Tpr. Moryc the perjury allegations stemmed from information obtained in the internal investigation from her domestic violence and sexual assault complaint against Tpr. Antcliff.

**ANSWER:**    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

161.    On or around October 11, 2023, Tpr. Moryc was scheduled to attend a panel interview with the University of Michigan Police Department.

**ANSWER:**    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

162.    Tpr. Moryc had to tell the panel she had to withdraw her application because MSP would not allow her to proceed with seeking another position and had filed a criminal investigation against her and MCOLES would not authorize her recertification.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

163.    On or around October 13, 2023, Tpr. Moryc's criminal defense attorney, Patrick O'Keefe, contacted D/Sgt. Schuett to notify her that Tpr. Moryc had invoked her right not to provide a statement in the criminal perjury investigation.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

164.    On or around December 6, 2023, Tpr. Antcliff was arrested and jailed by the Greenville Department of Public Safety after his current girlfriend, Jane Doe,[2] reported him for domestic assault.

**ANSWER:    MSP admits.**

165.    On or around December 7, 2023, Tpr. Antcliff was released from the Montcalm County Jail, placed on tether, and ordered to abide by the terms of the protective order put in place to protect Doe.

---

[2] Jane Doe is a pseudonym.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

166.    On or around December 28, 2023, MSPTA Vice President Tomassi told Tpr. Moryc that she had to abide by the terms of MSP's supplemental employment and renew the supplemental employment application annually, even though MSP was not paying her.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

167.    On or around January 10, 2024, Tpr. Antcliff resigned from MSP.

**ANSWER:     MSP admits Antcliff resigned in January 2024.**

168.    On or around January 15, 2024, Tpr. Moryc filed an internal complaint with Inspector Sarah Krebs and Human Resources Division Director Stephanie Horton alleging the following:

> a. Intimidation and harassment against F/Lt. Bock for lodging a malicious criminal investigation against Tpr. Moryc for perjury by using information obtained from Tpr. Moryc's domestic violence and sexual assault complaint; and

b. Violations of MSP policy and state law against Spl/Lt. Tabaczka and D/Sgt. Herr for failing to abide by domestic and sexual violence reporting standards.

**ANSWER:    MSP admits that on January 15, 2024, Moryc emailed Krebs and Horton but neither admits nor denies the remainder of the allegation for lack of knowledge or information sufficient to form a belief as to the truth of the allegation.  In further response, MSP avers that the email speaks for itself.**

169.    On or around January 18, 2024, Lieutenant Colonel Aimee Brimacombe assigned the complaint against F/Lt. Bock to Captain Cameron Henke for investigation.

**ANSWER:    No response is required as Defendant Brimacombe and Defendant Henke have been dismissed by the Court.**

170.    On or around March 8, 2024, D/Sgt. Schuett refused to provide Attorney O'Keefe with assistance in answering the Newaygo County Prosecutor's Office questions about Tpr. Moryc's criminal case unless Tpr. Moryc waived her right to remain silent and agreed to an interview with D/Sgt. Schuett.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

171.    On or around March 13, 2024, Horton sent a copy of Tpr. Moryc's complaint against MSP command staff to Transparency and Accountability Division

Commander Captain Thomas Deasy and Lt. Col. Brimacombe with the words "For discussion."

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

172.    On or around March 14, 2024, D/Sgt. Schuett told Attorney O'Keefe that the warrant request for perjury against Tpr. Moryc had been denied by the prosecuting attorney.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

173.    Until that time, Tpr. Moryc had no idea that MSP was aggressively trying to charge Tpr. Moryc with a felony (perjury) despite a glaring lack of evidence to support the warrant request.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

174.    That same day, Tpr. Moryc filed a complaint of discrimination and retaliation against MSP with the Michigan Department of Civil Rights (MDCR).

**ANSWER:    Defendants neither admit nor deny for lack of knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

175.    On or around March 16, 2024, Capt. Deasy notified Tpr. Moryc that her complaint against F/Lt. Bock alleging harassment and intimidation was being

54

closed without further investigation, saying it was "more than reasonable" for MSP to suspect that she had committed perjury.

**ANSWER:     Defendant Deasy admits that he stated it was "more than reasonable" for F/Lieutenant Bock to suspect that Moryc had committed perjury.**

176.    That day, Tpr. Moryc responded to Capt. Deasy's email, asking why MSP suspected she had committed perjury and seeking clarification as to why her complaint against Tpr. Antcliff for sexual assault were not being investigated.

**ANSWER:     Deasy admits that Moryc responded to his email but lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5) and in further response avers that the email speaks for itself.**

177.    On or around March 20, 2024, Tpr. Moryc contacted Horton to request that the domestic and sexual assault incidents be released to her as a survivor of domestic and sexual violence, in accordance with MSP Official Order and Procedure Manual 7-06 and M.C.L. 764.15c(2)(c).

**ANSWER:     MSP admits that on March 20, 2024, Moryc emailed Horton to request domestic violence incident report number PSS-239-23 but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal**

**Rule of Civil Procedure 8(b)(5).  In further response, MSP avers that the email speaks for itself.**

178.   On or around March 25, 2024, Attorney O'Keefe filed a Notice of Intent to File Claims against MSP with the Michigan Court of Claims.

**ANSWER:    MSP admits.**

179.   On or around April 2, 2024, Capt. Deasy responded to Tpr. Moryc's March 16 email notifying her that he had asked a supervisor at First District Command to contact her regarding her concerns about the report and investigation.

**ANSWER:    Defendant Deasy admits.**

180.   On or around April 3, 2024, Tpr. Moryc received a voicemail and a text message from Detective Lieutenant Erik Darling with First District Headquarters regarding her "complaints or concerns" about D/Sgt. Herr's investigation.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

181.   Upon information and belief, Attorney O'Keefe's office contacted D/Lt. Darling to schedule a time to meet with Tpr. Moryc and Mr. O'Keefe, during which communication D/Lt. Darling stated that he had "no need" to meet on the issue.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

182.    On or around April 29, 2024, Attorney O'Keefe sent a preservation of records letter and a request for Tpr. Moryc's employment file to MSP.

**ANSWER:    MSP admits.**

183.    On or around May 1, 2024, MSP was notified of Tpr. Moryc's MDCR complaint.

**ANSWER:    MSP admits.**

184.    By June 2024, because she had not received any income from her employment at MSP since January 20, 2021, and because MSP was preventing her from seeking any other employment, Tpr. Moryc had run out of money and was facing foreclosure of her home and was forced to take an emergency withdrawal From her 401K.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

185.    On June 24, 2024, Tpr. Moryc, through Attorney O'Keefe, filed a complaint alleging sex discrimination and retaliation under the Elliott-Larsen Civil Rights Act against MSP in Eaton County Circuit Court.  *Moryc v. Mich. St. Pol.*, No. 24-657-CD (Eaton Co. Cir. Ct. Jun. 24, 2024).

**ANSWER:    MSP admits that Moryc filed a lawsuit against MSP in Eaton County Circuit Court.**

186.    That matter is still pending before Judge Kelly Morton.

**ANSWER:    MSP admits that Moryc's retaliation claims remain pending but denies that any other claims remain pending for the reason that the allegation is untrue.  Judge Morton summarily dismissed Moryc's discrimination claim.**

187.    In August 2024, Tpr. Moryc learned for the first time of a high-profile scandal involving troopers at all levels of the MSP Flint Post.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

188.    Sergeant Jarad Chiros, a man, was accused of having committed numerous criminal law violations, including sexual assault against subordinate female troopers.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

189.    Upon information and belief, MSP never launched a criminal investigation into any of the serious criminal sexual assault allegations made against Sgt. Chiros.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

190.    This directly contradicts MSP's response to sexual harassment allegations made against Tpr. Moryc, a woman, in 2020, in which MSP launched a campaign of character assassination against her.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

191.    MSP's handling of the Chiros case spotlights a pattern of the discriminatory culture within the Department in which:

  a.  Female troopers are treated differently and worse than male troopers;

  b.  Female troopers' allegations of sexual assault are not taken seriously; and

  c.  Command staff retaliates against troopers who report the wrongdoing of male troopers, but not female troopers.

**ANSWER:    MSP denies for the reason that the allegation and all of its subparts are untrue.**

192.    On or around September 18, 2024, the Michigan Supreme Court denied MSP's leave to appeal on the arbitration issue, which effectively reinstated Tpr. Moryc's 2022 arbitration award.

**ANSWER:    MSP admits that the Michigan Supreme Court denied its Application for Leave to Appeal.**

193.    On or around September 26, 2024, MSP notified Tpr. Moryc that she was to report to MSP Headquarters (HQ) on October 2, 2024, at 1:00 p.m. and ask for Sarah Alberts in Human Resources, and to bring identification to complete onboarding items.

**ANSWER:    MSP admits.**

194.    Tpr. Moryc appeared at MSP headquarters on October 2 as directed.

**ANSWER:    MSP admits.**

195.    Initially, Tpr. Moryc met with Alberts to begin the onboarding process in the cafeteria area of MSP headquarters.

**ANSWER:    MSP admits.**

196.    Labor Relations First Lieutenant Brian Buege was also present at the meeting.

**ANSWER:    Defendant Buege admits.**

197.    Immediately after completing the reinstatement process, F/Lt. Buege took Tpr. Moryc to another room to be fingerprinted and palm scanned.

**ANSWER:    Defendant Buege admits.**

198.    F/Lt. Buege told Tpr. Moryc new scans were required for MCOLES re-activation and the department.

**ANSWER:    Defendant Buege admits.**

199.    F/Lt. Buege also provided Tpr. Moryc with drug screening paperwork which he ordered her to submit to at a medical facility, which he said was also required by MCOLES.

**ANSWER:    Defendant Buege admits.**

200.    F/Lt. Buege then took Tpr. Moryc to a private room, where he told her "the reporting" had to stop, an apparent admission that her reports of domestic and sexual assault, discrimination, harassment, and retaliation were the reasons for MSP's ongoing campaign of retaliation against her.

**ANSWER:     Defendant Buege admits that he took Moryc to a private room to advise her of the investigatory suspension, but denies the remainder of the allegation for the reason that the allegation is untrue.**

201.   F/Lt. Buege then handed Tpr. Moryc a letter addressed to her from Jon Meyer, Director of MSP's Human Resources Division, stating that she was being placed under investigatory suspension with pay pursuant to Article 8, Part A of the MSP/MSPTA Collective Bargaining Agreement, effective immediately, because of her "participation in an event of significant consequence to the Department and the public."  Ex. 2.

**ANSWER:     Defendant Buege admits.**

202.   Strangely, the letter stated that, even though Tpr. Moryc was being suspended, her work schedule was Monday to Friday, 8:00 a.m. to 5:00 p.m., with a one-hour lunch break from 12:00 to 1:00 p.m.

**ANSWER:     MSP admits the contents of the letter but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

203.   Meyer's letter instructed Tpr. Moryc to remain available to MSP management during the stated work hours while on investigatory suspension, to request sick leave from a direct supervisor if she was unable to comply due to illness or health-related appointments and said her failure to comply with the provisions may result in lost time and disciplinary action.

**ANSWER:    MSP admits.**

204.   This paid investigatory suspension letter was a drastic change from the letter Tpr. Moryc received in 2020, in which she was not ordered to be made available to MSP on specific days and hours under threat of termination.  Ex. 3.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

205.   While under the investigatory suspension, law enforcement officers cannot regain their MCOLES certification.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

206.   At the meeting, F/Lt. Buege told Tpr. Moryc that the investigatory suspension was due to the perjury investigation that had been opened against Tpr. Moryc a year prior and that she would not be able to engage in the MCOLES reactivation process until the investigation was completed.

**ANSWER:    Defendant Buege admits that he told her that the investigatory suspension was due to the perjury investigation but lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

207.    F/Lt. Buege also told Tpr. Moryc that she was ordered to report for a drug test by 4:00 p.m. that same day, which she did.

**ANSWER:    Defendant Buege admits.**

208.    On or around October 9, 2024, Tpr. Moryc spoke with Dr. Suzanne Steele from Vault Screening & Drug Testing, which had completed the October 2 drug test.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

209.    During the call, Tpr. Moryc notified Dr. Steele that she was prescribed medication to relieve symptoms of her ADHD.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

210.    On or around October 16, 2024, Tpr. Moryc received a letter dated October 10, 2024, from MSP HR stating that MSP had a "potential safety concern related to the medication you disclosed" asking Tpr. Moryc to complete an enclosed "Essential Job Function Questionnaire" with her prescribing physician within ten days of the date of the letter, October 20, 2024.

**ANSWER:    MSP admits the contents of the letter, but lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

211.   October 20, 2024, was a Sunday.

**ANSWER:    Defendants admit.**

212.   The letter therefore provided Tpr. Moryc only two business days to schedule and complete the required doctor's appointment.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

213.   Typically, MSP only requires the "Essential Job Function Questionnaire" to be completed when there is a serious concern about a trooper's ability to safely perform essential job functions.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

214.   The letter provided no explanation as to why an ADHD diagnosis or related medication would create a serious or "public safety" concern about Tpr. Moryc's ability to perform essential job functions.

**ANSWER:    MSP admits.**

215.   MSP also ordered Tpr. Moryc to undergo a medical evaluation regarding her ability to perform basic tasks including conducting searches, completing physical activities, and understanding basic commands.

**ANSWER:    MSP admits.**

216.   As Tpr. Moryc is on investigatory suspension, her ability to complete these tasks and essential functions of her job as a trooper is irrelevant.

**ANSWER:    MSP admits that Moryc  was on investigatory suspension but denies the remainder of the allegation as untrue.**

217.    On or around October 21, 2024, Lakeview Post Commander F/Lt. Michael Stephens contacted Tpr. Moryc and ordered her to appear at the MSP Ionia Detachment so he could serve her with two 48-hour administrative notices.

**ANSWER:    No response is required as Defendant Stephens has been dismissed by the Court.**

218.    Tpr. Moryc appeared as directed and F/Lt. Stephens presented her with two notices to sign.

**ANSWER:    No response is required as Defendant Stephens has been dismissed by the Court.**

219.    The first administrative notice demanded that Tpr. Moryc submit to an administrative interview regarding the perjury allegations.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers that the notices speak for themselves.**

220.    The second administrative notice demanded that Tpr. Moryc submit to an administrative interview for a retaliatory administrative complaint Sgt. Metivier made against her in 2021, accusing her of including him to participate in a 2021 MSP post-wide discrimination complaint in retaliation for an October 2020 criminal complaint he made against her.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to**

**Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers that the notices speak for themselves.**

221.    Both F/Lt. Bock and Capt. Deasy testified at their depositions in this matter that not all complaints against members receive a full investigation and that it is a discretionary decision.

**ANSWER:    Defendants Bock and Deasy admit that not all complaints against members require a full investigation but deny the remainder of the allegation as untrue  and aver that the transcripts speak for themselves.**

222.    MSP chose to investigate a three-year-old retaliatory complaint made against Tpr. Moryc by Sgt. Metivier, while ignoring the complaints of domestic and sexual assault she made against Tpr. Antcliff.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

223.    For these interviews, under Article 1, Section 1 of the MSPTA-MSP Collective Bargaining Agreement (CBA), Tpr. Moryc was only entitled to representation by MSPTA and not by Attorney O'Keefe.

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

224.    Upon information and belief, these administrative interviews, one related to a three-year-old allegation which had never been investigated previously, were intended to circumvent the civil discovery process in the Eaton County Circuit Court matter *Moryc v. Mich. St. Police*.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

225.    On October 31, 2024, Tpr. Moryc reported to MSP headquarters in Lansing for the administrative interviews as instructed.

**ANSWER:    MSP admits.**

226.    The first interview was conducted by Spl./Lt. Christopher Tuckey in reference to the perjury allegation.

**ANSWER:    MSP admits.**

227.    Spl./Lt. Tuckey interrogated Tpr. Moryc harshly and poorly, repeatedly attempting to force her to respond to compound questions which required different answers.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers that the notices speak for themselves.**

228.    The second interview was conducted by Spl./Lt. Donald Pisha in reference to the 2021 retaliation complaint made by Sgt. Metivier.

**ANSWER:    MSP admits.**

229.    Spl./Lt. Pisha handed Tpr. Moryc a single sheet of paper, dated November 30, 2006, titled "Article 5, Disciplinary Procedures, Commander's Responsibility."

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to**

**Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers that the notices speak for themselves.**

230.    Spl./Lt. Pisha demanded to know why Tpr. Moryc's allegations of discrimination and harassment were not completed on a written form as outlined in Section 5.1c of the document.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers that the notices speak for themselves.**

231.    Spl./Lt. Pisha told Tpr. Moryc her verbal complaints made to her supervisors earlier in her career did not comply with policy as they should have been submitted in written form according to the Commander's Responsibility sheet.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

232.    This was not accurate, as complaints could be made verbally as well as in writing.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

233.   Spl/Lt. Pisha provided Tpr. Moryc with three new Professional Standards Section investigation numbers in which he claimed Tpr. Moryc was the complainant: PSS-535-20, PSS-536-20, and PSS-365-21.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers that the notices speak for themselves.**

234.   Tpr. Moryc had no knowledge of and was unaware of the existence of these alleged complaints.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

235.   Spl/Lt. Pisha refused to provide Tpr. Moryc with any information or detail regarding these alleged complaints.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers that the notices speak for themselves.**

236.   On or around November 4, 2024, F/Lt. Buege notified Tpr. Moryc that background criminal investigator Cherie Ballor had been assigned to complete Tpr. Moryc's required background check from August 2021 through October 2024 as part of her MCOLES recertification process.

**ANSWER:    Defendant Buege admits that he notified Moryc that background investigator Cherie Ballor had been assigned to complete Moryc's MSP updated background check from 2021 though October 2024 and that Ballor would have also have the affidavit that MCOLES requires.**

237.    The timeline was specified as starting at August 2021, as that is when MSP had terminated Tpr. Moryc, and it was not necessary to investigate anything prior to that, as she had been MCOLES certified for all MSP employment prior to August 2021.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

238.    Tpr. Moryc's MCOLES certification had lapsed in around August 2023 as MSP had continued to fight her 2022 arbitration award in state court and she could not work.

**ANSWER:    MSP admits that Moryc's MCOLES certification lapsed in October 2022, but denies the remainder of the allegation for the reason that it is untrue.**

239.    F/Lt. Buege instructed Tpr. Moryc to complete the MCOLES 27-page affidavit prior to her interview with Ballor.

**ANSWER:    Defendant Buege admits.**

240.    This made no sense, because Tpr. Moryc's MCOLES reactivation could not proceed until after the investigations against her were completed.

**ANSWER:      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

241.    When asked, F/Lt. Buege acknowledged Tpr. Moryc's MCOLES reactivation could not proceed with the open internal investigations but told Tpr. Moryc the MCOLES packet needed to be completed regardless.

**ANSWER:      F/Lt. Buege admits that he told Moryc the MCOLES packet needed be completed, but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation.**

242.    F/Lt. Buege also told Tpr. Moryc that MSP was still conducting calculations of the back pay owed to her through the arbitration award over a month after the Michigan Supreme Court rejected MSP's leave to appeal.

**ANSWER:      Defendant Buege admits.**

243.    On or around December 6, 2024, Tpr. Moryc contacted F/Lt. Buege and requested that he provide her with the original MCOLES application packet she submitted to MSP in 2016.

**ANSWER:      Defendant Buege admits.**

244.    F/Lt. Buege never responded to this request.

**ANSWER:      Defendant Buege denies  the allegation is untrue.**

245.    On or around December 9, 2024, Tpr. Moryc had a phone conversation with F/Lt. Buege in which he admitted MSP wanted her to complete the MCOLES

application packet despite the ongoing internal investigation to get the lengthy re-activation "process" started.

**ANSWER:    Defendant Buege admits that he told Moryc she was required to complete the MCOLES application as it was required by MCOLES but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation.**

246.    Upon information and belief, this was so that MSP could ensure that her MCOLES application was denied as quickly as possible so that she could remain terminated even if MSP lost the 2022 arbitration appeal.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

247.    On or around December 18, 2024, the same day Judge Jamo ruled in MSPTA's favor and ordered MSP to comply with the 2022 arbitration award, MSP sent Tpr. Moryc a statement of charges and notice of proposed termination, finding through its investigation that it believed she had committed perjury during the Antcliffs' 2018.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

248.    Again, MSP moved straight to termination of Tpr. Moryc without imposing any progressive discipline, despite the 2022 arbitration finding against it for doing just that previously.

**ANSWER:    MSP admits that termination was recommended but denies the remainder of the allegation for the reason that it is untrue.**

249.   On or around January 7, 2025, MSP called Tpr. Moryc to a disciplinary conference led by Sixth District Captain Jason Nemecek.  The other disciplinary conference panel members were Insp. Gee-Cram and Human Resources Representative Jessica Mendez-Dunn.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

250.   Again, Tpr. Moryc was not permitted to have Attorney O'Keefe present at the disciplinary conference and could only have MSPTA Sgt. Tomassi present as her representative.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

251.   At the disciplinary conference, Capt. Nemecek and Insp. Gee-Cram began interrogating Tpr. Moryc with "gotcha"-type questions about information she provided to Spl/Lt. Tuckey during the October 31, 2024, administrative review.

**ANSWER:    Defendant Nemecek and Gee-Gram lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

73

252. Upon information and belief, this was another attempt by MSP to circumvent the discovery process in the Eaton County Circuit Court matter *Moryc v. Mich. St. Police.*

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

253. Capt. Nemecek asked Tpr. Moryc if Tpr. Antcliff should be charged with criminal sexual conduct (CSC), to which Tpr. Moryc responded, "Yes, I've already made that clear.  I made a CSC complaint."

**ANSWER:    Defendant Nemecek admits.**

254. Tpr. Moryc reiterated to the discipline panel that she was a victim of domestic and sexual assault, and yet she continued to be embroiled in discipline conferences and legal battles while nothing had been done within MSP to investigate the abuse Tpr. Antcliff had perpetrated against her.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

255. The discipline panel repeatedly pressured Tpr. Moryc to provide them with a copy of the written statement she had read, despite Sgt. Tomassi advising them that she would need to consult with Attorney O'Keefe before providing any written documents.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

256.   Capt. Nemecek asked if there was anything that he should review, and Tpr. Moryc provided a copy of her original domestic violence report against Tpr. Antcliff that was not properly investigated by MSP.

**ANSWER:     Defendant Nemecek admits he asked Moryc if there was anything else he should review and that MSP, not Moryc, gave him a copy of a report, but he lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

257.   At that point, Tpr. Moryc realized Capt. Nemecek had been ready to decide on her termination before reading all relevant material contained in the investigation file, other than Spl/Lt. Tuckey's biased investigation report against her.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

258.   On or around January 17, 2025, Sgt. Tomassi notified Tpr. Moryc that a follow up to the discipline conference was scheduled for January 28, 2025.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

259. Tpr. Moryc still had not received the back pay to which she was entitled per Judge Jamo's December 20, 2024, order, so on or around January 22, 2025, Sgt. Tomassi contacted Insp. Gee-Cram for an update on the status.

**ANSWER:** **Defendant Gee-Cram admits that on or around January 22, 2025, Sgt. Tomassi requested an update on the status of backpay calculations but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

260. That same day, MSP filed a Motion for Relief from Judgment in Ingham County Circuit Court., its fifth attempt to strip Tpr. Moryc of her arbitration award, which was scheduled for hearing on February 12, 2025.

**ANSWER:** **MSP denies for the reason that the allegation is untrue.**

261. On January 27, 2025, one day before the follow up discipline conference was scheduled to take place, Insp. Gee-Cram suddenly requested that conference to be rescheduled due to "personal issues."

**ANSWER:** **Defendant Gee-Cram admits that she contacted the MSPTA representative about rescheduling and that the MSPTA representative agreed to reschedule.**

262. MSP then unilaterally rescheduled the follow up discipline conference to February 13, 2025, just one day after the scheduled hearing on its motion for relief from judgment regarding the 2022 arbitration award.

76

**ANSWER:    MSP admits that the discipline conference was rescheduled but denies that it made the decision unilaterally for the reason that the allegation is untrue.**

263.    On or around February 7, 2025, Insp. Gee-Cram sent Sgt. Tomassi an email requesting that Tpr. Moryc provide all information about her interim employment between June 1, 2021, and September 18, 2024, to be used to calculate set off for her backpay.

**ANSWER:    Defendant Gee-Cram admits.**

264.    On or around February 13, 2025, at the follow up disciplinary conference which took place the day after Judge Aquilina had again upheld Tpr. Moryc's 2022 arbitration award, after just five short minutes, Capt. Nemecek stated that he would uphold the termination decision against Tpr. Moryc.

**ANSWER:    Defendant Nemecek admits that on or around February 13, 2025, at the follow-up disciplinary conference, he upheld the termination decision.  Defendant Nemecek lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation.**

265.    Just as in 2021, Tpr. Moryc's  employment with MSP was terminated due to manufactured allegations made in retaliation for her attempts to report relationship and sexual abuse, with no progressive discipline.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

266.   Upon information and belief, MSP terminated Tpr. Moryc so that, even if it ultimately lost its appeal of the 2022 arbitration award, Tpr. Moryc still would not be able to reactivate her MCOLES certification.

**ANSWER:   MSP denies for the reason that the allegation is untrue.**

267.   Later that day, MSPTA filed a grievance against MSP challenging the termination.

**ANSWER:   MSP admits.**

268.   Also at that conference, Sgt. Tomassi asked Insp. Gree-Cram to send Tpr. Moryc her 2015 MSP employment application information which was necessary for Tpr. Moryc to complete the MCOLES application packet.

**ANSWER:   Defendant Gee-Cram admits.**

269.   Insp. Gee-Cram agreed to do so.

**ANSWER:   Defendant Gee-Cram admits.**

270.   On or around February 24, 2025, Tpr. Moryc received a response to a Freedom of Information Act (FOIA) request she had made to the Oakland County Prosecutor's Office (OCPO) in reference to Tpr. Michael Patrick Floyd, the male trooper whose MCOLES license lapsed who was allowed to continue working at MSP, unlike Tpr. Moryc.

**ANSWER:   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

271.    The OCPO documents included Tpr. Floyd's criminal report, which included allegations of felonious assault, assault and battery, refusing to cooperate with the police, providing false identification to the police, providing knowingly false statements, stalking/harassment, witness tampering, abuse of power, filing a false complaint, and providing false identification to 911.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

272.    Upon information and belief, MSPTA had also participated in an arbitration to contest MSP's termination of Tpr. Floyd, and received a favorable outcome.

**ANSWER:    MSP admits.**

273.    Unlike Tpr. Moryc, Tpr. Floyd had never been removed from MSP's payroll, so he had never stopped receiving pay from MSP.

**ANSWER:    MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

274.    Unlike Tpr. Moryc, MSP never contested the arbitrator's award for MSPTA and Tpr. Floyd.

**ANSWER:    MSP admits.**

275.    Unlike Tpr. Moryc, Tpr. Floyd was allowed to work at MSP in an administrative capacity while awaiting the restoration of his MCOLES certification.

79

**ASNWER:    MSP admits.  In further response, MSP avers that unlike Moryc, Trooper Floyd did not lose his CJIS clearance.**

276.    Unlike Tpr. Moryc, MSP did not make any allegations against Tpr. Floyd that his numerous violations made him a threat to the "public interest."

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

277.    On or around February 27, 2025, MSP and MSPTA's attorneys met with Judge Aquilina in closed chambers to clarify the terms of the February 12 order.

**ANSWER:    MSP admits that its attorney met with Judge Aquilina and MSPTA's attorney but denies that MSP was present for the reason that the allegation is untrue.**

278.    On March 6, 2025, Judge Aquilina entered an order enforcing the 2022 arbitration award and requiring Tpr. Moryc to submit her MCOLES application for reactivation by March 14, 2025, or forfeit her job with MSP.

**ANSWER:    MSP admits that Judge Aquilina entered an order, but denies the contents of the order as alleged.  In further response, MSP avers that the order speaks for itself.**

279.    On or around March 11, 2025, Tpr. Moryc again contacted F/Lt. Buege, following up on her December 6, 2024 request that he provide her with-the finger print/palm scan records he took on October 2, 2024 which he said was for her

80

MCOLES application and the Employment Letter from MSP, which she was required submit with her current MCOLES application to comply with Judge Aquilina's February 12 order that she submit her MCOLES application by March 14 or lose her job with MSP.

**ANSWER:    Defendant Buege admits that Moryc contacted him to request the foregoing information but lacks knowledge or information sufficient to form a belief as to the truth of the allegation.**

280.   F/Lt. Buege did not respond to this request.

**ANSWER:    Defendant Buege denies for the reason that the allegation is untrue.**

281.   On or around March 12, 2026, Tpr. Moryc contacted Attorney Dlugos for assistance in acquiring the required documents from MSP to complete her MCOLES application.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

282.   Attorney Dlugos contacted MSP's counsel to request a response.

**ANSWER:    MSP admits.**

283.   Less than an hour after Attorney Dlugos' call to MSP's counsel, F/Lt. Buege finally responded to Tpr. Moryc, telling her that that the live scan fingerprints he took of her on October 2, 2024, which he stated were for the MCOLES application process, were not done on the correct MCOLES form.

**ANSWER:    Defendant Buege admits he responded to Moryc but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies is pursuant to Federal Rule of Civil Procedure 8(b)(5).**

284.    F/Lt. Buege also told Tpr. Moryc he would submit the MCOLES verification of employment document directly to MCOLES.

**ANSWER:    Defendant Buege admits.**

285.    Because of F/Lt. Buege's error or intentional oversight, Tpr. Moryc was forced to travel 50 miles to complete the MCOLES live scan fingerprint requirement on the very last day permitted by Judge Aquilina's order.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

286.    That day, Tpr. Moryc arrived at the MCOLES office to submit her completed application packet by the court deadline, only to discover the office employee had left early for the day.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

287.    Tpr. Moryc then mailed her MCOLES application packet via certified mail to ensure she met the court-ordered deadline.

**ANSWER:**    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

288.    On March 18, 2025, Col. Grady, Lt. Col. Brimacombe, and Lt. Hinz filed a Motion to Quash Tpr. Moryc's Subpoenas for deposition, which had been sent to them on February 21, 2025, arguing that the Court of Appeals' holding in *Fitzpatrick v Secretary of State*, 176 Mich App 615, 440 NW2d 45 (1989), protected these three individuals from deposition by Tpr. Moryc.

**ANSWER:**    **No response is required by Defendant Grady or Brimacombe as they have been dismissed by the Court.  Defendant Hinz admits.**

289.    The Motion included sworn Affidavits from Col. Grady, Lt. Col. Brimacombe, and Lt. Hinz as exhibits.

**ANSWER:**    **No response is required by Defendant Grady or Brimacombe as they have been dismissed by the Court.  Defendant Hinz admits.**

290.    In their sworn Affidavits, dated March 13, 2025, Col. Grady, Lt. Col. Brimacombe, and Lt. Hinz all attested that they had "no first-hand or unique knowledge related to the claims alleged by Ms. Moryc in the First Amended Complaint."

**ANSWER:**    **No response is required by Defendant Grady or Brimacombe as they have been dismissed by the Court.  Defendant Hinz denies for the reason that the allegation is untrue.  In further response, Defendant Hinz avers his affidavit speaks for itself.**

83

291.  According to MSP policy and testimony provided in subsequent depositions, these attestations by Col. Grady and Lt. Col. Brimacombe were false.

**ANSWER:     No response is required by Defendant Grady or Brimacombe as they have been dismissed by the Court.**

292.  Per MSP's Disciplinary Proceedings and Procedures Manual:

Section 1: Disciplinary Procedures

1.11    Relief from Duty

> a. After consultation with the commander of the Human Resources Division, work unit commanders or their authorized representative may relieve from duty, with pay, any subordinate member, either of their command or who is within their command jurisdiction, whenever it is necessary for the preservation of good order, efficiency, and discipline. This action is limited to violations that necessitate immediate action. In every instance, the commander or their representative shall immediately advise the Director, through channels, of such action stating the reason and the status of the involved member. The Director, upon receipt of such notification, may order the member suspended, if necessary, in accordance with Civil Service Rules and Regulations, as well as the appropriate collective bargaining agreement, or take such other action as is deemed appropriate. Such member shall not be restored to duty without authorization of the Human Resources Division Commander and the Director or the Director's designee….

> d. A member charged with a criminal offense may be suspended without pay by the Director or the Director's designee in accordance with Civil Service Rules and Regulations and any other applicable labor agreements.

> e. The Director or the Director's designee may take any action deemed necessary in accordance with

Civil Service Rules and Regulations, as well as the appropriate collective bargaining agreement.

MICH. ST. POLICE, DISCIPLINARY PROCEEDINGS AND PROCEDURES MANUAL 03-03 at 5 (2024), https://public.powerdms.com/MSP1917/documents/1995262. And:

"Administrative investigations are conducted under the authority of the Director…."

*Id.* at 8.

**ANSWER:    MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation as the forgoing does not contain an actual allegation, therefore, it is denied pursuant to Federal Rule of Civil Procedure 8(b)(5)**

293.   And according to MSP's Official Order on Administrative Investigations:

03-60-7      REQUIRED NOTIFICATIONS

C. Once a closing disposition has been determined in an administrative investigation, the commander of the PSS or their designee shall make the following notifications within three business days:…

(4) The Director, members of the leadership team, members of the principal's chain of command, and the Labor Relations Section shall be notified of closing dispositions in a manner determined by the commander of the TAD.

MICH. ST. POLICE, OFFICIAL ORDER 03-60 – ADMINISTRATIVE INVESTIGATIONS at 4 (2024) https://public.powerdms.com/MSP1917/list/documents/2926819.

**ANSWER:    MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation as the forgoing does not contain an**

**actual allegation, therefore, it is denied pursuant to Federal Rule of Civil**

**Procedure 8(b)(5)**

294.   Col. Grady is the Director of MSP.  STATE OF MICHIGAN, ABOUT MSP: MEET THE DIRECTOR, https://www.michigan.gov/msp/about-msp/meet-the-director (last visited Sep. 16, 2025).

**ANSWER:    MSP admits that Colonel James Grady II is the current Director of the Michigan State Police.**

295.   According to emails received by Tpr. Moryc via a FOIA request, Lt. Col. Brimacombe did have direct knowledge related to the First Amended Complaint.

**ANSWER:    No response is required as Defendant Brimacombe has been dismissed by the Court.**

296.   On March 25, 2025, Tpr. Moryc took F/Lt. Nicole Bock's deposition in the Eaton County Circuit Court matter *Moryc v. Mich. St. Police*, at which she swore under oath to tell the truth.

**ANSWER:    Defendant Nicole Bock admits that Moryc's attorney deposed her and that Defendant Bock swore under oath to tell the truth.**

297.   At her deposition, F/Lt. Bock testified:

> Q.   And if a full investigation is conducted, then who are the findings presented to?
>
> A.   Upon conclusion of the investigation, the findings are presented to HR, labor relations, our Transparency and Accountability Division director who is my boss, Captain Matt Williams; as well as executive level leadership, so Colonel Grady, and Lieutenant Colonel Brimacombe, and Lieutenant Colonel Sosinski.

...

Q.   So let's say, for example, your section found that a member, or a trooper, had violated one or more Official Orders, how would that get communicated to the people upstairs?

A.   Upon conclusion of the investigation, we would author a final disposition report, which is a case summary, as well as the findings based on the sections of the Code of Conduct and the sections of Official Orders. That gets sent via email to all of the stakeholders in that case, which would be executive leadership, HR, and -- as well as the involved member's command.

Q.   I see.  So when it comes to a violation of an Official Order, you're saying that the colonel's office and the lieutenant colonel's office would be notified?

A.   Yes.

**ANSWER:**   **Defendant Bock admits but avers that the allegation is not a complete transcript of her testimony and that the transcript speaks for itself.**

298.   On March 31, 2025, Tpr. Moryc took Capt. Thomas Deasy's deposition in the Eaton County Circuit Court matter *Moryc v. Mich. St. Police*, at which he swore under oath to tell the truth.

**ANSWER:**   **Defendant Deasy admits that Moryc's attorney deposed him and that he swore to tell the truth.**

299.   At his deposition, Capt. Deasy testified:

Q.   Okay.  So back in, let's say the fall of 2023, would have been the captain of the Transparency and Accountability Division?

A.   Yes.

87

Q.    So who reported to you at that time?

A.    In the fall of 2023.  Well, the Records Resource section, which is our FOIA people and our records management office, and the manager there at that time was Lori Hinkley, I believe.  Brody Boucher was the first lieutenant and commander of the Professional Standards section. Aimee Brimacombe was the first lieutenant in charge of the Risk Management section.

      …

Q.    Okay.  And then I want to talk a little bit more about the role of the Risk Management section under your command. What was your -- what were your expectations with respect to the Risk Management section when you were a captain over Transparency and Accountability?

A:    Well, the role -- the section was only two people, it was the analyst and then first lieutenant.  So, you know, the role was really to coordinate primarily with the AG's Office.  Sometimes we would hire outside counsel to defend the department or its members. My expectations were that they would work with the AG's Office, coordinate things like, you know, depositions and gather discovery, and then kind of get a handle on, let's take a look at what we were getting sued for and make recommendations to, you know -- make policy adjustments or practice  adjustments, that kind of thing.

      …

Q.    Who makes the ultimate decision to terminate a member?

A.    It's either the colonel or the HR director.

Q.    Okay.  So are you saying that there are instances where the HR director can terminate an employee, a member without the colonel's office's input?

88

A.     Well, so I'm not aware of any time we've terminated a member without the colonel at least being there and aware of the recommendation. The only people in the State system who can terminate somebody is somebody with authority, and that's the colonel; and then if the colonel delegates that authority, somebody like the HR director, which, in our case, I'm not sure if that agreement is still in place, but we have a service level agreement in the Civil Service that says the HR director can do things like appoint people for promotions and demote people and discipline people on behalf of the colonel. I'm not aware of a colonel never being notified prior to stating the charges proposing discipline being served.

Q.     And that's just -- we're just talking about a statement of charges; right?

A.     Yes.

Q.     So the colonel is notified even where there's a statement of charges regarding potential discipline against a member?

A.     No, I wouldn't say that. Generally that happens at the lieutenant colonel level, which is discipline. When it comes to firing somebody, the colonel is always notified. Whether the colonel -- you know, I've been there through a number of colonels; I think they all had a different approach to how hands on they are. I don't know if I would call it approval. It's generally, here are the facts as we know them, and here's what we're proposing, and it's more of an opportunity for the colonel to veto than it is really an approval, from my experience.

       …

Q.     I see. So because the complaint was filed against Tabaczka and Bock, it got assigned to Captain Henke?

A.     It was assigned to -- why Captain Henke, I don't know; I didn't make that decision. But we wanted to -- when I say "we," so the decision to have

89

Captain Henke investigate it was made either by Colonel Grady or Lieutenant Colonel Brimacombe. She is the one -- Lieutenant Colonel Brimacombe is the one who told me Captain Henke would be handling, not necessarily the investigation, but evaluate it, independent of whatever discussions they were having, because he's not involved in it. I wanted to have somebody outside of my division evaluate Trooper Moryc's complaint.

Typically when there's a complaint against somebody in Professional Standards, if we're going to do a full investigation, we'll assign somebody outside of the division, or I could conduct it.

In this case, I would have normally evaluated it, her complaint, to determine whether we were going to proceed with an administrative investigation; but she had made a previous complaint a couple years prior about being interviewed while she was in jail. And so I was the one who sent her a letter explaining our decision not to investigate that one, and I wanted somebody else, rather than have the same person making this decision, I wanted somebody outside of the division to take a look at it.  So I didn't make the decision to have Captain Henke do it.

Q.    You're saying either the colonel or the lieutenant colonel made that decision?

A:    Yes, yes.  I was going to assign -- I was going to have somebody outside my division do it anyway. They're the ones who decided on Captain Henke. When I say "they," I'm not sure which, they didn't tell me, but Colonel Brimacombe is the one that told me that Captain Henke would be evaluating the complaint for us.

**ANSWER:    Defendant Deasy admits in part (as the foregoing has typographical errors) but avers that the allegation is not a complete transcript of his testimony and that the transcript speaks for itself.**

90

300.    On May 15, 2025, Tpr. Moryc took F/Lt. Richard Chaffee's deposition in the Eaton County Circuit Court matter *Moryc v. Mich. St. Police*, at which he swore under oath to tell the truth.

**ANSWER:    MSP admits that counsel for Moryc deposed F/Lt. Richard Chaffee and that F/Lt. Richard Chaffee swore to tell the truth.**

301.    At his deposition, F/Lt. Chaffee testified:

Q.    And then you're a licensed attorney; correct?

A.    I am.

Q.    All right. When did you get licensed to practice in Michigan?

A.    2022.

Q.    '22? Okay. You're currently the risk manager, is that how I understand it?

A.    I am.

Q.    What is the risk manager?  What does that job assignment entail?

A.    There are kind of two aspects of it.  One of them I would say wasn't as, like, built up, and that's one of the things they tasked me with, but kind of a proactive and reactive.  So litigation management would be like reactive, you know.  I'm kind of dealing with lawsuits on behalf of the agency as a client representative.

…

Q.    Okay.  All right.  And when did you get hired as a first lieutenant in risk management?

A.    It would have been March of 2024.  And so I was the acting, if you will, from November of '23 until March of '24.

Q.    Okay.  What happened in November of '23 that made you the acting risk manager?

A.    The previous risk manager left the position, and it was -- it was vacant.  So they moved me from legal resources, which is kind of like a -- like maybe brother-sister, to risk management under the same division.  They moved me from legal resources over to risk management.

Q.    I see.  Okay.  And who was that position vacated by?

A.    Aimee Brimacombe.

      …

Q:    You have discussed Trooper Moryc with Lieutenant Colonel Brimacombe, is that what you're saying?

A:    Yes.

**ANSWER:    MSP admits but in further response avers that the foregoing is not a complete transcript and that the transcript speaks for itself.**

302.    Therefore, based on F/Lt. Bock, Capt. Deasy, and F/Lt. Chaffee's deposition testimony, emails provided by MSP, and MSP's own official policies and procedures, Col. Grady and Lt. Col. Brimacombe do have first-hand or unique knowledge related to the claims alleged by Tpr. Moryc in the First Amended Complaint and in this Third Amended Complaint.

**ANSWER:    No response is required as Defendants Grady and Brimacombe have dismissed by the Court.**

303.    Should Col. Grady or Lt. Col. Brimacombe wish to assert that MSP's own official policies and procedures were not followed, that MSP's emails were inaccurate, or F/Lt. Bock, Capt. Deasy, and/or F/Lt. Chaffee's deposition testimony

was false, then that would also be first-hand or unique knowledge related to the claims alleged by Tpr. Moryc in the First Amended Complaint and in this Third Amended Complaint.

**ANSWER:    No response is required as Defendants Grady and Brimacombe have dismissed by the Court.**

304.    On March 25, 2025, Tpr. Moryc took Spl/Lt. Ryan Tabaczka's deposition in the Eaton County Circuit Court matter *Moryc v. Mich. St. Police*, at which he swore under oath to tell the truth.

**ANSWER:    MSP admits that counsel for Moryc deposed Spl/Lt. Ryan Tabaczka and he swore to tell the truth.**

305.    At the deposition, Spl/Lt. Tabaczka admitted he interviewed Tpr. Moryc in MSP's internal investigation as a "favor" to Spl/Lt. Carissa Horan.

**ANSWER:    MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it under Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers the transcript speaks for itself.**

306.    Spl/Lt. Tabaczka testified that Spl/Lt. Horan had provided him with a list of questions to ask Tpr. Moryc.

**ANSWER:    MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it under Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers the transcript speaks for itself.**

307.    Spl/Lt. Tabaczka testified that he was still in possession of Spl/Lt. Horan's questions.

**ANSWER:    MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it under Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers the transcript speaks for itself.**

308.    Spl/Lt. Tabaczka testified that he had previously investigated Tpr. Antcliff for failing to investigate a domestic violence complaint.

**ANSWER:    MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it under Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers the transcript speaks for itself.**

309.    Spl/Lt. Tabaczka testified that his investigation into Tpr. Antcliff's failure to properly investigate a domestic violence complaint led to a finding of misconduct against Tpr. Antcliff.

**ANSWER:    MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it under Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers the transcript speaks for itself.**

310.    Spl/Lt. Tabaczka testified that he did not believe Tpr. Moryc had reported sexual assault against Tpr. Antcliff because Tpr. Moryc "never used the term rape."

94

**ANSWER:**    **MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it under Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers the transcript speaks for itself.**

311.    Spl/Lt. Tabaczka testified that he failed to follow up on Tpr. Moryc's report of sexual assault against Tpr. Antcliff.

**ANSWER:**    **MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it under Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers the transcript speaks for itself.**

312.    Spl/Lt. Tabaczka testified that MSP's Official Orders require him to report allegations of criminal misconduct by other MSP employees.

**ANSWER:**    **MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it under Federal Rule of Civil Procedure 8(b)(5).  In further response, MSP avers the transcript speaks for itself.**

313.    Spl/Lt. Tabaczka testified that, after his interview with Tpr. Moryc, F/Lt. Nicole Bock told him not to have any direct contact with Tpr. Moryc and to save any communications he had with Tpr. Moryc.

**ANSWER:**    **MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it under**

**Federal Rule of Civil Procedure 8(b)(5). In further response, MSP avers the transcript speaks for itself.**

314. Spl/Lt. Tabaczka testified that he had received a text message from Tpr. Moryc after the interview, in which Tpr. Moryc said she feared for her safety because she thought she saw Tpr. Antcliff driving around her neighborhood.

**ANSWER: MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it under Federal Rule of Civil Procedure 8(b)(5). In further response, MSP avers the transcript speaks for itself.**

315. On April 2, 2025, Insp. Gee-Cram again sought a last-minute adjournment for "personal reasons," this time of the arbitration hearing scheduled for April 4, 2025, regarding MSPTA's grievance against MSP for terminating Tpr. Moryc a second time.

**ANSWER: Defendant Gee-Cram admits.**

316. The arbitration hearing is rescheduled for April 24, 2025.

**ANSWER: MSP admits the arbitration hearing was rescheduled for April 24, 2025.**

317. On or around April 7, 2025, Tpr. Moryc contacted F/Lt. Buege to follow up on MSP's calculation and payment of her back pay, as she had heard nothing since March 19, 2025, when she had provided MSP with the documents it requested.

**ANSWER: Defendant Buege admits that Moryc contacted him about her back pay but lacks knowledge or information sufficient to form a belief as**

96

**to the truth of the remainder of the allegation and therefore denies it under Federal Rule of Civil Procedure 8(b)(5).**

318.    On or around April 8, 2025, F/Lt. Buege asks Tpr. Moryc for a statement of earnings from supplemental employment dating October 1, 2021, to December 31, 2021 to assist in calculating her backpay.

**ANSWER:    Defendant Buege admits.**

319.    No explanation was provided to Tpr. Moryc as to why this document was not initially requested.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

320.    Regardless, Tpr. Moryc immediately complied with F/Lt. Buege's request.

**ANSWER:    Defendant Buege admits.**

321.    On May 13, 2025, Tpr. Moryc finally received MSP's proposed calculation of the back pay she was owed because of the 2022 arbitration award.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

322.    The proposed calculations included the following:

    a.  A total gross pay allocation of $184,468.68;

    b.  The following deductions:

    a.  Union Dues: $3,311.47;

    b.  401k Deferrals: $30,830.92;

    c.  Taxes: $60,755.72; and

    d.  Insurance Premiums: $8,502.81.

**ANSWER:** **MSP admits that the foregoing amounts were included in the calculations but it lacks knowledge or information sufficient to form a belief as to the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

323.  Union dues, 401k deferrals, and insurance premiums are to be deducted pre-tax.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

324.  Therefore, the total taxable income MSP paid Tpr. Moryc in 2024 was $172,654.40.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

325.  A $60,755.72 deduction on $172,654.40 in taxable income total represents a 35.18% tax rate.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

326.   Tpr. Moryc never received health insurance from MSP during her suspension and had requested that MSP cancel the health insurance years before.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

327.   Through MSPTA, Tpr. Moryc began the process of challenging the inaccurate back pay calculations.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

328.   On May 27, 2025, MSP notified Tpr. Moryc that her back paycheck was ready for her to pick up at MSP HQ.

**ANSWER:    MSP admits.**

329.   The check did not include the $8,500 in health benefits that were wrongly deducted.

**ANSWER:    MSP admits that the check did not include the $8500,  but avers that those benefits were not "wrongly deducted" for the reason that the allegation is untrue.**

330.    To date, despite numerous efforts, MSP has continued to withhold the wrongly deducted health benefits from Tpr. Moryc.

**ANSWER:    MSP denies that it has wrongly withheld any amount for the reason that the allegation is untrue but it lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

331.    On June 12, 2025, Tpr. Moryc attended an interview with Ballor in MSP's background investigation, which had to occur without an attorney as Attorney O'Keefe had withdrawn from representation and Tpr. Moryc had not yet retained Attorney Abdnour.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

332.    At the interview, Ballor gave Tpr. Moryc a consent form to search Tpr. Moryc's various social media.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

333.    Tpr. Moryc was forced to sign the form without the advice of counsel.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

100

334. Beginning in August 2024 and into 2025, increasingly concerned about the corruption and cover-ups of discrimination, harassment, and retaliation she was experiencing, Tpr. Moryc began speaking with investigative reporter Todd Heywood of WLNS 6 News, a Lansing-area news station, as she had begun to believe that the only way MSP would be held accountable was through public outcry.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

335. Heywood began contacting MSP with questions sometime in fall 2024.

**ANSWER:** **MSP admits that Todd Heywood contacted its Communications & Outreach Division in October, 2024.**

336. On July 7, 2025, WLNS published the first in a multi-part series of articles about Tpr. Moryc's situation and other instances of corruption and dysfunction within MSP:

  a. Todd Heywood, *'Big Boys' Club': Discontent in the Michigan State Police*, WLNS 6 NEWS (July 7, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-discontent-in-the-michigan-state-police/;
  b. Todd Heywood and Karina Prieto, *'Disgusted': Michigan senator challenges MSP leader's claim of taking sexual harassment 'seriously' at the agency*, WLNS 6 NEWS (July 8, 2025), https://www.wlns.com/6newsinvestigates/disgusted-michigan-senator-challenges-msp-leaders-claim-of-taking-sexual-harassment-seriously-at-the-agency/;
  c. Todd Heywood, *'Big Boys' Club': 'Wolf in the hen house'*, WLNS 6 NEWS (July 8, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-wolf-in-the-hen-house/;
  d. Todd Heywood, *'Big Boys' Club': 'I never wanted to cheat on my husband'*, WLNS 6 NEWS (July 9, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-i-never-wanted-

101

to-cheat-on-my-husband/;

e. Todd Heywood, *'Big Boys' Club': The 'womanizer',* WLNS 6 NEWS (July 10, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-the-womanizer/;

f. Todd Heywood, *'Big Boys' Club': 'Too much room in the law … to discriminate',* WLNS 6 NEWS (July 11, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-too-much-room-in-the-law-to-discriminate/;

g. Todd Heywood, *'Big Boys' Club': 'The degradation of women',* WLNS 6 NEWS (July 14, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-the-degradation-of-women/;

h. Todd Heywood, *Frequently Asked Questions*, WLNS 6 NEWS (July 14, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-frequently-asked-questions/;

i. Todd Heywood, *'The Big Boys' Club': 'Gender discrimination and harassment, including sexual',* WLNS 6 NEWS (July 15, 2025), https://www.wlns.com/6newsinvestigates/the-big-boys-club-gender-discrimination-and-harassment-including-sexual/;

j. Todd Heywood, *'Big Boys' Club': Former Michigan State Police trooper says it 'went too far',* WLNS 6 NEWS (July 16, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-former-michigan-state-police-trooper-says-it-went-too-far/;

k. Todd Heywood, *'Big Boys' Club': Former Michigan State Police trooper says, 'They crucified me',* WLNS 6 NEWS (July 17, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-former-michigan-state-police-trooper-says-they-crucified-me/; and

l. Shajaka Shelton, *'Big Boys' Club': 'Not just a rumor',* WLNS 6 NEWS (Aug. 22, 2025), https://www.wlns.com/6newsinvestigates/big-boys-club-not-just-a-rumor/.

**ANSWER:      MSP admits that the foregoing articles were published but it lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

337.    The series featured extensive quotes and information from Tpr. Moryc detailing the retaliation and abuse she had suffered at the hands of MSP and its employees after making internal reports of discrimination and harassment, in

violation of both MSP policies and state and federal law.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

338.   On or around July 22, 2025, one of Tpr. Moryc's neighbors notified her that a plainclothes member of the MSP had driven around her neighborhood placing a business card with the handwritten note, "Call me," in each of Tpr. Moryc's neighbors' mailboxes.  Ex. 4.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

339.   The individual placing the business cards in mailboxes was Ballor.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

340.   None of Tpr. Moryc's neighbors were surveilled or interviewed when she first joined MSP in 2016.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

341.   Placing items without paid postage in a mailbox is a federal offense. 18 U.S.C. § 1725.

103

**ANSWER:**    **No response is required as this allegation calls for a legal conclusion.**

342.    On or around July 23, 2025, Tpr. Moryc's friend, Melissa Flinn, and her sister, Chelsea Moryc, contacted her to let her know they had just completed a phone interview with Ballor.

**ANSWER:**    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

343.    Flinn and Chelsea Moryc told Tpr. Moryc that Ballor had asked whether they had ever seen Tpr. Moryc "get angry" and ask what her response was to "anger."

**ANSWER:**    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

344.    Flinn said Ballor also asked whether she had ever seen Tpr. Moryc "drink and drive."

**ANSWER:**    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

345.    Flinn said no, and that if they drank together, Tpr. Moryc would sleep on Flinn's couch rather than drive home.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

346.  Both Flinn and Chelsea Moryc told Tpr. Moryc that they told  Ballor they were concerned for Tpr. Moryc's safety if she were to return to MSP.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

347.  Ballor was charged with investigating Tpr. Moryc only from her August 2021 date of separation from MSP.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

348.  Chelsea told Tpr. Moryc that Ballor had asked about events that had occurred in 2020, which was outside the scope of Ballor's investigation.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

349.  On July 28, 2025, Arbitrator Thomas J. Barnes issued a decision in the February 13, 2025 grievance proceeding.  Ex. 5.

**ANSWER:** **MSP admits.**

105

350.    Barnes found for MSPTA and Tpr. Moryc, finding that MSP's determination that Tpr. Moryc had perjured herself during the Antcliffs' 2018 divorce proceeding was not substantiated by the evidence and ordering Tpr. Moryc to be immediately reinstated to work.

**ANSWER:    MSP denies the allegation as written and in further response avers the arbitration decision speaks for itself.**

351.    Barnes' decision noted numerous instances of undue hostility by MSP and its employees against Tpr. Moryc.

**ANSWER:    MSP denies the allegation as written and in further response avers the arbitration decision speaks for itself.**

352.    Barnes wrote,

> [I]n the investigation, the Department clearly did not pursue the facts regarding Grievant being placed with Officer Antcliff at the beginning of her training since it was well known in the Department that he was a womanizer. That was something that could have and should have been taken into account in reaching a conclusion of whether or not discharge was appropriate. While [Tpr. Moryc]'s entanglement with Officer Antcliff was voluntary, nevertheless, it is very likely we wouldn't be here today if she hadn't been assigned to someone known to officers in the Department to be someone not to be trusted with women. Moreover, the internal investigations were tainted by the finding she had lied in Court, a conclusion I have rejected.

Ex. 5 at 19.

**ANSWER:    MSP admits and avers that the decision speaks for itself.**

353. Barnes wrote,

This case involved testimony not about police work, but about a divorce case in which [Tpr. Moryc] was not a party but was certainly an interested witness. This was off-duty conduct on a non-law enforcement civil lawsuit in which Grievant was not a party. She testified to the questions she was asked and nothing more. She didn't volunteer testimony and she did not answer any question untruthfully.

Additionally, but for the fact that one of the parties who was involved in the divorce proceeding, revealed five years later, in her opinion, that had [Tpr. Moryc] not testified truthfully, this case would have never seen the light of day. Disciplining someone, let alone discharging them nearly five years after they allegedly testified untruthfully (which I have determined not to be the case) does not find a precedent in any of the cases cited by the parties. While we know that testimony in this case was recorded in 2018 in the court transcript, that does not answer the deficits to be found in such dated testimony. First, discipline is normally to be timely meted out so that the employee understands the connection between their misconduct and the need for immediate action by the employee. Discharge of an employee nearly five years after the late discovery of a spurned spouse's claim of perjury is beyond the realm of the fair imposition of discipline. Even in the criminal law, there are statutes of limitations where criminals go free from their crimes because their conduct is not uncovered or discovered in time. Certainly at some point in time, an employee should be free of the threat of discipline where they even knowingly engaged in misconduct. Moreover, in this case it cannot be fairly said that [Tpr. Moryc] knowingly testified untruthfully five years previously. Further, one needs to consider the affect of the passage of time on an individual's ability to recollect exactly what happened in a prior proceeding five years previously. In other words, it is no surprise that investigatory interviews done nearly five years after someone is accused of a felony in untruthfully testifying that they wouldn't be able to recollect all of the details necessary to testify in internal interviews in a way which was 100% accurate. Memories fade, witnesses are not available or not called, and even

107

the investigators are not always sure about the words that were used, as in this case, in the court proceeding. Further, when the individual being examined in the administrative investigations is asked different questions than were propounded to her in the court proceedings five years previous, it is not any surprise that the answers would be different and in some cases conflicting.

Ex. 5 at 20-21.

**ANSWER:    MSP admits and avers that the decision speaks for itself.**

354.  Barnes wrote,

In addition to the foregoing, there were facts that developed in the hearing as a whole that indicated the Department was not giving that [Tpr. Moryc] a fair shake. First off, I am troubled by the fact that the prior arbitration decision, where that [Tpr. Moryc] was given a 30-day suspension by very well respected Arbitrator Opperwall indicated, at the very least, a dislike for [Tpr. Moryc]. The Employer, under the CBA, was responsible for implementing an arbitration decision regardless of the outcome because it had agreed that decision would not be appealable if within the arbitrator's authority just as the Court of Appeals determined and the Supreme Court affirmed. It is well- known that arbitration decisions that are challenged are highly unlikely to succeed. While there is no evidence as to what the Employer was advised by its Counsel, I can easily opine that attorneys or representatives who are asked to challenge arbitrator's awards almost unanimously advise their clients that their chances of success are not good, for one, because they selected the arbitrator and agreed to be bound by his/her decision. Nevertheless, the Employer in this case marched ahead on a 30-day suspension in trying to overturn the previous Arbitrator's award.

There is other evidence to suggest that the Employer similarly had some animus toward [Tpr. Moryc]. For example, for some reason unknown to the undersigned, the Employer maintained that [Tpr. Moryc]'s testimony regarding a suicide that she had attended on January 23, 2019, was exaggerated. As indicated above, I reviewed

that testimony and found it to be anything but exaggerated. It was a horrible situation to which [Tpr. Moryc] testified. If the Employer thought that was an exaggeration, there should have been testimony at the hearing to establish that fact. Its own witness interviews established it had no such testimony or witness.

Furthermore, the speculation that a judge in a divorce case would not have been able to make a proper decision on custody is purely that. The Circuit Judge here is very experienced and has done numerous domestic cases involving child support and custody and property matters. Judge Kreeger has been the Montcalm County Circuit Judge for 17 years and the Chief Judge since 2009, and 17 years prior to becoming a judge, she was Director of the Office of Friend of the Court and Circuit Court Referee. Stellar credentials to assess witnesses in a divorce case! She certainly has heard plenty of witnesses, some who she has probably credited, and others of whom she has not credited based on their testimony in front of her. There is no question in my mind that she was perfectly able to make whatever determinations were necessary and whatever credibility determinations were necessary in her case. Any speculation on the part of the Employer in this case that the Judge could not ably do that is a further indication that [Tpr. Moryc] was not given a fair hearing in this matter.

Last and finally, it does not help the Employer's case that it sought two criminal warrants [against Tpr. Moryc], one in Newaygo County (perjury) the other in Barry County (assault), both of which the Prosecutors dismissed. Thus, the Employer wasn't able to get complaints issued, let alone a conviction on conduct that it thought was perjurious and an assault. That should have been a red flag to the Employer that perhaps it should have reviewed at least its characterization of the testimony given in Court on January 23, 2018.

Given all of the above, this case falls far short of the requirements needed to perfect a case for a just cause discharge. The fact that, as indicated above, the Department did not take an objective view of the [Tpr. Moryc]'s conduct in this case further taints the reasons for

109

> discipline. I have decided that based upon that and all of
> the facts that [Tpr. Moryc] should not be disciplined in
> this case. [Tpr. Moryc] deserves a clean slate in this case
> and I expect she will take advantage of her opportunity to
> be an excellent Michigan State Police Trooper.

Ex. 5 at 22-24.

**ANSWER:     MSP admits and avers that the decision speaks for itself.**

355.    On August 28, 2025, MSP background investigator Cherie Ballor sent

Tpr. Moryc the following request:

> During an interview, it was alleged that you had bitten an
> in-law when they tried to step between you and another
> person during a verbal argument.  This incident occurred
> after a bachelorette party and was before you became a
> Trooper.  Can you provide an explanation or any details
> surrounding this incident.

**ANSWER:     Defendants neither admit nor deny for lack of knowledge or**

**information sufficient to form a belief as to the truth of the allegation and**

**therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

356.    Although Tpr. Moryc did not know what Ballor was referencing, the

alleged incident would have occurred sometime in or before 2015, at least six years

outside the range of the investigation's scope, which was August 2021 to present.

**ANSWER:     Defendants neither admit nor deny for lack of knowledge or**

**information sufficient to form a belief as to the truth of the allegation and**

**therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

357.    Tpr. Moryc responded as follows:

> I have no recollection of the incident being alleged.
>
> In addition and for the record, if this was at an alleged
> bachelorette party BEFORE I was a Trooper as you

110

indicated in your email, this is well outside the August 2021 to present background investigation parameters that were stated repeatedly by F/Lt. Buege.

Was this something that was brought up or investigated in my 2015 department background investigation, since as you stated these allegations happened prior to my becoming a trooper?

Your email specifically stated "in-law", which would mean you have been speaking with my now ex-in-laws.  I have not spoken to my ex-husband or his family since our divorce was finalized in 2018.  I am the one who filed for divorce. We did not part on great terms, combined with the recent news segment releases in which my quid pro quo affair with former Trooper Antcliff was made public, my ex-husband and/or any members of his family would have every reason to want to retaliate against me.

**ANSWER:     Defendants neither admit nor deny for lack of knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

358.    Ballor responded as follows: "The incident was not in your previous background.  It was disclosed during an interview.  I wanted to give you the opportunity to respond which will be included in the report."

**ANSWER:     Defendants neither admit nor deny for lack of knowledge or information sufficient to form a belief as to the truth of the allegation  and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

359.    Ballor never responded as to why she was investigating incidents beyond the purview of the August 2021 to August 2024 investigation scope or why

111

she was interviewing witnesses who had not had any contact with Tpr. Moryc since 2018.

**ANSWER:    Defendants neither admit nor deny for lack of knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

360.    Given Ballor's background as a Lansing Police Department Captain with expertise in the dynamics of domestic violence, Tpr. Moryc was shocked that Ballor would allow her former abuser's family to attack her through allegations about her conduct that were not within the scope of the investigation.  *See* Ann Pierret, *Domestic violence calls up for surprising reason*, WILX 10 NEWS (Aug. 12, 2016), https://www.wilx.com/content/news/Domestic-violence-calls-up-for-surprising-reason-390030951.html.

**ANSWER:    Defendants neither admit nor deny for lack of knowledge or information sufficient to form a belief as to the truth of the allegation  and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

361.    On September 11, 2025, Ballor notified Tpr. Moryc that she had completed the background investigation.

**ANSWER:    Defendants neither admit nor deny for lack of knowledge or information sufficient to form a belief as to the truth of the allegation  and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

362.   On September 16, 2025, Tpr. Moryc contacted MSP Sgt. Caitlyn Hammond, who Ballor had advised was supervising the investigation, to request a copy of the investigation report.

**ANSWER:   Defendants neither admit nor deny for lack of knowledge or information sufficient to form a belief as to the truth of the allegation  and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

363.   Sgt. Hammond did not respond.

**ANSWER:   Defendants neither admit nor deny for lack of knowledge or information sufficient to form a belief as to the truth of the allegation  and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

364.   On September 18, 2025, Tpr. Moryc contacted MSP Recruitment and Selection employee Ken Plaga, who Ballor had provided as a secondary contact, to request a copy of the investigation report.

**ANSWER:   Defendants neither admit nor deny for lack of knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

365.   Plaga did not respond.

**ANSWER:   Defendants neither admit nor deny for lack of knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

366.   On October 1, 2025, Tpr. Moryc again contacted Plaga, following up on her September 18 request.

**ANSWER:    Defendants neither admit nor deny for lack of knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

367.    Plaga did not respond.

**ANSWER:    Defendants neither admit nor deny for lack of knowledge or information sufficient to form a belief as to the truth of the allegation  and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

368.    On October 1, 2025, Insp. Gee-Cram notified Attorney Dlugos and Sgt. Tomassi that MSP had taxed Tpr. Moryc's back pay, paid to her in the 2024 tax year, at a 37% tax rate.

**ANSWER:    Defendant Gee-Cram admits that on October 10, 2025, she sent an email that reflected "Taxed at 37%" but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

369.    According to the 2024 IRS tax guidelines, $172,654.40 in income should be taxed at a 24% tax rate.  INTERNAL REVENUE SERVICE, FEDERAL INCOME TAX RATES AND BRACKETS, https://www.irs.gov/filing/federal-income-tax-rates-and-brackets (last visited October 11, 2025).

**ANSWER:    No response is required as this allegation calls for a legal conclusion.**

114

370.    However, had MSP appropriately compensated Tpr. Moryc in real time rather than wrongly withholding her pay, her tax rate in 2024 would have been 22%.

**ANSWER:    MSP lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

371.    To make Tpr. Moryc whole, her tax rate should not have been increased due to MSP's unlawful failure to pay her, and MSP should have paid the difference between the two tax rates.

**ANSWER:    MSP lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

372.    Therefore, MSP overtaxed Tpr. Moryc's 2024 compensation by 15%, or $25,898.16.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

373.    Insp. Gee-Cram's October 1 email also admitted that MSP had never compensated Tpr. Moryc for a significant portion of the 401k contributions she was denied.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

374.    On or around November 26 and 27, 2024, Attorney O'Keefe received records he had requested through the Freedom of Information Act from the previously unknown investigations conducted by MSP into allegations of sex discrimination and harassment made by Tpr. Moryc.  These included, but are not limited to, the following:

    a.  PSS-535-20, opened on February 21, 2020;

    b.  PSS-536-20, opened on September 25, 2020;

    c.  PSS-365-21, reported on May 17, 2021, but not opened for investigation;

    d.  PSS-321-21, reported on July 15, 2021; and

    e.  PSS-239-23, reported on April 9, 2023.

**ANSWER:    Defendants neither admit nor deny for lack of knowledge or information sufficient to form a belief as to the truth of the allegation  and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

375.    Before Attorney O'Keefe obtained these records, Tpr. Moryc had never seen any of the investigative reports or evidentiary materials collected in these investigations and had no idea the investigations related to PSS-535-20 and PSS-536-20 had even been conducted.

**ANSWER:    Defendants neither admit nor deny for lack of knowledge or information sufficient to form a belief as to the truth of the allegation  and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

376. The records are heavily redacted, and the specific allegations forming the basis for the investigations is for the most part impossible to determine.

**ANSWER:    Defendants neither admit nor deny for lack of knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

377. Upon review of the records, Tpr. Moryc learned the following information for the first time.

**ANSWER:    Defendants neither admit nor deny for lack of knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

*PSS-535-20, opened on February 21, 2020*

378. Report PSS-535-20, which was completed on November 16, 2020, contained text conversations between former MSP Lakeview Post Troopers Kelly Julin (Escott) and Timothy Moreno.

**ANSWER:    MSP admits.**

379. On July 19, 2019, Tpr. Julin sent Tpr. Moreno a text message stating that she did not want to be posted at the Sixth District Rockford Post because "I don't like the good ole boys club at Rockford."

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

380. Therefore, Tpr. Moryc learned for the first time that MSP had notice as of at least November 16, 2020 that at least one other female trooper had concerns of sex discrimination and/or harassment within MSP Sixth District posts.

**ANSWER:**    **MSP denies for the reason that the allegation is untrue.**

381.   On November 13, 2020, while the biased criminal investigation into Tpr. Moryc was just beginning, Capt. Dale Hinz determined her complaints of sex discrimination and harassment made in PSS-535-20 and PSS-536-20 should be closed as "Unfounded."

**ANSWER:**    **Defendant Hinz denies for the reason that the allegation is untrue.**

382.   Capt. Hinz referenced report PSS-083-20, the very first sex discrimination complaint Ms. Moryc made, as influencing his decision to close PSS-535-20 and PSS-536-20 as unfounded.

**ANSWER:**    **Defendant Hinz denies for the reason that the allegation is untrue.**

383.   Therefore, Tpr. Moryc learned for the first time that Capt. Hinz had found her subsequent reports of sex discrimination and harassment as unfounded simply because she had made a similar prior report.

**ANSWER:**    **Defendant Hinz denies for the reason that the allegation is untrue.**

384.   MSP launched an investigation into all male employees of the Lakeview Post where Tpr. Moryc worked at the time and notified them that Tpr. Moryc was the source of the complaint.

**ANSWER:**    **MSP denies for the reason that the allegation is untrue.**

385.   Upon information and belief, a criminal complaint Tpr. Moryc's male

118

colleagues made against her in October 2020 for engaging in horseplay of the exact same type in which they frequently engaged, was in direct retaliation for her reports of sex discrimination and harassment against them.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

386.    Upon information and belief, on or around October 19, 2020, MSP and Sgt. Robert Metivier retaliated against Tpr. Moryc by launching a character assassination, career ending criminal investigation against her due to false allegations of misconduct made against her by Sgt. Metivier, who was one of the known worst perpetrators of discrimination and harassment against Tpr. Moryc at the Lakeview Post.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

387.    Capt. Hinz knew Tpr. Moreno had admitted to watching homemade pornography on his cell phone while on duty in the common area of the Lakeview Post where troopers including Tpr. Moryc were able to observe him.

**ANSWER:    Defendant Hinz admits that Trooper Moreno admitted homemade pornography having played on his cell phone while scrolling through recent photos while on duty where other troopers could hear or observe the video but Defendant Hinz lacks knowledge or information sufficient to form a belief as to truth of the remainder of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

388.    Capt. Hinz also knew Troopers James Yates and Jacob Robison had admitted they had observed and participated in watching pornography with Tpr.

Moreno on his cell phone while on duty in the common area of the Lakeview Post.

**ANSWER:     Defendant Hinz denies for the reason that the allegation is untrue.**

389.    Capt. Hinz was therefore aware of the hostile and discriminatory work environment male troopers were creating for Tpr. Moryc based on her sex at the Lakeview Post.

**ANSWER:     Defendant Hinz denies for the reason that the allegation is untrue.**

390.    Report PSS-365-21 contained evidence establishing that Capt. Deasy and Insp. Gee-Cram declined to launch a full investigation into an incident outlined in Tpr. Moryc's complaint against Spl/Lt. Horan and D/Sgt. Fink, in which her life was put in mortal danger.

**ANSWER:     MSP admits that a full investigation was unnecessary, but MSP denies that Moryc's complaint alleged that her "life was put in mortal danger" for the reason that the allegation is untrue.  In further response, MSP avers that the complaint and report speak for themselves.**

391.    Capt. Deasy stated that that the decision was partly due to Tpr. Moryc not alleging a specific violation of the Code of Conduct.

     a. As the Commander of the Transparency and Accountability Division in 2021, Capt. Deasy was directly responsible for the Professional Standards Section.
     b. When Tpr. Moryc filed the complaint against Spl/Lt. Horan in 2021, Spl/Lt. Horan was operating as a member of the Professional Standards Section.
     c. As evidenced by testimony obtained in the Eaton County Circuit Court matter *Moryc v. Mich. St. Police,* any violations of MSP's Code of

120

Conduct are determined by the Professional Standards Section after a full investigation has been conducted.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

392.    Within these records, Tpr. Moryc discovered the report number generated for her 2024 complaint against Professional Standards F/Lt. Nicole Bock, PSS-185-24.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

393.    These records provide evidence that Lt. Col. Aimee Brimacombe directly inserted herself into the 2024 complaint against F/Lt. Bock, by personally assigning Tpr Moryc's complaint to her direct report Captain Cameron Henke, Division Commander of Special Investigations.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

394.    MSP provided Capt. Henke with only certain complaints/investigations related to Tpr. Moryc to review in his investigation.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

395.    These included reports into investigations of which Tpr. Moryc had never been made aware, which painted Tpr. Moryc as a predator (PSS-542-20), and

those that made her look like she filed false harassment complaints that were concluded as "unfounded."

**ANSWER:      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

396.    MSP did not provide Capt. Henke with complaints/investigations in which any allegations Tpr. Moryc had filed in which there was a finding against a respondent, or any complaints/investigations against her that were concluded as "unfounded."

**ANSWER:      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

397.    Upon information and belief, this was done to create bias against Tpr. Moryc.

**ANSWER:      MSP denies for the reason that the allegation is untrue.**

398.    In these records, Tpr. Moryc learned former 6th District Commander Dale Hinz requested input from former Sixth District Inspector Cameron Henke, former F/Lt. Andrew Fias of the Lakeview Post, and former Lt. Ryan Maki, also of the Lakeview Post, regarding Tpr. Moryc's claims of sex harassment  and discrimination, which occurred from 2016 to 2020 while she worked at the Lakeview Post.

**ANSWER:     Defendant Hinz admits that he requested input from Henke and Fias regarding Moryc's 2020 complaints and that he notified Maki of Moryc's 2021 complaint, but Defendant Hinz lacks knowledge or information sufficient to form a belief as to the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

399.   These records provide evidence that former MSP Col. Joseph Gasper was provided with a copy of her complaint, which she did not know.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

400.   Capt. Deasy closed the complaint as "exonerated without a full investigation."

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

401.   Capt. Deasy emailed Capt. Henke, "The summary was exactly what we needed."

**ANSWER:     Defendant Deasy admits that he sent an email that contained, in part, the quote alleged above.**

402.   On March 25, 2025, Tpr. Moryc took D/Sgt. Kandyce Herr's deposition in the Eaton County Circuit Court matter *Moryc v. Mich. St. Police*, at which she swore under oath to tell the truth.

123

**ANSWER:    Defendant Herr admits that on March 25, 2025, Moryc's attorney deposed her and that she swore under oath to tell the truth.**

403.    At her deposition, D/Sgt. Herr admitted that she never investigated former Tpr. Antcliff for sexual assault in connection with Tpr. Moryc's April 2023 complaint.

**ANSWER:    Herr admits that she did not investigate a sexual assault because Moryc did not indicate that there was a sexual assault, but lacks knowledge or information sufficient to form a belief as to the truth of the allegation and in further response Herr avers that the transcript speaks for itself.**

404.    D/Sgt. Herr also testified that she never interviewed Nina Antcliff as a "witness" to domestic violence or sexual assault because she was not aware of this allegation.

**ANSWER:    D/Sgt. Herr admits that she did not interview Nina Antcliff but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).  In further response, Defendant Herr avers that the transcript speaks for itself.**

405.    D/Sgt. Herr also testified that she did not know of any police reports in which Nina Antcliff filed domestic violence complaints against Tpr. Antcliff.

**ANSWER:    Defendant Herr admits that she testified she was not aware that "Nina Antcliff field multiple reports of abuse against Trooper Antcliff" and in further response avers that the transcript speaks for itself.**

406.    This testimony is contradicted by documentation Attorney O'Keefe obtained related to PSS-239-23.

**ANSWER:    Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

407.    In D/Sgt. Herr's report, No. 10-201-23, under the heading "REVIEW OF FILES PRESENTED BY TPR. MORYC", D/Sgt. Herr wrote that she reviewed the files presented by Tpr. Moryc in her complaint.

**ANSWER:    Defendant Herr admits.**

408.    D/Sgt. Herr's report mischaracterized the police reports Tpr. Moryc provided as "Police reports from issues between Antcliff and previous wife, none substantiated."

**ANSWER:    Defendant Herr denies that her report mischaracterized the police reports for the reason that the allegation is untrue.**

409.    In fact, D/Sgt. Herr had been provided with Greenville Department of Public Safety report #17-1800, reported on May 23, 2017 by Nina Antcliff, against her then-husband, Tpr. Antcliff.

**ANSWER:    Defendant Herr lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

410.    The Greenville Department of Public Safety classified Ms. Antcliff's complaint as domestic violence.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

411.    That 2017 domestic violence complaint by Ms. Antcliff complaint led MSP to complete to an internal investigation into Tpr. Antcliff.

**ANSWER:    MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

412.    As a result of the investigation, MSP made a finding that Tpr. Antcliff had engaged in battery of his wife and imposed a 5-day disciplinary suspension.

**ANSWER:    MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

413.    At her deposition, D/Sgt. Herr also testified that MSP had never taken any disciplinary action against her for failing to comply with departmental standards in taking Tpr. Moryc's domestic violence complaint against Tpr. Antcliff.

126

**ANSWER:     Defendant Herr admits that she has never been disciplined by the Michigan State Police.**

414.    This directly contrasts with MSP's actions in other situations in which its employees had failed to take seriously or adhere to department standards in taking a domestic violence complaint.

**ANSWER:     MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

415.    For example, at the completion of internal investigation PSS-538-20, MSP's Human Resource Division prepared the following Statement of Charges/Proposed Discipline which was served on Tpr. Andrews on January 8, 2021:

> An Internal Affairs investigation, PSS-538-20, established that on October 14, 2020, you violated department policy when you changed the factual account in an incident report you had authored three days earlier.  After completing a Domestic Violence incident report on October 11, 2020, you were given a reasonable work order to properly complete the requirements of a Domestic Violence incident submission…Additionally, you failed to follow the requirements of Official Order No. 50, when you shirked your duties and failed to adequately investigate or take action on the reported domestic assault, failed to provide the victim with a UD-3-, failed to complete a DV-001, and failed to submit to the prosecutor for review within 48 hours.

**ANSWER:     MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

127

416.   The Human Resources Division proposed the termination of Tpr. Andrews, which was upheld by Capt. Stephen O'Neill during a discipline conference on January 25, 2021.

**ANSWER:    MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

417.   The records included references to multiple additional internal complaint numbers assigned to complaints Tpr. Moryc had allegedly made, of which she had never been made aware and the status of which, to date, she has no knowledge: PSS-751-22, PSS-533-21, PSS-075-22, and PSS-083-20.

**ANSWER:    MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

418.   Upon information and belief, PSS-083-20 is an investigation into a report filed by another female trooper regarding a nonconsensual recording Tpr. Moreno made of she and Tpr. Moreno having sex.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

419.   Upon information and belief, Tpr. Moryc is listed as a witness in the investigation, as Capt. Matt Williams interviewed her in the investigation in August 2020.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

420.   The records included evidence that discovered Spl/Lt. Horan had

launched two additional, retaliatory investigations against Tpr. Moryc while Tpr. Moryc was being criminally investigated in October 2020.

**ANSWER:     MSP denies for the reason that the allegation is untrue.**

421.    Upon information and belief, Tpr. Moryc's name being included in the PSS-083-20 investigation report led to the criminal investigation and these two retaliatory internal investigations.

**ANSWER:     MSP denies for the reason that the allegation is untrue.**

422.    In August 2021, Capt. Hinz chose to uphold Tpr. Moryc's first termination in retaliation for her coming forward with complaints of sex discrimination and harassment against Tpr. Moreno.

**ANSWER:     Defendant Hinz and MSP denies for the reason that the allegation is untrue.**

423.    Despite documented admissions by MSP employees that condoms had been placed in Tpr. Moryc's  backpack and that male employees were watching pornography while on duty in Tpr. Moryc's presence, both of which were unwelcome to Tpr. Moryc, Capt. Hinz determined Tpr. Moryc had not experienced sexual harassment or a hostile work environment.

**ANSWER:     Defendant Hinz denies for the reason that the allegation is untrue.**

424.    On or around March 14, 2024, Tpr. Moryc filed a complaint with MDCR regarding the sex discrimination and retaliation she suffered at MSP.

**ANSWER:    MSP admits that Moryc filed a complaint with MDCR but denies it was "regarding the sex discrimination and retaliation she suffered at MSP" for the reason that the allegation is untrue.**

425.    MDCR opened an investigation into the complaint, contacted MSP, and began interviewing witnesses and gathering evidence.

**ANSWER:    MSP admits that MDCR contacted it but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

426.    On or around November 15, 2024, MDCR learned Tpr. Moryc had filed a complaint in the instant matter and, according to its case processing procedures, closed its investigation, as it no longer had jurisdiction over the claims.

**ANSWER:    MSP lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

## CAUSES OF ACTION

### COUNT I
**Violation of Title VII**
**Discrimination of the Basis of Sex**
**42 U.S. Code § 2000e-2 *et seq*.**
**(Defendant MSP)**

427.  Tpr. Moryc realleges and incorporates by reference the allegations contained in the previous paragraphs.

**ANSWER:    Defendant MSP likewise incorporates its previous responses.**

428.  Tpr. Moryc is an employee within the meaning of Title VII.

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

429.  Tpr. Moryc, a woman, is a member of a protected class.

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

430.  MSP is an employer within the meaning of Title VII.

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

431.  Tpr. Moryc met, and many times exceeded, her employer's legitimate job performance expectations.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

432.  Tpr. Moryc suffered numerous adverse employment actions.

**ANSWER:**    **MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

433.    By the acts and omissions alleged herein, MSP discriminated against Tpr. Moryc on the basis of sex in violation of Title VII by failing to investigate her reports of sex discrimination, harassment, and abuse.

**ANSWER:**    **MSP denies for the reason that the allegation is untrue.**

434.    Tpr. Moryc filed a charge with the Michigan Department of Civil Rights (MDCR) regarding the sex discrimination and retaliation she suffered at MSP.

**ANSWER:**    **MSP admits that Moryc filed a charge with MDCR but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

435.    On June 23, 2025, the Equal Employment Opportunity Commission (EEOC) issued a Notice of Right to Sue regarding Charge No. 23A-2024-00781/MDCR #643570, which alleged that MSP had discriminated against Tpr. Moryc based on her sex, covering the period from August 17, 2023 to March 16, 2024.

**ANSWER:**    **MSP admits that EEOC issued a Notice of Right to sue but lacks knowledge or information sufficient to form a belief as to the truth of**

the remainder of allegation and therefore denies it pursuant to Federal

Rule of Civil Procedure 8(b)(5).

**COUNT II**
**Violation of Title VII**
**Retaliation**
**42 U.S.C. § 2000e-3(a)**
**(Defendant MSP)**

436.    Tpr. Moryc realleges and incorporates by reference the allegations

contained in the previous paragraphs.

**ANSWER:    MSP likewise incorporates its previous responses.**

437.    Title VII prohibits employers from retaliating against employees that

have made or assisted in claims:

> It shall be an unlawful employment practice for an
> employer to discriminate against an of his employees …
> because he has opposed any practice made an unlawful
> employment practice by this subchapter, or because he
> has made a charge, testified, assisted, or participated in
> any manner in an investigation, proceeding, or hearing
> under this subchapter.

42 U.S.C. § 2000e-3(a).

**ANSWER:    No response is required as this allegation contains a legal**

**conclusion.**

438.    Tpr. Moryc repeatedly opposed unlawful employment practices by MSP

and other MSP employees by filing multiple complaints of sex discrimination,

harassment, and retaliation, and participating in all such investigations of which

she was made aware.

**ANSWER:    MSP lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

439.    MSP engaged in adverse action against Tpr. Moryc by:

a. Failing to pay her back pay she is owed in the form of health insurance premiums deducted from her paycheck while she was not receiving health insurance coverage from MSP;
b. Initiating false and retaliatory criminal and internal investigations against her;
c. Failing to allow her to return to work; and
d. Making false statements in legal proceedings against her.

**ANSWER:    MSP denies this allegation and all its subparts for the reason that the allegations are untrue.**

440.    MSP and its employees engaged in this discrimination because she opposed unlawful employment practices and made charges and participated in investigations about her claims of sex discrimination, harassment, and retaliation.

**ANSWER:    MSP denies for the reason that the allegation is untrue.**

441.    Tpr. Moryc filed a charge with the EEOC regarding the sex discrimination and retaliation she suffered at MSP.

**ANSWER:    MSP admits that Moryc filed a charge with EEOC but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

442.    On July 7, 2025, the EEOC issued a Notice of Right to Sue regarding Charge No. 471-2025-05591, which alleged that MSP had retaliated against Tpr. Moryc due to her reports of sexual harassment, sexual assault, and sex discrimination, covering the period from October 1, 2024 to June 12, 2025.

**ANSWER:    MSP admits that the EEOC issued a Notice of Right to sue but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

### COUNT III
### Violation of the Right to Substantive Due Process
### Bodily Integrity
### 42 U.S.C. § 1983 and the
### Fourteenth Amendment
### (Defendants Grady, Brimacombe, Gee-Cram, Hinz, Henke, Nemecek, Dillon, Darling, Herr, Deasy, Williams, Bock, Sweeney, Fias, Maki, Stephens, Buege, Davis, and Ziesman in their individual capacities)

443.    Tpr. Moryc realleges and incorporates by reference the allegations contained all prior paragraphs as if stated herein.

**ANSWER:    Defendants likewise incorporate their previous responses.**

444.    Defendants are state actors and at all relevant times were acting under color of law.

**ANSWER:    Defendants admit.**

445.    The Due Process Clause of the Fourteenth Amendment assures an individual the implied right to bodily integrity, including the right of the individual to be free of sexual assault, abuse, or molestation.   Tpr. Moryc enjoyed those rights.

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

446.    The acts committed by Tpr. Antcliff as alleged herein constitute a violation of these well-established, constitutionally protected rights of which a reasonable person in Defendants' position should have known.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

447.    Pursuant to custom, policy, and/or practice, Defendants had, and continue to have, the ultimate responsibility and authority to properly investigate complaints levied against their employees, agents, and representatives.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

448.    Defendants failed to fulfill and execute this responsibility and authority, thus amounting to deliberate indifference.

**ANSWER:    Defendants deny for the reason that the allegation is untrue.**

449.    Defendants' failure to address and properly respond to complaints about Tpr. Antcliff's sex discrimination, harassment, and abuse of prior victims, and its subsequent decision to place Tpr. Moryc under Tpr. Antcliff's supervision knowing that he had a history of abusing women, led directly to Tpr. Moryc being victimized by Tpr. Antcliff's sexual assault, abuse, stalking, and molestation.

**ANSWER:**    **Defendants deny for the reason that the allegation is untrue.**

450.   Defendants' decision to investigate and discipline only Tpr. Moryc regarding the October 2020 incident, despite knowing that male troopers were engaging in similar horseplay, and that their complaint against her was made in retaliation for her complaints against them, led directly to Tpr. Moryc being wrongly terminated, criminally convicted, and jailed.

**ANSWER:**    **Defendants deny for the reason that the allegation is untrue.**

451.   Defendants' failure to address and properly respond to Tpr. Moryc's complaints other male troopers' sex discrimination, harassment, and abuse of prior victims, led directly to Tpr. Moryc being victimized by other male troopers' sex discrimination and harassment.

**ANSWER:**    **Defendants deny for the reason that the allegation is untrue.**

452.   Defendants ultimately failed to adequately investigate the complaints brought by Tpr. Moryc and other similarly situated victims upon information of Tpr. Antcliff's and other male troopers' sexual abuse, harassment, discrimination, and retaliation, which includes Defendants':

     a.  Knowingly allowing Tpr. Antcliff to supervise Tpr. Moryc even though he had a history of abusing and discriminating against women;

     b.  Failure to remove Tpr. Antcliff from a position of authority over subordinate female troopers who would be unlikely to complain about Tpr. Antcliff's conduct;

     c.  Failure to perform a thorough investigation into Tpr. Antcliff and other troopers' improper conduct upon receiving complaints regarding their abuse; and

     d.  Failure to thoroughly review and investigate all policies, practices, procedures, and training materials related to the circumstances surrounding the conduct of Tpr. Antcliff and other male troopers.

**ANSWER: Defendants deny for the reason that the allegation and all of its subparts are untrue.**

453. Defendants failed to respond to reports of Tpr. Antcliff and other male troopers' sexual assault, abuse, harassment and molestation in a clearly unreasonable manner, and thereby failed to prevent such conduct and harm to Tpr. Moryc.

**ANSWER: Defendants deny for the reason that the allegation is untrue.**

454. Defendants tolerated, authorized, and/or permitted a policy, procedure, practice, or custom that allowed for the inadequate screening, insufficient supervision, and nonexistent discipline of Tpr. Antcliff and other male troopers such that they were was allowed to violate the rights of those such as Tpr. Moryc with impunity.

**ANSWER: Defendants deny for the reason that the allegation is untrue.**

455. Defendants' policies, practices, and customs contributed to Tpr. Moryc's harm by allowing Tpr. Antcliff and other male troopers' sexual abuse, discrimination, harassment, and retaliation to continue, thereby depriving Tpr. Moryc of her rights secured by the United States Constitution.

**ANSWER: Defendants deny for the reason that the allegation is untrue.**

456. Defendants' actions and inactions shock the conscience.

**ANSWER: Defendants deny for the reason that the allegation is untrue.**

138

457.    Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.[3]

**ANSWER:    Defendants deny for the reason that the allegation is untrue.**

**COUNT IV**
**Denial of Equal Protection**
**42 U.S.C. § 1983 and the**
**Fourteenth Amendment**
**(Defendants Grady, Brimacombe, Gee-Cram,**
**Hinz, Henke, Nemecek, Dillon, Darling,**
**Herr, Deasy, Williams, Bock, Sweeney, Fias,**
**Maki, Stephens, Buege, Davis, and Ziesman**
**in their individual capacities)**

458.    Tpr. Moryc incorporates by reference the allegations contained in the previous paragraphs.

**ANSWER:    Defendants likewise incorporate their previous responses.**

459.    Defendants are state actors and at all relevant times were acting under color of law.

**ANSWER:    Defendants admit.**

460.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

**ANSWER:    No response is required as this allegation contain a legal conclusion.**

---

[3] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

461.    As MSP Director, Col. Grady responsible for oversight of MSP and ensuring that MSP complied with its legal obligations.  He also supervised Lt. Col. Brimacombe.

**ANSWER:    No response is required as Defendant Grady and Defendant Brimacombe have been dismissed by the Court.**

462.    As MSP Deputy Director, Lt. Col. Brimacombe was responsible for oversight of MSP and ensuring that MSP complied with its legal obligations.  She also supervised Lt. Col. Hinz, Capt. Deasy, and Capt. Williams.

**ANSWER:    No response is required as Defendant Brimacombe was dismissed by the Court.**

463.    As MSP Human Resources Inspector, Gee-Cram was responsible for ensuring that MSP complied with its legal obligations.  She also supervised F/Lt. Brian Buege.

**ANSWER:    Defendant Gee-Cram admits that she supervised F/Lt. Brian Buege but Defendant Gee-Cram lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

464.    As Captain of the Sixth District and, later, Deputy Director of MSP's Field Services Bureau, Lt. Col. Hinz was responsible for oversight of the Sixth District and the Field Services Bureau and ensuring that MSP complied with its legal obligations.  He also supervised Capt. Nemecek, F/Lt. Sweeney, F/Lt. Fias, F/Lt. Maki, F/Lt. Stephens, Lt. Davis, and Sgt. Ziesman.

140

**ANSWER:      Defendant Hinz admits that as Captain of the Sixth District, he was responsible for the oversight of the Sixth District and supervised F/Lt. Fias, F/Lt. Maki, F/Lt. Stephens, Lt. Davis, and Sgt. Ziesman. Defendant Hinz further admits that as Lieutenant Colonel of Field Operations Bureau, he supervised all of the above except for Sweeney and denies that allegation as untrue.  Defendant Hinz lacks knowledge or information sufficient to form a belief as to the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

465.   As Commander of MSP's Special Investigation Division, Capt. Henke was responsible for oversight of the Special Investigations Division and ensuring that MSP complied with its legal obligations.  He also supervised Det. F/Lt. Dillon.

**ANSWER:      No response is required as Defendant Henke was never served and has been dismissed sua sponte by the Court.**

466.   As Commander of MSP's Sixth District, Capt. Nemecek was responsible for oversight of the Sixth District and ensuring that MSP complied with its legal obligations.  He also supervised F/Lt. Sweeney, F/Lt. Fias, F/Lt. Maki, F/Lt. Stephens, Lt. Davis, and Sgt. Ziesman.

**ANSWER:      Defendant Nemecek admits that as Captain of the Sixth District, he was responsible for oversight of the Sixth District and supervised F/Lt. Maki, F/Lt. Stephens, Lt. Davis, and Sgt. Ziesman but denies that he supervised F/Lt. Sweeney at any time and denies that he supervised F/Lt. Fias as Captain of the Sixth District for the reason that**

141

**those allegations are untrue.  Defendant Nemecek lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

467.    As Commander of MSP's First District Special Investigation Section, F/Lt. Dillon was responsible for oversight of the First District Special Investigation Section and ensuring that MSP complied with its legal obligations.  He also supervised Det. Lt. Darling.

**ANSWER:      No response is required as Defendant Dillon was dismissed by the Court.**

468.    As Assistant Section Commander of MSP's First District Special Investigation Section, F/Lt. Dillon was responsible for oversight of the First District Special Investigation Section and ensuring that MSP complied with its legal obligations.  He also supervised Det. Lt. Herr.

**ANSWER:      No response is required as Defendant Dillon was dismissed by the Court.**

469.    As Detective Sergeant of MSP's First District Special Investigation Section, Det. Sgt. Herr was responsible for ensuring that MSP complied with its legal obligations.

**ANSWER:      Defendant Herr lacks knowledge or information sufficient to form a belief as to the truth of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

470.    As Commander of MSP's Transparency and Accountability Division, Capt. Deasy was responsible for oversight of the Transparency and Accountability Division and ensuring that MSP complied with its legal obligations.  Capt. Deasy also supervised F/Lt. Bock.

**ANSWER:    Defendant Deasy admits that he was responsible for oversight of the Transparency and Accountability Division but lacks knowledge or information sufficient to form a belief as to the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5). Defendant Deasy admits he supervised F/Lt. Nicole Bock.**

471.    As Commander of MSP's Transparency and Accountability Division, Capt. Williams was responsible for oversight of the Transparency and Accountability Division and ensuring that MSP complied with its legal obligations. Capt. Deasy also supervised F/Lt. Bock.

**ANSWER:    No response is required as Defendant Williams has been dismissed by the Court.**

472.    As Lieutenant of MSP's Professional Standards Division, F/Lt. Bock was responsible for ensuring that MSP complied with its legal obligations.  She also supervised Spl/Lt. Tabaczka, Spl/Lt. Tuckey, and Spl/Lt. Pisha.

**ANSWER:    Defendant Bock admits that as a First Lieutenant of MSP's Professional Standards section, she supervised Spl/Lt. Tabczka, Spl/Lt. Tuckey, and Spl/Lt. Pisha but lacks knowledge or information sufficient to**

**form a belief as to the truth of the remainder of the allegation and**

**therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

473.   As Commander of the Lakeview Post, F/Lt. Sweeney was responsible for oversight of the Lakeview Post and ensuring that MSP complied with its legal obligations.  He also supervised all troopers within the Lakeview Post, including Tpr. Antcliff and other male troopers who sexually assaulted, harassed, discriminated, and retaliated against Tpr. Moryc.

**ANSWER:    No response is required as Defendant Sweeney was dismissed by the Court.**

474.   As Commander of the Lakeview Post, F/Lt. Fias was responsible for oversight of the Lakeview Post and ensuring that MSP complied with its legal obligations.  He also supervised all troopers within the Lakeview Post, including Tpr. Antcliff and other male troopers who sexually assaulted, harassed, discriminated, and retaliated against Tpr. Moryc.

**ANSWER:    No response is required as Defendant Fias was dismissed by the Court.**

475.   As Commander of the Lakeview Post, F/Lt. Maki was responsible for oversight of the Lakeview Post and ensuring that MSP complied with its legal obligations.

**ANSWER:    Defendant Maki admits that as Commander of the Lakeview Post, he was responsible for the oversight of the Lakeview Post but lacks**

**knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation.**

476. As Commander of the Lakeview Post, F/Lt. Stephens was responsible for oversight of the Lakeview Post and ensuring that MSP complied with its legal obligations.

**ANSWER:    No response is required as Defendant Stephens was dismissed by the Court.**

477. As Commander of MSP's Recruiting and Selection Section, F/Lt. Buege was responsible for oversight of the Recruiting and Selection Section and ensuring that MSP complied with its legal obligations.

**ANSWER:    Buege admits that when he was the Commander of MSP's Recruiting and Selection Section, he was responsible for the oversight of that section but lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation and therefore denies it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

478. As Assistant Post Commander of the Lakeview Post and Det. Lt. in the Sixth District, Lt. Davis was responsible for oversight of the Lakeview Post and ensuring that MSP complied with its legal obligations.  He also supervised all troopers within the Lakeview Post, including Tpr. Antcliff and other male troopers who sexually assaulted, harassed, discriminated, and retaliated against Tpr. Moryc.

**ANSWER:    No response is required as Defendant Davis was never served and was dismissed by the Court sua sponte.**

479.    As Squad Sergeant, Sgt. Ziesman was responsible for oversight of the Lakeview Post and ensuring that MSP complied with its legal obligations.  He also supervised all troopers within the Lakeview Post, including Tpr. Antcliff and other male troopers who sexually assaulted, harassed, discriminated, and retaliated against Tpr. Moryc.

**ANSWER:    No response is required as Defendant Ziesman was dismissed by the Court.**

480.    As an internal investigator, Spl/Lt. Horan was responsible for conducting ethical,   unbiased internal investigations and ensuring that MSP complied with its legal obligations.

**ANSWER:    No response is required as Defendant Horan has been dismissed by the Court.**

481.    Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to intermediate scrutiny.

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

482.    Defendants' discrimination against Tpr. Moryc on the basis of sex was not substantially or rationally related to any legitimate government interest.

**ANSWER:    Defendants deny that Moryc was discriminated against on any basis for the reason that the allegation is untrue.**

146

483.    Defendants, in their individual capacities and under color of law, subjected Tpr. Moryc to violations of her liberty and property interests by:

   a.  Knowingly allowing Tpr. Antcliff to supervise Tpr. Moryc even though he had a history of abusing and discriminating against women;
   b.  Failing to remove Tpr. Antcliff from a position of authority over subordinate female troopers who would be unlikely to complain about Tpr. Antcliff's conduct;
   c.  Failing to perform a thorough investigation into Tpr. Antcliff and other male troopers' improper conduct upon receiving complaints regarding their abuse;
   d.  Failing to thoroughly review and investigate all policies, practices, procedures, and training materials related to the circumstances surrounding the conduct of Tpr. Antcliff and other male troopers;
   e.  Failing to comply with the procedures and timelines outlined in their own internal policies, protocols, and orders;
   f.  Engaging in direct discrimination, retaliation, and harassment of Tpr. Moryc;
   g.  Failing to timely investigate and respond to Tpr. Moryc's complaints of sex discrimination, harassment, and retaliation;
   h.  Investigating a retaliatory complaint against her and disciplining her for it, while failing to investigate and/or discipline her similarly situated male colleagues for similar allegations;
   i.  Failing to ensure Tpr. Moryc was protected from retaliation;
   j.  Failing to remove themselves from involvement in investigations when appropriate   due to potential or actual bias;
   k.  Failing to ensure that the effects of sex discrimination against her were fully remedied; and
   l.  Failing to adequately train and supervise their staff with respect to responding to complaints of sex discrimination, harassment, and retaliation.

**ANSWER:    Defendants deny the allegation and all of its subparts for the reason that the allegations are untrue.**

484.    Defendants' discrimination against Tpr. Moryc on the basis of sex endangered her safety, privacy, security, and well-being.

**ANSWER:    Defendants deny that Moryc was discriminated against on any basis for the reason that the allegation is untrue.**

485.    Defendants' actions and inactions deprived Tpr. Moryc of her rights to equal dignity, liberty, and autonomy by treating her as a second-class citizen within MSP.

**ANSWER:    Defendants deny for the reason that the allegation is untrue.**

486.    Tpr. Moryc was denied MSP's protective services as a female victim of sex discrimination.

**ANSWER:    Defendants deny for the reason that the allegation is untrue.**

487.    This selective treatment was related to MSP's interest in covering up sexual misconduct and discrimination; in other words, this selective treatment was not substantially or rationally related to any legitimate government interest.

**ANSWER:    MSP denies the allegations for the reason that they are untrue.**

488.    It is clearly established that failing to properly investigate allegations of sex discrimination violates the Equal Protection clause.

**ANSWER:    No response is required as this allegation calls for a legal conclusion.**

489.    "A State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989).

**ANSWER:    No response is required as this allegation contains a legal conclusion.**

490.    Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity. *Pearson*, 555 U.S. at 231.

148

**ANSWER:**     **Defendants deny for the reason that the allegation is untrue.**

**COUNT V**
**Retaliation**
**42 U.S.C. § 1983 and the**
**First Amendment**
**(Defendants MSP, Grady, Brimacombe,**
**Gee-Cram, Hinz, Henke, Nemecek, Herr,**
**Deasy, Williams, Bock, Stephens, and Buege**
**in their individual capacities)**

491.    Tpr. Moryc incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

**ANSWER:**     **Defendants Gee-Cram, Hinz, Nemecek, Herr, Deasy, Bock, and Buege likewise incorporate their previous response.  No response from MSP is required as this claim was dismissed by the Court against MSP.**

492.    Defendants are state actors and at all relevant times were acting under color of law.

**ANSWER:**     **Defendants admit.**

493.    Tpr. Moryc made comments to WLNS 6 News as a private individual on a matter of public interest: dysfunction and corruption within MSP.

**ANSWER:**     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

494.    Whether speech by a public employee is protected depends on whether the speech was ordinarily within the course of his duties as a public employee, not whether it merely concerns those duties. *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345 (6th Cir. 2010).

**ANSWER:**    **No response is required as this allegation contains a legal**

**conclusion.**

495.    Tpr. Moryc's speech was protected by the First Amendment to the U.S.

Constitution as it was not ordinarily within the course of her duties as an MSP

employee.

**ANSWER:**    **Defendants lack knowledge or information sufficient to form**

**a belief as to the truth of the allegation and therefore deny it pursuant to**

**Federal Rule of Civil Procedure 8(b)(5).**

496.    After Tpr. Moryc spoke to WLNS 6 News, Defendants engaged in

retaliation against her including but not limited to:

  a. Terminating her employment;
  b. Failing to provide her with backpay owed to her due to MSP's wrongful
     withholding of health insurance premiums during a period when she
     was not insured by MSP;
  c. Overtaxing her;
  d. Failing to allow her to return to work;
  e. Terminating her employment;
  f. Interfering with her MCOLES investigation and expanding the scope
     beyond the August 2021-October 2024 period; and
  g. Making false statements about their knowledge of and involvement in
     the allegations included in the First Amended Complaint in the Eaton
     County Circuit Court matter *Moryc v. Michigan State Police.*

**ANSWER:**    **Defendants deny for the reason that the allegation and all its**

**subparts are untrue.**

497.    Defendants' retaliation was designed to silence Tpr. Moryc and prevent

her from further speaking out against MSP, which would likely prevent an ordinary

person from continuing to engage in the exercise of free speech.

**ANSWER:**    **Defendants deny for the reason that the allegation is untrue.**

150

498.   Defendants' retaliation has had a chilling effect that acts as a deterrent to free speech.

**ANSWER:    Defendants deny for the reason that the allegation is untrue.**

499.   Tpr. Moryc's protected speech was a motivating factor in Defendants' retaliatory actions.

**ANSWER:    Defendants deny for the reason that the allegation is untrue.**

500.   Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.  *Pearson*, 555 U.S. at 231.

**ANSWER:    Defendants deny for the reason that the allegation is untrue.**

**COUNT VI**
**State Created Danger**
**42 U.S.C. § 1983 and the**
**Fourteenth Amendment**
**(Defendants Hinz, Sweeney, Davis,**
**and Ziesman in their individual capacities)**

501.   Tpr. Moryc realleges and incorporates by reference the allegations contained in all prior paragraphs as if stated herein.

**ANSWER:    No response is required as this claim was dismissed by the Court.**

502.   Defendants are state actors and at all relevant times were acting under color of law.

**ANSWER:    No response is required as this claim was dismissed by the Court.**

503.    According to United States Constitution, the Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of the law."

**ANSWER:    No response is required as this claim was dismissed by the Court.**

504.    Defendants deliberately subjected Tpr. Moryc to the care and/or supervision of Tpr. Antcliff—a known sexual predator—regardless of Defendants' knowledge that Tpr. Antcliff could and would cause harm to Tpr. Moryc as a woman.

**ANSWER:    No response is required as this claim was dismissed by the Court.**

505.    Defendants' conduct and culpability is blatant and extreme.

**ANSWER:    No response is required as this claim was dismissed by the Court.**

506.    As a result of Defendants' decisions to not investigate prior complaints about Tpr. Antcliff; to avoid corrective measures following Tpr. Antcliff's abuse; and to keep Tpr. Antcliff employed at and in a supervisory role at MSP, Tpr. Moryc became the foreseeable and certain victim of sexual assault.

**ANSWER:    No response is required as this claim was dismissed by the Court.**

507.   Defendants' decisions deprived Tpr. Moryc of a safe workplace and constitute affirmative actions intended to cause and/or increase the risk of harm done to Tpr. Moryc, including any physical and emotional injuries.

**ANSWER:    No response is required as this claim was dismissed by the Court.**

508.   Defendants acted with willful disregard for Tpr. Moryc's safety and have breached their fiduciary duty to protect employees, like Tpr. Moryc, from harm, by placing Tpr. Moryc in the hands of a sexual predator and thereby allowing Tpr. Antcliff's sexual assaults to occur.

**ANSWER:    No response is required as this claim was dismissed by the Court.**

509.   Defendants provided Tpr. Antcliff—a known sexual predator—the abhorrent opportunity to sexually assault Tpr. Moryc.

**ANSWER:    No response is required as this claim was dismissed by the Court.**

510.   Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity. *Pearson*, 555 U.S. at 231.

**ANSWER:    No response is required as this claim was dismissed by the Court.**

**COUNT VII**
**Failure to Train and Supervise**
**42 U.S.C. § 1983 and the**
**First and Fourteenth Amendments**
**(Defendants Grady, Brimacombe, Gee-Cram,**
**Hinz, Henke, Nemecek, Dillon, Darling,**
**Deasy, Williams, Bock, Sweeney, Fias, Maki,**
**and Stephens in their individual capacities)**

511.    Tpr. Moryc incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

**ANSWER:    No response is required as this claim was dismissed by the Court.**

512.    Defendants are state actors and at all relevant times were acting under color of law.

**ANSWER:    No response is required as this claim was dismissed by the Court.**

513.    It is Defendants' ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives.

**ANSWER:    No response is required as this claim was dismissed by the Court.**

514.    These duties include specific responsibilities relative to identifying, reporting, and/or addressing sexual misconduct, harassment, and retaliation in MSP locations, activities, and/or premises.

**ANSWER:    No response is required as this claim was dismissed by the Court.**

515. Defendants failed to train and supervise their employees, agents, and/or representatives regarding the following duties:

a. Perceiving, reporting, and stopping inappropriate sex discrimination, harassment, and retaliation in the workplace;

b. Providing ready, diligent, and ongoing supervision over employees and other individuals;

c. Reporting suspected incidents of sex discrimination, harassment, and retaliation;

d. Properly investigating incidents of sex discrimination, harassment, and retaliation;

e. Establishing and ensuring the safety of all MSP employees;

f. Following MSP policies, procedures, orders, and state and federal law;

g. Providing a safe environment for all MSP employees, free from sex discrimination, harassment, and retaliation;

h. Properly training employees and agents to be aware of their individual duty to create and maintain a safe environment in MSP locations, activities, and/or premises;

i. Payroll, proper withholding of health insurance benefits, proper backpay reimbursement, and other basic accounting and human resource functions.

**ANSWER: No response is required as this claim was dismissed by the Court.**

516. Defendants failed to adequately train MSP employees on those duties, leading to Defendants' violations of Tpr. Moryc's constitutional rights.

**ANSWER: No response is required as this claim was dismissed by the Court.**

517.   This failure to train is the direct result of Defendants' deliberate indifference towards the well-being of its employees, including their physical, mental, and emotional health.

**ANSWER:    No response is required as this claim was dismissed by the Court.**

### COUNT VIII
### Injunctive Relief
### (Defendants Grady, Brimacombe, Gee-Cram, Williams, Nemecek, and Stephens in their individual capacities)

518.   Tpr. Moryc incorporates by reference the allegations contained in the previous paragraphs as if fully restated herein.

**ANSWER:    Defendants incorporate their previous responses.**

519.   Defendants' adverse actions against Tpr. Moryc were in direct response to her reports of sex discrimination, harassment, and retaliation, and her decision to speak out about corruption within MSP to WLNS 6 News.

**ANSWER:    Defendants deny for the reason that the allegation is untrue.**

520.   Defendants used their positions as high-level MSP administrators with power and influence over subordinate MSP employees to incite and encourage retaliation against Tpr. Moryc for her protected speech.

**ANSWER:    Defendants deny for the reason that the allegation is untrue.**

521.   Tpr. Moryc's right to free speech and expression under the law is one of which reasonable persons in these state officials' position would have known.

**ANSWER:**    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

522.    Tpr. Moryc is seeking immediate reinstatement to a full-time position at MSP.

**ANSWER:**    **No response is required as this allegation contains a request for relief.**

523.    Tpr. Moryc is also seeking an order enjoining MSP from interfering in any way with her MCOLES application, and from it considering anything beyond the August 2021 to August 2024 period with respect to her reinstatement.

**ANSWER:**    **No response is required as this allegation contains a request for relief.**

524.    Tpr. Moryc is also seeking an order that MSP immediately compensate her for the $8,500 it is unlawfully withholding from her for health insurance premiums during a period when she was not insured by MSP.

**ANSWER:**    **No response is required as this allegation contains a request for relief.**

525.    In the absence of such orders, Tpr. Moryc will continue to suffer irreparable injury.

**ANSWER:**    **Defendants deny for the reason that the allegation is untrue.**

526. Further, irreparable harm is presumed where 42 U.S.C. § 1983, 28 U.S.C. § 2201, and 5 U.S.C. §§702, 704, and 706 authorizes such relief to remedy the violations of Plaintiff's Constitutional rights.

**ANSWER: No response is required as this allegation contains a legal conclusion.**

527. The threatened injury to Tpr. Moryc outweighs any harm to Defendants.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

528. Such an injunction is not averse to public policy as the public has an interest in MSP not retaliating against employees who file complaints of sex discrimination, harassment, and retaliation, and who speak out publicly about corruption within MSP.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

529. Tpr. Moryc has no other adequate remedy at law to address the ongoing harm she is suffering.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and therefore deny it pursuant to Federal Rule of Civil Procedure 8(b)(5).**

## DAMAGES

530.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

**ANSWER:    Defendants likewise incorporate their previous responses.**

531.    As a direct and proximate result of the above-described conduct, Plaintiff suffered general, special, incidental, and consequential injuries and damages, past, present, and future, in excess of the jurisdictional threshold of this Court, an amount that shall be fully proven at the time of trial.  These past, present, and future damages include, but are not limited to, the following:

a.  Physical injury and suffering;
b.  Pain, suffering, mental, and emotional distress;
c.  Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, and humiliations;
d.  Loss of her constitutional rights;
e.  Loss of work, income, and employment opportunities;
f.  Damage to her professional reputation;
g.  Weight changes;
h.  Post-traumatic stress disorder;
i.  Anxiety;
j.  Depression;
k.  Sleep disturbances and nightmares;
l.  Hypervigilance;
m. Economic loss;
n.  Loss of the ordinary pleasures of everyday life;
o.  Loss of relationships;
p.  Travel and travel-related expenses;
q.  All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

**ANSWER:    Defendants deny for the reason that the allegation and all of its subparts are untrue.**

## AFFIRMATIVE DEFENSES

Defendants assert the following affirmative defenses under Fed. R. Civ. P. 8 :

1.     Some or all of Plaintiff's claims may be barred by sovereign immunity, governmental immunity, or other immunity granted by law.

2.     Defendants are entitled to qualified immunity as they did not violate any clearly established constitutional or statutory rights of Plaintiff.

3.     Plaintiff has failed to exhaust her contractual or administrative remedies available by agreement and/or by law.

4.     Plaintiff's claims are barred in whole or in part to the extent that Plaintiff failed to satisfy administrative prerequisites to filing suit, including but not limited to timely filing an administrative charge and/or timely filing suit after receiving notice of the right to sue.

5.     Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to properly exhaust administrative remedies as required by Title VII of the Civil Rights Act of 1964, including, but not limited to, failing to file a charge with the Equal Employment Opportunity Commission (EEOC) that encompasses the allegations contained in the complaint.

6.     The Court lacks jurisdiction over any allegations that fall outside the scope of Plaintiff's EEOC charge.

7.     Plaintiff has failed to state a claim upon which relief may be granted.

8.     The Court should decline to exercise jurisdiction over some or all of the Plaintiff's claims under the abstention doctrine recognized in *Colorado River*

*Conservation District v. Untied States* because parallel state proceedings concerning the same underlying dispute exist.

9.      This Court lacks subject-matter jurisdiction over some or all of Plaintiff's claims under the doctrine established in *Rooker v. Fidelity Trust Co.,* and the *District of Columbia Court of Appeals v. Feldman.*

10.      Plaintiff's claims are barred by the rule against claim splitting because Plaintiff has pursued or is pursing separate actions arising from the same transaction or occurrence underlying the claims asserted in this action.

11.      Plaintiff has failed to join necessary parties.

12.      Some or all of Plaintiff's losses and damages, if any, were caused by Plaintiff's own conduct or the conduct of third parties and not attributable to the Defendants.

13.      Some or all of Plaintiff's claims may be barred because they are moot.

14.      Some or all of Plaintiff's claims may be barred by res judicata/claim preclusion.

15.      Some or all of Plaintiff's claims may be barred by collateral estoppel/issue preclusion.

16.      Some or all of Plaintiff's claims may be barred by the applicable statute of limitations.

17.       Defendants reserve the right to claim some or all of Plaintiff's claims may be barred by the failure to mitigate damages if discovery reveals appropriate evidence.

161

18.     Defendants have legitimate, nondiscriminatory and nonretaliatory reasons for taking any alleged adverse action against Plaintiff that were not pretextual in nature.

19.     Plaintiff's claims and/or damages may be barred by the doctrine of after-acquired evidence due to her own misconduct.

20.     Plaintiff's sex was not a causal factor in any adverse employment actions.

21.     Plaintiff's claims may be subject to an arbitration agreement between the parties.

22.     There is no causal relationship between the losses alleged, if any, and any alleged wrongful acts or omissions by Defendants.

23.     Plaintiff's claims are barred in whole or in part by release, waiver, judicial estoppel, and accord and satisfaction.

24.     Some of or all of Plaintiffs' claims are moot.

25.     Any damages recoverable by Plaintiff must be reduced by the doctrines of set-off and/or recoupment for amounts owed to one or more Defendant arising out of the same transactions or related conduct.

26.     Defendants reserve the right to assert additional affirmative or other defenses pending completion of discovery.

**Wherefore, Defendants respectfully request that this Court deny Plaintiff's request for relief, dismiss this and all other claims, and grant any other appropriate relief to Defendants.**

## RELIANCE ON JURY DEMAND

Defendants by counsel, hereby relies on Plaintiff's demand for a trial by jury in the above cause.

Respectfully submitted,

/s/ *Mary A. Waddell*
Mary A. Waddell
Assistant Attorney General
Attorney for Defendants
MI Dep't of Attorney General
State Operations Division
P.O. Box 30754
Lansing, MI  48909
517.335.7573
waddellm1@michigan.gov
P70545

Dated:  March 20, 2026

## CERTIFICATE OF SERVICE

I certify that on March 20, 2026, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system, which will provide electronic copies to counsel of record, and I certify that my secretary has mailed by U.S. Postal Service the papers to any non-ECF participant.

/s/ *Mary A. Waddell*
Mary A. Waddell
Assistant Attorney General
Attorney for Defendants
State Operations Division

2025-0444648-A